**MARC P. BERGER (NY Bar No. 3005275)**
**SANJAY WADHWA (NY Bar No. 2837151)**
**SHELDON L. POLLOCK (NY Bar No. 4023024)**
**JOHN O. ENRIGHT (NY Bar No. 4461893)**
**JOSEPH P. CEGLIO (Cal. Bar No. 225251)**

**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**200 Vesey Street, Suite 400**
**New York, NY 10281-1022**
**Tel: (212) 336-1100**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

--------------------------------------------------------------------:

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : |
| | :     **'18 CV 1530 BEN JLB** |
| **Plaintiff,** | : |
| | : |
| **- against -** | :     **COMPLAINT** |
| | : |
| **GANNON GIGUIERE,** | : |
| **OLIVER-BARRET LINDSAY,** | : |
| **ANDREW HACKETT,** | : |
| **KEVIN GILLESPIE, and** | : |
| **ANNETTA BUDHU,** | : |
| | :     **DEMAND FOR** |
| **Defendants.** | :     **JURY TRIAL** |
| | : |

--------------------------------------------------------------------:

Plaintiff Securities and Exchange Commission ("Commission") for its Complaint against Defendants Gannon Giguiere ("Giguiere"), Oliver-Barret Lindsay ("Lindsay"), Andrew Hackett ("Hackett"), Kevin Gillespie ("Gillespie"), and Annetta Budhu ("Budhu" and, together, "Defendants") alleges as follows:

### SUMMARY OF THE ALLEGATIONS

1.     This case concerns a series of fraudulent schemes conducted by the Defendants in the common stock of three penny-stock issuers—Kelvin Medical, Inc. ("KVMD"), Arias Intel

Corp. (f/k/a First Harvest Corp.) ("ASNT"), and Eco Science Solutions, Inc. ("ESSI")—between approximately December 2015 and March 2018 (the "Relevant Period").

2.      The three fraudulent schemes netted more than $10 million in illicit proceeds.

**Scheme #1 - KVMD**

3.      The first scheme concerned KVMD, a purported medical-device business. Beginning in approximately June 2016, Giguiere, a stock promoter and KVMD's undisclosed control person, caused KVMD to issue three million shares of its common stock to one of his associates, who in turn sold two tranches of 1.5 million shares to each of two nominee entities he and Lindsay, the owner and operator of a Cayman Islands-based broker-dealer, controlled.

4.      Giguiere deposited one tranche of 1.5 million shares into a U.S. brokerage account he opened in the name of his nominee, and Lindsay deposited the second tranche of 1.5 million shares into an account in the name of his nominee at his Cayman Islands broker-dealer.

5.      Between November 29, 2017 and January 26, 2018, Giguiere, Lindsay, and an associate conducted a matched trading scheme in KVMD's stock, whereby they coordinated Giguiere's sales of his 1.5 million shares of KVMD to Lindsay, who was buying those shares in his own brokerage accounts and customer accounts at his Cayman Islands broker-dealer.

6.      Unbeknownst to Giguiere and Lindsay, the associate with whom they conducted the scheme was a witness cooperating with the Federal Bureau of Investigation ("FBI"), who was recording their phone calls and preserving their encrypted email and text message communications.

7.      By January 26, 2018, as a result of their scheme, Giguiere and Lindsay had netted approximately $1.57 million in proceeds and had increased KVMD's share price from zero to $1.20.

8.      Soon thereafter, Giguiere began promoting KVMD's stock on TheMoneyStreet.com ("TheMoneyStreet"), a stock promotion website he controlled, in anticipation of his and Lindsay's sales of their second tranche of 1.5 million shares of KVMD into the buying volume generated by the promotion.

9.      Giguiere and Lindsay's plan to liquidate the second tranche of 1.5 million shares was stymied, however, on March 19, 2018, when the Commission suspended trading in KVMD's securities for a period of ten business days.

**Scheme #2 - ASNT**

10.      The second fraudulent scheme concerned ASNT, a purported digital media company.

11.      In early 2017, Gillespie, ASNT's chief executive officer, Budhu, a purported adviser to the company, and Hackett, a purported lender to ASNT, began laying the groundwork for a "pump and dump" of ASNT's stock.[1]

12.      In February 2017, Gillespie caused ASNT to enter into a purported "Advisory Agreement" with Budhu, under which she was paid 200,000 shares of ASNT stock for her "consulting services." ASNT issued the stock to Budhu in March 2017, and in August 2017 she sold the shares to Hackett at a significant premium to its then trading price.

13.      Gillespie then caused ASNT to issue to Hackett a sham $300,000 convertible promissory note that would allow Hackett to convert the debt into 750,000 shares of ASNT stock. The group planned to have Hackett ultimately sell these 950,000 shares in connection with the pump and dump and then split the proceeds among the group's members.

14.      In October 2017, the group approached the cooperating witness about promoting ASNT's stock on TheMoneyStreet in connection with their planned pump and dump. Unbeknownst to them, the cooperating witness was recording their phone calls and preserving the encrypted email and text message conversations that they sought to hide from, among others, law enforcement.

---

[1]      In a "pump and dump" scheme, a group of individuals who control the "free trading" shares of an issuer with a thinly-traded stock, also referred to as the issuer's "float," inflate the issuer's share price and trading volume through, among other things, engaging in wash and matched trading, issuing false or misleading press releases, and paying for stock promotions. When the issuer's share price reaches a desirable level or target price, the individuals "dump" their shares into the buying volume generated during the "pump" phase for substantial financial gain.

15.     In December 2017, after he ultimately declined to promote ASNT, the cooperating witness introduced Hackett to an individual claiming to be the ringleader of a network of corrupt stockbrokers who would buy stock that Hackett was selling in the open market in their customers' accounts—and without their customers' knowledge—in exchange for a 30% kickback.  Unbeknownst to Hackett, the purported ringleader of the corrupt broker network was an undercover FBI agent ("UC").

16.     Hackett agreed, and between December 22, 2017 and January 12, 2018 he sold more than 14,000 shares of ASNT in matched trades with the UC that he coordinated with the cooperating witness in recorded phone calls and preserved encrypted text messages.

### Scheme #3 - ESSI

17.     The third fraudulent scheme concerned ESSI, a purported technology company focused on the cannabis industry.

18.     Beginning in December 2015, Giguiere, who was acting as the company's undisclosed control person, arranged for a transfer of control of ESSI to two nominal officers.

19.     Giguiere then caused the company to enter into an agreement with one of his nominee entities, under which the nominee entity promoted ESSI's stock on TheMoneyStreet. In exchange, ESSI paid the nominee entity millions of purportedly free trading shares of ESSI stock that the company issued pursuant to two faulty Form S-8 registration statements.

20.     Throughout 2016 and into January 2017, Giguiere liquidated the shares of ESSI stock paid to his nominee entity while he was concurrently promoting ESSI's stock on TheMoneyStreet without adequately disclosing to investors his active liquidation of his own shares.  As a result of the scheme, Giguiere earned more than $8.5 million in illicit proceeds.

### VIOLATIONS

21.     As a result of the foregoing conduct and as alleged further herein, Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

22.     Unless Defendants are permanently restrained and enjoined, they will again engage in the acts, practices, transactions, and courses of business set forth in this Complaint and in acts, practices, transactions, and courses of business of similar type and object.

## JURISDICTION AND VENUE

23.     The Commission brings this action pursuant to authority conferred by Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], seeking a final judgment:  (a) restraining and permanently enjoining Defendants from engaging in the acts, practices, and courses of business alleged against them herein; (b) ordering Defendants to disgorge any ill-gotten gains and to pay prejudgment interest on those amounts; (c) imposing civil money penalties on Defendants pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (d) imposing penny-stock bar orders against the Defendants under Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)]; and (e) imposing permanent officer-and-director bar orders against Giguiere and Gillespie pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C.§ 78u(d)(2)] as a result of the violations alleged in this Complaint.

24.     This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].

25.     Defendants have, directly or indirectly, singly or in concert, made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails.

26.     Venue lies in this District under Section 27 of the Exchange Act [15 U.S.C. § 78aa] because many of the acts, practices, events, transactions, communications, courses of business, and other matters alleged herein occurred in the Southern District of California.  For example, during the relevant time period, the Defendants communicated with the

UC by telephone, email, and text message, all while the UC was located in the Southern District of California.  In addition, the UC placed orders to buy ASNT stock while located in the Southern District of California.

## DEFENDANTS

27.     **Giguiere**, age 46, resides in Newport Coast, California.  Giguiere has never been registered with the Commission and he holds no securities licenses.  Giguiere owns and operates TheMoneyStreet, a stock promotion website.  Giguiere is also the undisclosed control person of ESSI and KVMD.

28.     **Lindsay**, age 43, is a Canadian citizen who resides in Grand Cayman, Cayman Islands.  Lindsay has never been registered with the Commission and he holds no U.S. securities licenses.  Lindsay is the principal of CMGT Capital Management ("CMGT"), a Cayman Islands-exempt broker-dealer registered with the Cayman Islands Monetary Authority.

29.     **Hackett**, age 29, is a dual U.S.-Canadian citizen who resides in Toronto, Canada.  Hackett has never been registered with the Commission and he holds no securities licenses.

30.     **Budhu**, age 53, resides in New York, New York.  Budhu has never been registered with the Commission and she holds no securities licenses.  Budhu is a purported adviser to ASNT.

31.     **Gillespie**, age 49, resides in Lutz, Florida.  Gillespie has been a registered representative since May 1995.  He is currently associated with, and is a part owner of, a broker-dealer registered with the Commission since 2000.  Gillespie holds Series 7, 24, and 63 securities licenses.  Gillespie is the chief executive officer of ASNT.

## OTHER RELEVANT ENTITIES

32.     **KVMD** is a Nevada corporation with a principal place of business in Nevada City, California.  KVMD purports to be in the medical-device business.  KVMD is a reporting company with a class of securities registered under Section 12(g) of the Exchange Act [15 U.S.C. § 78l(g)].  During the relevant time period, KVMD's common stock was a "penny

stock" as defined in Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)] and Exchange Act Rule 3a51-1 [17 C.F.R. § 240.3a51-1]. On March 19, 2018, the Commission suspended trading in KVMD's securities for ten business days because of concerns about the accuracy and adequacy of information about KVMD's securities in the marketplace and potentially manipulative transactions in KVMD's common stock. KVMD's shares are quoted on OTC Link, operated by OTC Markets Group, Inc. ("OTC Markets"), under the ticker symbol KVMD.[2]

33.     **ASNT** is a Nevada corporation with a principal place of business in Tampa, Florida. ASNT purports to be a digital media company with a focus on the cannabis industry. ASNT is a reporting company with a class of securities registered under Section 12(g) of the Exchange Act [15 U.S.C. § 78l(g)]. During the relevant time period, ASNT's common stock was a "penny stock" as defined in Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)] and Exchange Act Rule 3a51-1 [17 C.F.R. § 240.3a51-1]. ASNT's shares are quoted on OTC Link, operated by OTC Markets, under the ticker symbol ASNT.

34.     **ESSI** is a Nevada corporation with a principal place of business in Makawao, Hawaii. ESSI purports to be a technology company focused on the cannabis industry. ESSI is a reporting company with a class of securities registered under Section 12(g) of the Exchange Act [15 U.S.C. § 78l(g)]. During the relevant time period, ESSI's common stock was a "penny stock" as defined in Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)] and Exchange Act Rule 3a51-1 [17 C.F.R. § 240.3a51-1]. On May 19, 2017, the Commission suspended trading in ESSI's securities for ten business days because of concerns about the accuracy and adequacy of information in the marketplace about ESSI's business. ESSI's shares are quoted on OTC Link, operated by OTC Markets, under the ticker symbol ESSI.

---

[2]     OTC Link is an electronic inter-dealer quotation system that displays quotes from broker-dealers for many over-the-counter securities. OTC Link is registered with the Commission as a broker-dealer and as an alternative trading system and is a member of the Financial Industry Regulatory Authority.

## FACTS

**A.    The KVMD Scheme**

*Giguiere Obtains 1.5 Million Shares of KVMD Stock in Anticipation of His and Lindsay's Market Manipulation Scheme*

35.    On August 1, 2016, KVMD, a purported medical-device business, filed a Form S-1 registration statement with the Commission that, as amended, sought to register thirty million shares of its common stock ("S-1").

36.    The S-1 disclosed, among other things, that KVMD had entered into a Consulting Agreement dated June 1, 2016 with S-1 Services LLC ("S-1 Services"), a purported consultant "in the business of assisting private companies in the process of going public and getting listed on the OTC Markets through the Form S-1 Registration."

37.    The S-1 further disclosed that KVMD had paid S-1 Services three million shares of its restricted common stock as payment for S-1 Services' assistance in preparing and filing the S-1.

38.    The S-1 did not disclose that S-1 Services was an entity recently formed by a lawyer and associate of Giguiere's ("Lawyer-1"), or that Giguiere had arranged for KVMD to enter into the Consulting Agreement with S-1 Services as a means by which Giguiere could obtain control of the three million shares for his and Lindsay's benefit.

39.    On October 23, 2017, Giguiere caused Lawyer-1 to have S-1 Services enter into a Stock Purchase Agreement with Phenix Ventures LLC ("Phenix"), a nominee entity Giguiere

owned and controlled.[3]  Under the terms of the Stock Purchase Agreement, S-1 Services agreed to sell Phenix 1.5 million restricted shares of KVMD for $30,000, or $0.02 per share.

40.     On November 3, 2017, Giguiere deposited the 1.5 million shares of restricted KVMD shares into a brokerage account he had recently opened in Phenix's name.

41.     In connection with that deposit, Giguiere signed a "Rule 144 Seller's Representation Letter – Non-Affiliate" dated October 25, 2017, in which he knowingly, or at least recklessly, falsely stated that he was not an affiliate of KVMD.

42.     In reality, and as described below, Giguiere was an "affiliate" of KVMD for purposes of Rule 144 of the Securities Act of 1933 because he controlled KVMD's entire public float and he had the ability to direct KVMD to take certain corporate actions, including the filing of an 8-K with the Commission announcing the company's change in business.

43.     Giguiere similarly caused Lawyer-1 to sell a second tranche of 1.5 million shares of KVMD owned by S-1 Services to Cataleya Capital ("Cataleya"), a nominee entity Lindsay owned and controlled.  On December 5, 2017, Lindsay deposited those shares in an account in the name of Cataleya that he had opened at CMGT.

***From November 2017 to January 2018, Giguiere and Lindsay Match Trades in KVMD's Stock, Causing Its Share Price to Increase to $1.20***

44.     KVMD's common stock began trading on November 29, 2017 when Giguiere began selling his shares to Lindsay in predetermined and coordinated trading.

45.     From November 29, 2017 to January 16, 2018, Giguiere and Lindsay engaged in a matched trading scheme to create a misleading appearance of active trading in KVMD's stock, to increase the price of KVMD stock, and to induce investors to buy KVMD stock.

---

[3]     A "nominee" in this context refers to a person or entity into whose name securities or money is transferred to facilitate transactions like stock sales while seeking to mask the identity of the beneficial owner of the securities or money.

46.     Giguiere and Lindsay coordinated their trading with the cooperating witness in telephone calls and encrypted text message chats in which they agreed to place, respectively, sell and buy orders of KVMD stock in substantially the same size, at substantially the same time, and at substantially the same price.

47.     For example, on November 30, 2017, Giguiere wrote to Lindsay in an encrypted message, "I suggest 1500 to 2000 shares a day in KV at .55 and I will just have a large offer there showing min [sic] for the next 5 to 7 trading days . . . let's let a week go by right here with a little volume and at this price . . . then we can move it . . . need the company to put out some press."  Lindsay replied, "Yes.  Good plan."

48.     Similarly, on December 8, 2017, Giguiere wrote in an encrypted message, "KVMD Gameplan for the day? . . .  As I would think it is time for some volume."

49.     And again, on December 15, 2017, Lindsay told Giguiere, "I have at least 30k shares to buy today."  Giguiere responded, "Let's do 10,000 at .95 and 20000 at 1.00 . . . and then tomorrow we can move to 1.05."

50.     Giguiere and Lindsay coordinated their trading in phone calls and in encrypted text messages in an effort to hide their conduct from law enforcement.  Indeed, in a December 8, 2017 phone call with the cooperating witness, Lindsay admitted, "I'm a little hesitant about typing all of these details into this app. . . . You can just imagine if it finds its way somewhere *it's fairly incriminating*" (emphasis added).

51.     Similarly, Lindsay told the cooperating witness in a December 20, 2017 phone call, "I just mentioned to Gannon that some of these text messages look, just like, really evil.  I'd rather just pick up the phone . . . .  [W]hen he starts saying, hey, do you think you can you finish it green, I'm like, fuck!"

52.     By January16, 2018, Giguiere had sold Phenix's 1.5 million shares of KVMD in the open market, most of which was purchased by Lindsay in accounts he controlled at CMGT, earning approximately $1.57 million in proceeds.

53.     Giguiere and Lindsay's matched trading dominated the public market for KVMD stock.  From November 29, 2017 to January 16, 2018, their trading constituted, on average, more than approximately 79% of KVMD's total trading volume on days that the stock traded.

### Giguiere Causes KVMD to Issue a Misleading Form 8-K with the Commission, and Giguiere Begins Promoting KVMD's Stock on TheMoneyStreet

54.     On January 18, 2018, Giguiere caused KVMD to issue a Form 8-K with the Commission announcing purported changes in the company's business plan, including "evolv[ing] into an early stage telehealth wearable technology company."

55.     The Form 8-K went on to state that KVMD was "focused on developing and launching next generation telehealth wearable technologies," and that it intended to "leverage artificial intelligence and machine learning combined with the latest advancements in monitoring and therapeutic delivery technologies to increase the recovery and performance of the body."

56.     In fact, KVMD's principals had taken no steps—and lacked the resources—to become a "wearable technology company" or to "leverage artificial intelligence."  Indeed, when Giguiere presented the Form 8-K to KVMD's nominal chief executive officer, the chief executive officer told Giguiere that it sounded good, but he had no idea what it all meant.

57.     On or about January 29, 2018, Giguiere began promoting KVMD's stock on TheMoneyStreet in an article titled "Can Machine Learning Actually Predict Therapeutic Results?"

58.     The article claimed, among other things, that TheMoneyStreet was "diving into the consumer sports and active lifestyle therapy market, specifically the sub-sector of combined

fitness tracking, artificial intelligence and therapeutic treatment" and that it had identified KVMD as "[o]ne such Company perfectly positioned to take advantage of this fast-growing category."

59.     The article then recommended investing in KVMD:

> [W]e believe that the investment opportunity is right now.  And you can't play if you aren't in the game.  Given Kelvin Medical's (OTC: KVMD) current share price, we believe that a double or triple share price value is not out of the question.  But like we always say, YOU MUST OWN KVMD in order to ride its growth.  So HURRY up and do your own research on Kelvin Medical, and make sure to show this information to your broker.

60.     Notably, the article did not disclose that Giguiere owned and controlled TheMoneyStreet, that Giguiere was a control person of KVMD, that Giguiere had caused KVMD to issue a dubious Form 8-K, that Giguiere and Lindsay's matched trading had increased KVMD's share price from zero to $1.20, or that he and Lindsay were intending to sell additional shares of KVMD they controlled into the buying volume they hoped to generate through this promotion.

61.     Indeed, by March 12, 2018, Giguiere and Lindsay had begun selling the second tranche of 1.5 million shares of KVMD held in the name of Cataleya at CMGT.

62.     In a phone call on March 13, 2018, Giguiere and Lindsay agreed to a plan to sell those shares at a predetermined price of "between a dollar fifty and a dollar seventy," with Giguiere suggesting that "I think if we're pretty astute with how we do this we can probably be done in about twenty trading days . . . and then we'll let the price appreciate into that low two dollar mark naturally."

63.    Giguiere also told Lindsay in the same call that he was in the process of obtaining an additional three million shares from the company that they could then begin selling.  Lindsay concurred in the plan.

64.    From March 12 to March 16, 2018, KVMD's share price increased, and its trading volume almost tripled, closing at a high of $1.70 on March 15 and $1.55 on March 16, 2018, more than a 31% increase from a closing price of $1.18 on March 9.

65.    On March 19, 2018, the Commission issued an order suspending trading in KVMD's securities for ten business days, citing concerns about the accuracy and adequacy of information about KVMD's securities in the marketplace and potentially manipulative transactions in KVMD's common stock.

**B.    The ASNT Scheme**

*Background*

66.    ASNT was incorporated on February 27, 2013 as American Riding Tours, Inc., a shell company that, according to its filings with the Commission, planned to become a provider of "on-road" motorcycle tours of Nevada.

67.    On or about March 1, 2016, Budhu brokered ASNT's then-sole officer and director's sale of (a) three million control shares of ASNT's common stock and (b) 200,000 shares of ASNT's preferred convertible stock to Gillespie for approximately $166,000.  As a result, Gillespie became ASNT's majority shareholder.

68.    On June 7, 2016, Gillespie was appointed ASNT's president, chief executive officer, and the chairman of its board of directors.

69.    On February 10, 2017, Gillespie caused ASNT to consummate a reverse merger in which Cannavoices, Inc., a private company Gillespie controlled, was merged into the ASNT

shell.  As a result, Cannavoices' shareholders exchanged their shares of Cannavoices for shares of ASNT.

### *Gillespie, Budhu, and Hackett Enter Into a Series of Agreements as a Means to Transfer ASNT Stock to Hackett to Sell in an Anticipated Pump-and-Dump Scheme*

70.     On February 10, 2017, Gillespie caused ASNT to enter into a purported "Advisory Agreement" with "Annetta Budhu/Baywall Inc.," pursuant to which Budhu was obligated to provide various "consulting services," including "third party introductions," to ASNT in exchange for 200,000 shares of ASNT's common stock.

71.     Accordingly, on or about March 15, 2017, Gillespie caused ASNT's transfer agent to issue 200,000 restricted shares of ASNT's common stock to Budhu's nominee Baywall Inc. ("Baywall") as payment for her purported "consulting services" under the Advisory Agreement.

72.     On August 8, 2017, Baywall entered into a Share Purchase Agreement with Hackett's nominee FreeLife Investments, Inc. ("FreeLife"), under which Baywall sold the 200,000 shares of ASNT common stock it had previously been issued to FreeLife for $5,000, or $0.025 per share.

73.     FreeLife's purchase price of $0.025 per share was at a 136 times premium to ASNT's stock's closing price that day of $3.40 per share.

74.     To effect Baywall's sale of the 200,000 shares to FreeLife, ASNT's transfer agent required both entities to execute "Seller's Representation Letters" in connection with the transaction.

75.     Both Budhu and Hackett made materially false misrepresentations in the Seller's Representation Letters they executed and emailed on behalf of Baywall and FreeLife, respectively, to ASNT's transfer agent.

14

76.    Budhu falsely represented and warranted in Baywall's letter, among other things, that she was "not acting in concert with any person in selling the shares" and that she had "not engaged in a plan with anyone else to dispose of the Shares."  Budhu knew, or was at least reckless in not knowing, that this statement was materially false and misleading because she was in fact acting in concert with Hackett and Gillespie to have Hackett ultimately sell the shares in a pump and dump of ASNT's stock and then split the proceeds among themselves.

77.    Hackett falsely represented and warranted in FreeLife's letter that "I am not aware of any material, non-public information about the Company."  Hackett knew, or was at least reckless in not knowing, that this statement was materially false and misleading because he was aware of material non-public information about ASNT, including that he intended to sell the shares for his, Gillespie's, and Budhu's joint benefit in connection with a pump and dump that they were planning.

78.    On August 2017, Gillespie and Hackett took steps to provide Hackett with an additional 750,000 shares of ASNT stock to sell in connection with the planned pump and dump.

79.    On August 10, 2017, Gillespie caused ASNT to issue to FreeLife a convertible promissory note in a principal amount of $300,000, and with an option to convert the debt into ASNT's common stock at $0.40 per share.  Upon conversion of the entire principal amount, then, FreeLife would be entitled to 750,000 shares of ASNT stock (i.e., 300,000/.40 = 750,000).

80.    Notwithstanding that the principal amount of the note was $300,000, on August 9, 2017 Hackett caused FreeLife to wire only $4,990 to a bank account beneficially owned and controlled by Gillespie.  Upon information and belief, that payment was the only payment FreeLife made to purchase the $300,000 convertible promissory note from ASNT.

***Budhu, Gillespie, and Hackett Agree with the Cooperating Witness to Promote ASNT's Stock on TheMoneyStreet in Connection with Their Planned Pump and Dump***

81.     From October 31 to at least December 12, 2017, Budhu, Gillespie, and Hackett agreed to a scheme in which the cooperating witness would promote ASNT's stock on TheMoneyStreet in an effort to generate investor interest and trading volume into which Hackett would sell the shares obtained by FreeLife as discussed above, and then split the proceeds with the group.

82.     On October 31, 2017, an associate of the cooperating witness ("Associate 1") first introduced Budhu to the cooperating witness by phone to discuss the cooperating witness's promotion of ASNT's stock on TheMoneyStreet.

83.     In that call, Budhu explained, among other things, that "they," i.e., the group, had 300,000 shares "with a 4a1 opinion that [Gillespie] owns and are free trading," and that those shares are "available to do something with."

84.     Budhu further explained that Hackett would have 750,000 shares upon conversion of the convertible promissory note and that "I have shares I own that I gave to Andrew."

85.     On November 1, 2017, Budhu forwarded to Associate 1's encrypted email account copies of ASNT's shareholder list and documents from the Depository Trust & Clearing Corporation showing at which broker-dealers ASNT's shareholders' shares were being held.

86.     In a call that day, Associate 1 asked Budhu, in substance to looks through those documents to identify "the big block" and let him know which ones were "friendly that we can . . . ."  Budhu then finished Associate 1's sentence, saying "have access to . . . very good."

87.     Also that day, Gillespie emailed to Budhu a screenshot of a document titled "Arias Intel Corp. Press Release Schedule" that listed the titles of ASNT's expected press

16

releases, including a release titled "Arias announces the launch of it [sic] social gaming app in the US." Budhu in turn forwarded the file to the cooperating witness's encrypted email account.

88.     On a November 6, 2017 group call, Gillespie explained to Budhu, Hackett, the cooperating witness, and Associate 1 that ASNT, which was then known as First Harvest Corp., would change its name in days and that the name change would then trigger the company's issuances of press releases.

89.     Gillespie agreed with the cooperating witness that, in order to generate investor interest in ASNT's stock, the issuances of the press releases would need to go "hand in hand" with the promotion on TheMoneyStreet.

90.     During that same call, Gillespie agreed that he would sell 300,000 shares of ASNT to the cooperating witness and Associate 1, who in turn could sell the shares and split the proceeds with the group. In response, Associate 1 told the group that he could create a bogus services contract to justify the sale.

91.     On December 9, 2017, in a phone call with Budhu, Hackett, and the cooperating witness, the group discussed setting a target price of $5.00 per share for ASNT's stock, agreeing that Hackett would not begin selling the shares on behalf of the group until that target price was reached.

92.     The group then discussed coordinating their planned trading and promotion over a particular encrypted text messaging application. Budhu interrupted them, saying that that particular app was "not good," and instead suggested using one of two other encrypted text messaging apps.

93.     On December 12, 2017, Gillespie told the cooperating witness in a phone call that he had seven to eight press releases ready to "put out quickly" to generate interest in ASNT's

17

stock, that he'd "space them over a few weeks," and that he thought they would have a "large impact on the stock."  He then confirmed that he had his "deal worked out with Annetta and Andrew and we're happy about that," that he was using one of the encrypted text messaging apps Budhu had suggested, and that he was looking forward to "a long and mutually beneficial relationship."

### Hackett Engages in a Matched Trading Scheme in ASNT with the UC

94.    From December 22, 2017 to January 12, 2018, Hackett engaged in a matched trading scheme in which he sold more than 14,400 shares of ASNT stock to the UC.

95.    Hackett believed that the UC's network of corrupt stockbrokers would be buying his shares in their customers' accounts unbeknownst to the customers and in exchange for a 30% kickback from Hackett.  For example, on December 20, 2017 the cooperating witness told Hackett in a phone call that the UC would start "working on his network" and that he got the UC to agree to "put this paper [i.e., stock] away with his crew for 30% commis[sion] . . . which means his take is nothing—he's got to pay all these brokers and fund managers most of that . . . to put this away."

96.    Hackett engaged in the scheme to liquidate his holdings and to create a misleading appearance of active trading in ASNT.

97.    Hackett coordinated his trading with the UC in phone calls and encrypted text message chats with the cooperating witness, in which he agreed to place sale orders of ASNT in substantially the same size, at substantially the same time, and at substantially the same prices at which he understood the UC was placing his buy orders.

98.    For example, on December 22, 2017, Hackett coordinated his trading with the cooperating witness in a series of encrypted text messages.  Hackett began, "We are good to go

on asnt if we have trades," to which the cooperating witness responded, "Are you ready to plug a trade[?]"  Hackett responded "Yes 2.06."

99.     The cooperating witness then wrote, "Ok.  One last time.  My guy gonna go in and buy 4000 shares at 2.06.  It's all you[rs].  Correct.  I just need you to say yes.  And my guy will go buy it."  Hackett responded, "Yes," and the cooperating witness then confirmed, "I believe u got 3900 at 2.05 backprint.  Please confirm."  Hackett confirmed, "3900 asnt filled at 2.06."

100.    The cooperating witness then asked, "U want me to tell him to try to do the whole 160k?," that is, the rest of the 160,000 shares of ASNT that Hackett still owned, to which Hackett responded, "Yes!!!!"

101.    On January 4, 2018, Hackett paid the UC his 30% kickback for the trades they executed on December 22, 2017.  Specifically, Hackett wired $2,875 from a Canadian bank account he controlled in the name of FreeLife to a bank account controlled by the UC in the United States.

102.    Similar to the December 22, 2017 trades, Hackett and the cooperating witness discussed additional matched trading in ASNT on January 8, 2018.

103.    The cooperating witness began by explaining to Hackett that the UC's corrupt stockbrokers were a little nervous about buying ASNT when its trading volume was low because the trades could attract the scrutiny "from the alphabet crew," a reference to law enforcement. Hackett affirmed that he understood.

104.    As a result, the cooperating witness asked if Hackett could have the company issue "news," to which Hackett agreed that company news would make the brokers' files "stronger"—that is, the brokers could point to the news as justification for buying the stock in

their customers' accounts.  The cooperating witness then told Hackett, in substance, that if "the abc crews come around, you know, nobody needs to worry about orange jump suits, you know what I'm saying," to which Hackett replied, "yeah."

105.    On January 8, 9, and 10, 2018, Hackett placed orders to sell 4,000 shares each day in an effort to match trades with the UC.  On January 12, 2018, Hackett placed an order to sell 2,200 shares of ASNT in an effort to match trades with the UC.

106.    Later on January 12, 2018, the cooperating witness sent an encrypted email to Hackett and the UC attaching a spreadsheet with an accounting of their matched trades and the kickback paid on January 4, 2018.  After the UC thanked Hackett for his prompt payment, Hackett, said "No problem[.]  I send funds out as quick as possible."

107.    On January 16, 2018, Hackett paid a 30% kickback to the UC for his January 8-10, 2018 trades by wiring $9,620 from a Canadian bank account he controlled in the name of FreeLife to a bank account controlled by the UC in the United States.

108.    Because the cooperating witness ultimately did not promote ASNT on TheMoneyStreet, the group was unable to accomplish its goal of conducting a pump and dump of ASNT's stock.

### C.    The ESSI Scheme

***Giguiere Obtains Control of ESSI and Causes the Company to Enter Into an Agreement with His Nominee to Promote ESSI's Stock on TheMoneyStreet***

109.    On December 17, 2015, ESSI filed a Form 8-K with the Commission disclosing a change in the company's control.  The 8-K claimed that the company's then-majority shareholder had sold his shares of ESSI stock to two brothers in a private transaction, and that the brothers had been appointed as ESSI's new chief executive officer ("ESSI CEO") and chief financial officer ("ESSI CFO").

20

110.    In reality, Giguiere had arranged to pay for the majority shareholder's control block of ESSI shares and, acting as a control person of ESSI, had installed the ESSI CEO and ESSI CFO as the company's nominal officers.

111.    On January 1, 2016, Giguiere next caused ESSI to enter into a "technology licensing and marketing support" letter agreement with his nominee Separation Degrees Online, Inc. ("SDOI"), a purported technology company.  The stated purpose of the agreement was to "pursue mutual beneficial opportunities that result in the development, licensing/acquisition of, and management of on-going technology solutions and marketing campaigns for ESSI's initiatives."

112.    In reality, the "marketing support" services to be provided by SDOI under the letter agreement were Giguiere's promotion of ESSI's stock on TheMoneyStreet.

113.    In exchange for Giguiere's promotion of ESSI's stock under the letter agreement, ESSI agreed to pay SDOI $35,000 worth of ESSI common stock per month to be issued pursuant to a Form S-8 registration statement.  The letter agreement called for the stock to be issued at the greater of $0.01 per share or a 30% discount to the volume average weighted price of ESSI's stock on the date of payment.

114.    The parties amended the letter agreement on June 1 and October 1, 2016.

115.    In an "Addendum 1" to the letter agreement dated June 1, 2016, the parties agreed that ESSI would purchase from SDOI a purported "proprietary messaging and customer relationship management software platform" in exchange for payment of an additional 500,000 shares of its common stock.

116.    In an "Addendum 2" to the letter agreement dated October 1, 2016, the parties agreed to increase SDOI's monthly payments under the letter agreement to $42,000 worth of ESSI common stock to be issued pursuant to a Form S-8 registration statement.

117.    ESSI's own filings with the Commission demonstrate that the services SDOI overwhelmingly provided under the agreement were "advertising and promotion services"—i.e., stock promotion through TheMoneyStreet as described below.

118.    For example, ESSI's Form 10-K for the year ending January 31, 2017, filed with the Commission on May 1, 2017, disclosed that $1,720,914 of the $2,061,506 (approximately 83%) worth of stock paid to SDOI was for advertising and promotion services, while the balance of $340,592 (approximately 17%) was paid for purported "technology, licensing and marketing fees."

### Giguiere Causes ESSI to Issue SDOI Millions of Shares of ESSI Stock, and Then Lies to Two Broker-Dealers in Order to Deposit the Stock

119.    Giguiere caused ESSI to file two Form S-8 registration statements with the Commission—the first on April 4 and the second on November 23, 2016—that each purported to register five million shares of ESSI's common stock pursuant to ESSI's "2016 Equity Incentive Plan."[4]

120.    On April 6, 2016, ESSI issued its first tranche of 1,250,000 shares to SDOI under the April 4, 2016 S-8 as payment for a "portion of the month of January's salary."

---

[4]    Form S-8 registration statements allow issuers to register securities to be offered under an "employee benefit plan" (as that phrase is defined in Rule 405 of Regulation C under the Securities Act of 1933) to their "employees," which term is defined to include "consultants" and "advisors."  Notably, a Form S-8 may be used to issue securities to "consultants" and "advisors" only if, among other things, the services they provide to the issuer are bona fide, the services are not performed in connection with the offer or sale of securities in a capital-raising transaction, and the services do not, directly or indirectly, promote or maintain a market for the issuer's securities.

121.    On April 18, 2016, Giguiere deposited SDOI's initial tranche of 1,250,000 shares in a brokerage account in SDOI's name.

122.    In the deposit documentation, Giguiere stated that he was not an "affiliate/control person" of ESSI and that he had not "made arrangement for the solicitation of buy orders in connection with this sale."  Giguiere knew, or was at least reckless in not knowing, that these statements were materially false and misleading because he in fact controlled ESSI and was arranging for the solicitation of buy orders of ESSI stock through his promotion of the investment on TheMoneyStreet, as described below.

123.    On May 23, October 3, and October 19, 2016, Giguiere deposited approximately 3,607,000 additional shares of ESSI issued pursuant to the April 4, 2016 Form S-8 into the SDOI account, making the same false statements he made in connection with his April 18, 2016 deposit.

124.    For the October 3, 2016 deposit, Giguiere was required to submit a "Non-Affiliate Shareholder's Representations Letter" in which he also stated that he was not an affiliate of ESSI and that he was not aware of any non-public material adverse information about ESSI.  Giguiere knew, or was at least reckless in not knowing, that these statements were materially false and misleading because he in fact controlled ESSI and was aware of non-public material information adverse to ESSI, namely, that it was subject to his own fraudulent scheme.

125.    The October 3, 2016 deposit also included a letter signed by Giguiere and the ESSI CEO in which Giguiere represented that he was not an affiliate of ESSI, and that Giguiere "did not directly or indirectly promote or maintain a market for the Company's securities." Giguiere knew, or was at least reckless in not knowing, that these statements were materially

23

false and misleading because he in fact controlled ESSI and was actively promoting ESSI's securities on TheMoneyStreet.

126.    On November 18 and 29, 2016, Giguiere deposited into a second brokerage account in his own name an additional 1.9 million shares of ESSI.  These 1.9 million shares were comprised of 1.4 million shares Giguiere had purchased from ESSI's prior chief executive officer for $100,000, and 500,000 shares he received from ESSI as payment for SDOI's sale of the purported communications software platform.

127.    Giguiere made the same false statement in the deposit documentation accompanying these deposits that he made in connection with his previous deposits, namely, that he was not an "affiliate/control person" of ESSI and that he had not "made arrangement for the solicitation of buy orders in connection with this sale."  Giguiere knew, or was at least reckless in not knowing, that these statements were materially false and misleading because he in fact controlled ESSI and was arranging for the solicitation of buy orders of ESSI stock through his promotion of the investment on TheMoneyStreet, as described below.

128.    On December 23, 2016, Giguiere deposited 600,000 shares of ESSI stock into another brokerage account in his own name that he opened at a second broker-dealer.  Giguiere's deposit documentation states that he obtained 500,000 of the 600,000 shares as payment from ESSI for SDOI's sale of the purported communications software platform—i.e., a duplicate tranche of 500,000 shares he had already been paid and had deposited in the first brokerage account on November 29, 2016.

129.    In connection with the latter deposit, Giguiere signed a "Stock Promotion Affidavit" dated December 29, 2016 in which the broker-dealer stated that it had "detected promotional activity that is concurrent with the deposit and/or sale of your stock.  Attached is a

sample of the information currently being circulated."  The attachment was comprised of two

online articles from September and December 2016 discussing the promotion of ESSI by

TheMoneyStreet.

130.    The affidavit asked Giguiere, "Were you aware of the promotional activity in the

issue you wish to deposit or are offering for sale?"  Giguiere checked "no" and then falsely

stated, "I am not involved in any promotional activity whatsoever."  Giguiere knew, or was at

least reckless in not knowing, that these statements were materially false and misleading because

he knew that he was promoting ESSI on TheMoneyStreet, as described below.

### *Giguiere Promotes ESSI's Stock on TheMoneyStreet While Concurrently Liquidating His Shares of ESSI in the Open Market*

131.    Throughout 2016, Giguiere recommended ESSI's stock—a company with zero

revenues and an accumulated deficit of more than $43 million by January 31, 2017—on

TheMoneyStreet.

132.    TheMoneyStreet published at least two multi-page articles titled "ESSI and the

2016 Elections" and "Is This the Next Big Stock for 2016[?]"  The first article claimed, among

other things, that

> [i]t's typically been true that most industries will not see much movement
> during an election year. . . .  BUT once in a while, there are a few outliers
> that challenge this thought.  AND when they do, they merit a closer look.
> Eco Science Solutions just may be that outlier to bring the returns you are
> seeking during this window of time.

133.    The second article claimed, among other things, that "Eco Science seems to be

taking a page out of Amazon.com's playbook" and that "[i]t's eerily similar to how Amazon

started. . . .  If you take a look at Eco Science's business model, one could see the similarities to

Amazon's strategy."

134.    Neither article disclosed that Giguiere owned TheMoneyStreet, that he controlled ESSI, or that he was intending to and/or actively liquidating his ESSI stock into the market.

135.    Although TheMoneyStreet's articles recommending investing in ESSI did not disclose any of the myriad material facts about Giguiere's control of ESSI and TheMoneyStreet, the website contained a separate "Disclaimer" page that, at different points in 2016, made certain disclosures about SDOI.

136.    As of March 2016, TheMoneyStreet's "Disclaimer" page made no mention of Giguiere and affirmatively misrepresented that "[a]rticles on our website represent independent financial commentary.  The content is provided by independent authors via a common carrier platform and do not necessarily represent the opinions of our website."  Giguiere knew, or was at least reckless in not knowing, that those statements and omissions were false and misleading because Giguiere controlled TheMoneyStreet and the website's authors were not independent.

137.    Sometime thereafter, Giguiere caused the disclosures made on the TheMoneyStreet's "Disclaimer" page to be modified to disclose that TheMoneyStreet "may" be compensated by SDOI for "advertising services" and that SDOI "may" sell shares it owns in a recommended stock.  At no time, however, did the Disclaimer page disclose that Giguiere controlled all of SDOI, TheMoneyStreet, and ESSI, and that he was actively selling shares of ESSI—shares that he obtained under the Forms S-8 for the stock promotion services he was providing through TheMoneyStreet—into the market.

138.    Between April 21, 2016 and January 18, 2017, Giguiere sold more than 6.6 million shares of ESSI in his brokerage accounts for illicit proceeds of more than $8.5 million.

139.     Beginning in May 2016, Giguiere began wiring a portion of the proceeds of his stock sales to a third party, who in turn wired the money to ESSI's bank account.  The ESSI CEO and ESSI CFO then paid themselves $5,000 per month out of the ESSI account.

140.     Because ESSI earned no revenues, the third party's deposits of the proceeds of Giguiere's sales of ESSI stock were the ESSI account's primary funding source, and thus the source of the ESSI CEO's and ESSI CFO's salaries.

141.     In other words, and upon information and belief, Giguiere used the proceeds of his sales of ESSI stock to pay the ESSI CEO and ESSI CFO to act as nominal officers of the company.

## FIRST CLAIM FOR RELIEF
### Violation of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c)
### (Giguiere and Lindsay)
### KVMD

142.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 141 of this Complaint.

143.     Giguiere and Lindsay, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, knowingly or recklessly have: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

144.    By reason of the foregoing, Giguiere and Lindsay, directly or indirectly, singly or in concert, have violated, and unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

## SECOND CLAIM FOR RELIEF
### Violation of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c)
### (Gillespie, Hackett, and Budhu)
### ASNT

145.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 141 of this Complaint.

146.    Gillespie, Hackett, and Budhu, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, knowingly or recklessly have: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

147.    By reason of the foregoing, Gillespie, Hackett, and Budhu, directly or indirectly, singly or in concert, have violated, and unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

### THIRD CLAIM FOR RELIEF
### Violation of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c)
### (Giguiere)
### ESSI

148.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 141 of this Complaint.

149.     Giguiere, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, knowingly or recklessly have: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

150.     By reason of the foregoing, Giguiere, directly or indirectly, singly or in concert, has violated, and unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

### PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests a Final Judgment:

### I.

Permanently enjoining Defendants, their respective agents, servants, employees, and attorneys, and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)];

## II.

Ordering Defendants to disgorge any ill-gotten gains they received directly or indirectly, with prejudgment interest thereon, as a result of the violations alleged in this Complaint;

## III.

Ordering Defendants to pay civil monetary penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

## IV.

Ordering a penny-stock bar against the Defendants under Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)];

## V.

Ordering Giguiere and Gillespie to be barred from serving as an officer or director of an issuer pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C.§ 78u(d)(2)] as a result of the violations alleged in this Complaint; and

## VI.

Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this

case be tried to a jury.

Dated:  New York, New York
         July 6, 2018


                              By:   s/ John O. Enright
                                    John O. Enright
                                    Attorney for Plaintiff
                                    Email: EnrightJ@sec.gov