**Pages 1 - 32**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Before The Honorable William Q. Hayes, Judge

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>Plaintiff,<br>VS.<br>GANNON GIGUIERE, et al.,<br>Defendants. | NO. 18-CV-01530-WQH-JLB |

San Diego, California
Monday, April 29, 2024

**TRANSCRIPT OF MOTION HEARING**

**APPEARANCES**:

For Plaintiff:
U.S. SECURITIES AND EXCHANGE COMMISSION
200 Vesey Street, Suite 400
New York, New York 10281
**BY: CHRISTOPHER JOHN DUNNIGAN, ESQ.**

U.S. SECURITIES AND EXCHANGE COMMISSION
100 Pearl Street, Suite 20-100
New York, New York 10004
**BY: DANIEL LOSS, ESQ.**

For Defendant Gannon Giguiere:
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
**BY: MIRIAM GOLDMAN BAHCALL, ESQ.**
**MICHAEL R. CEDILLOS, ESQ.**

Reported By: James C. Pence-Aviles, RMR, CRR, CSR No. 13059
Official Court Reporter

**Monday - April 29, 2024** **11:19 a.m.**

**P R O C E E D I N G S**

---000---

**THE COURT:** Ready to go?

**THE CLERK:** Yeah. We're good.

Please be seated and come to order. This court is once again in session.

Calling Matter Number 8, 18-CV-1530, Securities and Exchange Commission versus Giguiere, et al., for a motion hearing.

**THE COURT:** Please enter your appearances, Counsel.

**MR. DUNNIGAN:** Christopher Dunnigan from the Securities Exchange Commission. With me is my colleague, Daniel Loss, who has not yet entered a notice of appearance but will be shortly.

**THE COURT:** Yes.

**MS. BAHCALL:** Good morning, Your Honor.

**THE COURT:** Good morning.

**MS. BAHCALL:** Miriam Bahcall on behalf of Defendant Gannon Giguiere.

**MS. CEDILLOS:** And Michael Cedillos on behalf of Mr. Giguiere as well.

**THE COURT:** All right. Good morning.

All right. Counsel, I'm familiar with the -- the case. I've read your pleadings, and we can have argument. My sense

is maybe about 20 minutes a side. I think that would probably work. I have some questions.

Does that seem like that will work for each side?

**MR. DUNNIGAN:** Absolutely, Your Honor.

**MS. BAHCALL:** Yes, Your Honor.

**THE COURT:** Okay. So SEC first, and then I have some clarifying questions.

With respect to the date of prejudgment interest, is it the SEC's position that that -- the starting date would be January 1st of 2017?

I think that -- maybe on Page 16, I think you may have indicated September 30th, 2021. But I think also, in other places, it's January 1st of 2017.

**MR. DUNNIGAN:** I apologize, Your Honor. If I could have one moment, I can just pull up the PGI calculation itself, which I do not appear to have, Your Honor.

Oh. I --

**THE COURT:** Well, the prejudgment interest reports, in support of your motion, calculates it from -- let's see -- February 1st, 2018, for the KVMD and February 1st, 2017, for the ESSI fraud.

**MR. DUNNIGAN:** Correct, Your Honor.

**THE COURT:** Are those the dates that you're requesting that I rely on?

**MR. DUNNIGAN:** Yes, Your Honor.

**THE COURT:** All right. Giguiere returned one and a half million shares of the ESSI stock to the company, I think, in connection with a settlement of the derivative action; correct?

**MR. DUNNIGAN:** That's what the defense has claimed, and we have limited visibility into that.

**THE COURT:** Okay.

**MR. DUNNIGAN:** It remains an open question as to what, if any, credit Mr. Giguiere should receive because there's no argument made by the defendant as to whether Mr. Giguiere had those shares legitimately in the first place. We -- we believe Mr. Giguiere received them illegitimately for his services in fraudulently promoting the company.

So there's no, say, cost basis.

**THE COURT:** Sure.

**MR. DUNNIGAN:** He didn't put -- purchase them in the open market.

Second of all, you know, the pump and dump here, as referred to in the parallel civil forfeiture action, raised the price of the -- the stock from 2 cents to $4.80 a share.

**THE COURT:** Right.

I guess here's my question: Is it correct to say, though, that -- correct to say that those shares were not factored into the SEC's approximate -- approximation of his ill-gotten gains?

**MR. DUNNIGAN:** That's correct, Your Honor. We based

our analysis off of brokerage records.

**THE COURT:** Okay.

**MR. DUNNIGAN:** So, in a way, we never counted those against him in the first place.

**THE COURT:** Okay. Then with respect to the penalty, the SEC's requesting a penalty that's 10 percent of the disgorgement amount. Obviously, there are a lot of cases where the amount -- you know, the penalty is much higher, where the penalty may be equal to the disgorgement amount.

And so I guess the question is: How did you come up with 10 percent? What's that based on?

**MR. DUNNIGAN:** Certainly, Your Honor.

So the theoretical maximum, if we apply the 232,000-dollar penalty for each transaction -- I'm sorry -- approximately 232,000 is a Tier -- maximum Tier 3 civil penalty against an individual. If we'd applied that for each transaction, we'd come over -- our maximum would be over $29 million. Obviously, we're not asking for a 29-million-dollar civil penalty in this case.

So what we did was we took each of the four instances where Mr. Giguiere deposited shares under false pretenses by explicitly lying to a broker dealer about his relationship with the company and said that the Court should apply a one-time Tier 3 civil penalty for those, and then we rounded down by a small amount.

So it's -- it -- it could be slightly over $900,000. We ended up asking for 875,000, which represents about 10 percent of the requested disgorgement.

**THE COURT:** All right. And so your -- as I understand it, your position is the SEC can wait until after judgment is entered to petition the Court for a Fair Fund, if that's necessary; is that right?

**MR. DUNNIGAN:** Absolutely, Your Honor.

So we have made a preliminary determination that we will be pursuing the Fair Fund route, but this is dependent, first and foremost, on whether we collect meaningful amounts of money. We do believe that we are going to be able to track down the investors vis-à-vis the blue sheets.

As we've outlined, this is, you know, not a highly traded stock; right? If it -- if this were Apple, it would be, you know, a lifetime's worth of work to trade -- to -- to do. There's not -- so there's not a ton of transactions here, and we believe we have the ability to do that.

**THE COURT:** All right. And so is there any authority that supports, pro or con, your ability to wait until after the judgment is entered to -- to petition for a Fair Fund?

**MR. DUNNIGAN:** That's how we've always done things, Your Honor. I mean, I -- I would have to go back and look up the -- the statutory authority for Fair Funds.

But we -- we always -- first, we collect money, and then

we come back to the Court and say, "We would like to do the following with the money." And, historically, the -- it's either distribute to investors or, in some cases, it gets sent to the United States Treasury.

But under no circumstances do we have the authority to make the final determination. It always remains with the Court.

**THE COURT:** All right. And then there was $187,893.43 in restitution that was paid to the KVMD victims in connection with the criminal case.

Your position is, though, that there's investors that are out there that are harmed that did not make requests for the restitution; is that correct?

**MR. DUNNIGAN:** Our understanding is that the -- the restitution order was based on the investors who came forward -- sorry. The restitution order was based on the investors who came forward in the criminal case. We believe that there are likely others. We've taken a more holistic approach, and we go into all of the people who purchased this -- the -- the security during the time of the fraud, and we tracked them down.

So we believe that we're -- we're aiming for a much broader pool. Obviously, we're giving the defendant credit for any sums already paid.

**THE COURT:** All right. And then I think this might

have just been a typo.

On Page -- on Page 13 of 19, under "Disgorgement should be assessed as to both KVMD fraud and ESSI fraud" -- are you with me?

**MR. DUNNIGAN:** Page 9 of our initial moving papers -- 19 of our initial moving papers?

**THE COURT:** Yeah, Page 13 in Document 157, the file number.

It says, Paragraph II, "Disgorgement should be assessed as to both the KVMD fraud and the ESSI fraud." It might be -- Page 9 -- it's Page 9 at the bottom. Page 13 is the file -- file page.

**MR. DUNNIGAN:** Ah. Thank you, Your Honor.

Yes, I see it.

**THE COURT:** Okay. It says, "The Court should order Giguiere to disgorge his net ill-gotten gains of 1 million" -- it says what it says -- "with respect to the KVMD fraud and 6,641,000," et cetera, "for the ESSI fraud."

And then on Page 11, it says, "The SEC seeks disgorgement of 6 million," et cetera, "regarding the KVMD and 1,119,000 regarding the ESSI."

So that's just -- you just reversed it?

**MR. DUNNIGAN:** Yes, Your Honor. That is a typo.

So the 1.7 number is pre-deductions for the parallel criminal and civil forfeiture actions. So it -- the right

number is $1,119,361.20.

**THE COURT:** For the KVMD?

**MR. DUNNIGAN:** Yes, Your Honor.

**THE COURT:** All right. And -- all right.

All right. I think that those are -- those are my questions to start. So if there's any -- I mean, I'm familiar with the papers, but anything else you want to add? You're free to make any argument you'd like.

**MR. DUNNIGAN:** Thank you, Your Honor.

So as an initial matter, I just want to briefly correct one mistake that we made in our reply brief, where we stated that the suspension of the SE- -- the SEC suspension of the trading in ESSI stock -- which we don't think is really a relevant issue, but it came up in the defendant's surreply brief.

We stated incorrect language. We transposed language from the SEC's press release and stated that it was from the SEC's second amended complaint in this matter, but very similar language in the SEC's second amended complaint does -- it does appear, and -- but ultimately -- the ultimate reason why the SEC suspended trading isn't really relevant in determining what the defendant's ill-gotten gains were, and I just wanted to point that out.

The other major issue that I guess I would want to point out is something that the SEC and counsel for Mr. Giguiere have

been grappling with since before I entered my notice of appearance -- and there were prior SEC lawyers on this case -- which is 7.1 million dollars of deductions that the defendant wants against the disgorgement.

And under the relevant analysis from the Ninth Circuit in *Platforms Wireless*, once the SEC has made its prima facie showing of what the disgorgement should be, the burden then shifts to the defendant, as the wrongdoer and as the person who is in possession of the knowledge, as to what legitimate business expenses were and what illegitimate business expenses were.

In this particular case, we have a strange sort of impasse, and the impasse is really clearly shown actually in defendant's own declaration of Attorney Mir- -- Ms. Bahcall --

**MS. BAHCALL:** That's fine.

**MR. DUNNIGAN:** Sorry. We're -- we're all -- we're all old friends.

And, basically, it's a spreadsheet of wire transfers, and the parties agree that the transfers happened. Okay? Like, we're not here to fight over, like, whether the underlying documents show that they haven't. But we have a fundamental disagreement -- is what they were for because the answer is we don't really know, and it is the defendant's burden to show this.

It is the defendant's burden, at this point, to say, "Hey,

you know, this payment for hundreds of thousands of dollars, for example, to Yahoo Finance," which is something that we've struggled with -- "this was for a" -- "first for the benefit of the ESSI. But even more importantly, this was a legitimate business expense," because if it's just to perpetrate the pump and dump, that is not a legitimate business expense. And I just wanted to make that very clear.

So it's Exhibit A. Once -- it's Docket Number 172-2. That spreadsheet is really sort of the point of impasse where I think the parties have a fundamental disagreement, and -- I mean, if the Court doesn't have any further questions, I mean, I'm prepared to talk about, you know, the Second Circuit's decision in *Govil*, if the Court wants to discuss it.

We believe *Govil* was wrongly decided, and we believe it is pretty clearly not applicable in the Ninth Circuit. But at, you know --

**THE COURT:** Well, I'll hear from the -- I'll hear from the defendants, and then I'll give you a chance to make any other responses that you would like.

**MR. DUNNIGAN:** That's very fair.

**THE COURT:** Does that work for you?

Okay. Thank you.

Good morning.

**MS. BAHCALL:** Good afternoon, Your Honor, and I appreciate the fact that, you know, you're clearly familiar

with this situation and have read the -- read the papers.

And I'm here to answer, obviously, any questions that you may have for Mr. Giguiere. And I'm happy to start there, or I can respond to --

**THE COURT:** However you'd like. I don't have any specific questions for you at this point, but you're welcome to start with any presentation you'd like or address any points you'd like to emphasize, whatever you'd like to do.

**MS. BAHCALL:** Absolutely.

Well, then, I guess where I'd like to start is, because you've seen this case before -- is to put it in a little bit of context.

So first of all, as you're well aware -- that we've been before the Court before on the criminal matter. Originally, that criminal matter involved both KVMD and ESSI. The Court went forward on KVMD. There was a plea. There was restitution, et cetera, awarded.

And Mr. Giguiere was sentenced to a year and a day, which he served, three years' supervised release, which he's still undergoing. Forfeiture of 266,000 of his money related to KVMD is there in order to restitute victims. And then, in addition to that, there was 187,000 for victims.

In addition to that, there was a civil forfeiture action that -- whereby we agreed, even though the Government recommended -- and it was dismissed, the ESSI action. They

didn't go forward on that. Nonetheless, we forfeited about -- I think it was 1.7 million dollars to the Government in connection with ESSI.

That is still -- it was made available, and no one came forward for it. Even though, through due process, people were notified of it, no victims came forward. That money is there as well. And in addition, as you've noticed -- as you made note of, we also gave the 105 -- 1.5-million-dollar shares. So that's what happened there.

Where are we now? We're in a civil case where, again, we're hearing about KVMD and ESSI. We agreed to a consent judgment, where we agreed to admit facts but not legal conclusions and not opinions or things going forward. It's a single claim on KVMD, which is, again, based on the matched trading scheme with Codefendant Oliver Lindsay.

And, again, with respect to that, most of the shares that were sold were purchased by Oliver Lindsay, which would also explain why there was a limited number of victims that came forward because 80 percent of the shares, according to the Government's own complaint, were simply trading back and forth between them.

The way they get to the 1.1 million is they count five -- let's assume matched trading. So Mr. Giguiere, you know, sells his share for $5. Mr. Lindsay buys it for 5. That's $10. Clearly, neither of them are victims. It's just money -- their

own money going back and forth, which explains why, as much as this Court pushed -- and everyone did -- to find any legitimate victims and pay them, they were paid. So that is the claim on KVMD.

And on ESSI, there's two claims in this case: One, a 10b5 claim, which is based on the fact that the stock was promoted and, they say, a failure to adequately disclose that there may be a sale -- that there was going to be a liquidation into the market. They do admit that Mr. Giguiere -- or they did disclaim and disclose, at various times, that there would be a sale, but they said it may sale [sic]. That was the issue.

And the -- the other claim is Section 5, a strict liability claim, which is based on ESSI selling -- you know, giving Mr. Giguiere, as opposed to money in payment for services, S-8 shares, which they said were not available for promotion. ESSI did it on the advice of counsel. That's the second claim. So they're seeking disgorgement of basically 6 million for ESSI, penalties of 875-.

What our issue is here with both of them -- and I will start with, I think, the disgorgement on KVMD because I do think it really comes down to the question about whether or not -- and Your Honor raised it with them -- that, according to *Liu* -- and everyone agrees that *Liu* applies -- they need to show two things -- it's their burden of proof -- net profits and that it's for victims.

And "victims" is a defined term under the law. "Victims" means that people have suffered, or investors suffered, pecuniary harm as a result of the violation. And with respect to KVMD, they cannot show, one, they -- they're claiming they'll show later on they're going to compensate victims, but they can't show there were victims that weren't compensated.

Any victims -- in other words, victims, persons who suffered pecuniary loss as a result of the matched trading -- have already been compensated. As this Court may recall, we kept that open to the last minute to make sure anyone who got paid for it was paid, and they were. And now they've been restituted, and there's still $110,000 unclaimed in KVMD money that people could come forward with.

And the thing is it makes sense, like I said. I don't think it's the U.S. government didn't look hard enough for victims, and that's why no more came forward. The reason is no more came forward because there -- as they admitted, the bulk majority of the trading happening during that time period was the matched trading.

And it's -- they claim it's 80 percent, and it's -- Paragraph 21, is it? -- Paragraph 55 of their complaint. 55 -- 79 percent of the trading that occurred at the time was matched trading.

And if you do the math, that means that there's only -- if you assume that their numbers -- and we were -- had to agree to

the complaint. I assume they got the best numbers they could. Assuming they're correct, that means, at most, you have $329,000 worth of possible trading by victims, the value, and we've already restituted, you know, over 260- -- -66-.

So the delta is, I think, about $60,000, if you assume everybody else was a victim. And it -- like I said, it makes sense because of that allegation. And, again, when you look at the dollars, yes, they're claiming 1-point, I guess, -1 or something.

But if you've got 80 percent of the trading by these guys, and they keep upping the number, and you're counting it both ways, my dollar, your dollar -- and, again, they're joint and several -- it's just money they paid to each other. So we do not believe that they can show there's victims, let alone ones they haven't yet identified, putting aside that they haven't even tried to set up any sort of plan as of now.

So that, we believe, if -- is the answer on disgorgement on KVMD. They're not looking for penalties on KVMD with no disgorgement, no prejudgment interest on KVMD. So unless Your Honor has any questions on KVMD, I'll move to the ESSI.

**THE COURT:** Okay. Thank you.

**MS. BAHCALL:** Okay. Then on disgorgement on CSSI [sic], we have the same two issues. One, we do not believe that they can show harm to victims, and they haven't yet attempted to. They haven't said, you know, now they've

come forward, that, after the fact, they will compensate victims.

But, again, you first have to show they've even been harmed. And, again, 1.769 million was made available to victims in the DOA [sic] action of ESSI. They used due process. They informed everybody that the money was available to ESI [sic] purchasers. Nobody came forward.

Shareholders have also participated in a derivative suit, where the stock went to. But, more fundamentally, you have to show, again, that they suffered pecuniary harm because of Mr. Giguiere's violations. One was the strict liability violation of whether or not the shares are registered, and two was whether or not there was loss as a result of him failing to adequately represent when he was going to sell his shares.

Okay. And normally, what you see in these cases -- and they like to refer to it as a pump and dump, but they don't really call it a pump and dump in the complaint. Why not? This isn't a typical pump and dump.

Who does a pump and dump where they pump the shares, they make $8 million, and they give it back to the company to fund the company to use? And it's a legitimate company. There's no allegation it isn't. It's in business today, and they use it to support the company and its investors.

If it's a pump and dump, they spend the money, they promote it, they get the money out, and then they go to the

Cayman Islands, and we never hear from them again. This is not that.

**THE COURT:** Well, what in the record supports how the money was used?

**MS. BAHCALL:** What supports, in the record, it was used is in their complaint. They say, in Paragraph -- yes. They say that the money was wired back, in Paragraph 142, that he -- that Mr. Giguiere received. In Paragraph 143- -- -3, they say that money was ESS's [sic] primary funding source.

They say, in addition, you know, part of the money was used to pay the CEO and the CFO. I would agree with them that it was our burden to then go a step further and say, "Well, once the money went to ESSI, how did they use the money, and was that legitimate?"

If they claimed we were ESSI, if they had made ESSI a defendant in this suit -- they didn't. We're separate entities, and this is their complaint, and they don't even claim that we're alter egos. The closest they come is to say that we -- you know, that he was controlling.

Well, Your Honor is well aware that a controlling shareholder is somebody with 10 percent. They say that, you know, we influenced some of the decisions, and they have been, you know, part of -- and, again, you know how these settlements work. We had to agree to the allegations that we played a part of putting in the CEO or something, or CFO, at the beginning.

But it doesn't say anywhere that we controlled the bank accounts, that we were the CEO or CFO, that we decided how the money was to be spent, nothing. And, again, they're looking for disgorgement, ill-gotten gains, from Defendant Giguiere. Defendant Giguiere gave the money to the company.

And there's precedent, which we've cited, including *Govil*, which says funds returned are not unjust gains, in the same way -- and, again, it's their burden to prove these were technical unjust gains. We give it back to the company, just like we gave money back to the Government to use with investors. That is not an unjust gain to Mr. Giguiere. It's disgorgement of his unjust gains, not the company's. They don't have an alter ego allegation. They don't even try that.

So, yes, we gave the money back. We don't -- we aren't the company. We don't have their records. We don't -- if that were the -- the main thing, they certainly could have subpoenaed it, but we're -- we are required to show our net profits, Mr. Giguiere's. And that needs to subtract the amount of money that went to the company as well as the amount of money that we gave to the Government for the victims, et cetera.

So, again, I think it's two points. They do not -- and going back to -- which is the point I wanted to make, that we -- it's -- there's no -- they do not allege -- put it this way. They say it doesn't matter that the reason the price went

down was because the SEC suspended trading, and the fact that the SEC suspended trading -- having nothing to do with the promotion or even Mr. Giguiere settling his shares.

SEC suspended trading in May 2017. We -- the share -- shares that were traded at issue were traded -- the trading was completed in January 2017. There's no allegation, which you would normally see in a pump and dump, that after you sold the shares, that your shares of -- the price drops. There's no allegation.

It drops in May 2017 because what happened was -- and this is public record, so you can take judicial notice, and it's in our surreply because, in the reply, they made the comment that it was suspended because of the promotion, which wasn't the case.

It was suspended because of a press release regarding Ga-Du, that there had been no accompanying 8-K. The Ga-Du transaction was the company determined -- and, again, what they do is they do technology solutions having to do with the cannabis industry. And their big thing, at least back at this time -- it's more since. Now they're doing a lot more dealing with accounting for cannabis.

But what they did then is they had an app, and this app -- which are not cheap to put together because you need all the technology -- would put together entities or individuals that were looking to buy different types of cannabis. And then, on

the other side, they would get, as clients, people who had shops, who were looking to sell it, and they would put it together in a marketplace.

Well, the problem in the cannabis -- this is pretty out there. You can take judicial notice -- is the banking element because, since it's still not legal on a federal level, it's hard to get banks. So ESSI, from the public reports, was interested in Ga-Du because they thought, being an offshore bank, it could maybe be the answer so they could buy and sell whatever.

But they didn't do an 8-K. The SEC came in and suspended it because they were concerned about the press release being out there without an 8-K, and maybe there was an issue with that. As soon as they suspend, of course, the SEC -- you know, the price drops, and they're still trying -- working on getting back trading, from what I'm reading, in the public markets.

There's no allegation that Mr. Giguiere had anything to do with the Ga-Du transaction. There's no allegation he controlled -- had nothing to do with it. That's what caused the investor harm.

So then they say, when we raise it, "Well, yeah, but the problem" -- "where the harm is really -- and we'll be able to find them -- is anyone who bought during the period when he was selling and promoting was harmed because there was inflation in the price of this stock." They say it in their brief. It is

not an allegation in the complaint. They do not allege price inflation, you know, as a harm in the complaint.

So there's no basis for which -- to even do a Fair Funds because you can't get past Step 1. You have to first be able to identify that people were harmed. They don't even have an allegation about it. And in their brief, what they do is cite to KVMD, they were victims, which was a matched trading scheme.

And, again, when you look at what the purported misrep was, that -- you know, they say that, "Well, in March 2016, we didn't say we were going to be trading with Mr. Giguiere and getting stock and trading sometimes after he does disclose." So I assume that's probably April 2016. He doesn't even start trading until the end.

So, from the bulk of it, there was a disclosure that he was going to be -- or maybe -- it wasn't going to be. It was maybe liquidating into the market. Plus, ESSI disclosed. They had a filing saying they had given S-8 shares to Giguiere's company that was going to be promoting this stock. So it was part of -- it was already part of the conversation, which is why it's no surprise there's no price inflation.

And they don't get an expert. You've seen these cases. You typically get an expert, and you go, "Okay. There's Ga-Du. There's this going on." How much of the price -- the fact it went up isn't enough. Yeah, when people hear about stock, and they like it, they're going to buy it. So that's why people do

do promotions, but not every one of them is illegal, and not every one is a pump and dump.

And so they don't have an expert, let alone an allegation, to find that there was price inflation because of the way he framed the disclaimer. There's no allegation that he, in any way, misrepresented what was going on in terms of the facts about the company, any material facts there. It was just what was in the disclaimer.

So there were no victims. It's limited to net profits, which should include what we gave -- what Mr. Giguiere gave back to the company. It is a legitimate offset. Funds returned are not unjust gains. And when you take into consideration all of the offsets, he didn't make any money to be disgorged or anything left after the payments he made for an appropriate disgorgement claim.

So then that brings us to prejudgment interest. Again, given no disgorgement, there's no legal basis to do prejudgment interest. And at a minimum, if you were to find that there was some disgorgement, et cetera, the whole purpose of prejudgment interest is that he shouldn't profit from keeping the money if he got the money, you know, illegitimately.

I mean -- and he -- Mr. Giguiere -- but he did give back that money to the company. Within a month of getting it, he was continually just feeding it back to the company. He didn't have it. Again, they're not saying Mr. Giguiere is ESSI. So

giving it to ESSI -- he's not giving it to himself. They're not even named as a defendant. So it isn't one of those cases.

So prejudgment interest, we think, would be inappropriate without taking into consideration the date that any were given back. And then the last issue -- and this is, again, only ESSI -- is civil penalties, and I don't -- I'll quickly -- you know the factors. I'll quickly kind of run through them.

But in terms of -- they're basing it on Tier 3 because they're saying a high degree of scienter. Again, I will only say that two claims -- Section 5, the strict liability -- they don't even allege any scienter, and that kind of makes sense.

The company, ESSI, issued the shares. The company used a lawyer, who gave a legal opinion saying the shares were proper. There was no subterfuge about what the shares were being used for. The S-8 registration referred to the technology and consulting agreement that said it would be used for advertising.

So nobody was hiding the ball. They got it wrong, but nobody was hiding the ball in terms of scienter there. Then the other disclosure that's the other basis for the 10(b) claim, which is that he didn't adequately disclose that he was going to be liquidating shares -- they make reference, in Paragraphs, you know, 139 and 140, that the -- the disclaimers kept changing and getting more fulsome.

So clearly, it appears, from the allegations and

inferences from there, that they were trying to get it right, and maybe they -- you know, based on the complaint, it wasn't good enough, but, again, high degree of scienter -- it's pretty technical. He's not a securities lawyer. He's not in the industry.

And then I go back to he gave the money back to the company. He did not go to the Caymans and live a good life, where we would never see him again, which, to me, would be intent to do harm such that -- and he has rec- -- you know, in terms of the recurrence, again, it was two S-8 shares being delivered and, you know, a period of time that he promoted. But, again, the disclaimers changed.

Finally, him recognizing the wrongful nature of his conduct -- you were here when he pled guilty to KVMD. He's gone to -- to jail for it. Even though the DOJ dropped ESSI liability, he agreed to forfeit the money that they had received on ESSI. He's agreed here -- you know, we agreed to liability, even though the DOJ dropped its case on ESSI and determined not to go forward.

He agreed to a director and officer bar for life. He agreed to a penny stock bar for life, where many courts will limit it to five years, and five -- that's pretty egregious. He forfeited over 1.7 million, like I said, in ESSI. He settled back 1.5 shares. I think he has, you know, recognized -- and I think he has suffered.

He's -- again, the idea that it's likely to recur -- well, he's already been to jail. He's now a convicted felon. He's agreed to these bars. He's got no money. Try getting lucrative employment. I don't think he's going to be in a position to do this again.

And as you may recall, at the sentencing, he did stand up here, and he did say to this Court that -- and this Court found that -- and accepted that he took full responsibility, and they didn't expect to see him again. Again, the ES- -- this conduct all relates back to them, and ESSI was before KVMD. It was right at the same time.

And this Court, in that case, did not impose a fi- -- financial crime other -- liability other than restitution, which was important to this Court, and it's been done. And other than -- and didn't do prejudgment interest because they found he had no money mainly because he gave it back.

And, you know, not that it matters, but we are here not being paid because we believe in Mr. Giguiere.

**THE COURT:** All right.

**MS. BAHCALL:** And, you know, the prospects of -- I mean, it's going to take -- he's paid what he can on the restitution, as I said.

But you can also take into consideration that he has no money. And, in fact, the Government recognized it because they had MLARS, at our request, use the money he had forfeited to

pay the restitution finally. It happened, like, a month ago. And there's still money sitting there, from when he originally forfeited, for both KVMD and ESSI.

So we would ask -- we do not believe that a fine is appropriate in this case.

**THE COURT:** All right. Thank you, Counsel.

Counsel?

**MR. DUNNIGAN:** Thank you, Your Honor.

To begin, beforehand, the Court asked me if there was any sort of citations that I could provide in support of the idea that one seeks disgorgement and then subsequently seeks a Fair Fund. I have a number of case citations at hand that I can read for the record.

**THE COURT:** Sure.

Just one's sufficient. Sure.

**MR. DUNNIGAN:** *SEC v. Cole*, 2024 WL445335, Ninth Circuit, February 26th, 2024.

**THE COURT:** Okay.

**MR. DUNNIGAN:** But -- but there are many cases in this circuit -- and, indeed, from this courthouse -- where -- where that is the case, including one that I argued about four weeks ago in front of Judge Huff, which is *SEC v. Sripetch*.

The -- the -- but there's a big legal point that I am really obligated to address here, and that is the conflation between the Supreme Court's decision in *Liu* and the

Second Circuit's decision in *Govil* that -- that I think we just heard, and I really want to tease this out.

The Supreme Court, in *Liu*, stated that disgorgement has to be for the benefit for -- of investors but left open the question of whether or not investors have to receive the money or whether it can be ultimately sent to the United States Treasury, but -- and -- and Justice Sotomayor was very specific in choosing the term "generally" -- funds should go to investors. And, indeed, we believe that's the road we're headed down. But no determination needs to be made at this point in time.

This idea of pecuniary harm to investors being a prerequisite is solely a Second Circuit notion and has not been exported to any other circuits. That's the *Govil* decision, and that's no court in the Ninth Circuit that has followed that or any other circuit.

And I just want to make it clear that, you know, the SEC's position is that *Govil* is simply mistaken, and we would urge the Court not to export this brand-new requirement from the Second Circuit to the Ninth Circuit. It would effectively contradict all of the other SEC disgorgement cases that have been handed down post-*Liu* in this circuit.

The next point that I want to make is with regards to the KVMD disgorgement because I understand that there was some matched trading between Oliver Barrett Lindsay, who was a

defendant, and Mr. Giguiere. However, the Brucculeri declaration, in Paragraph 4, does provide their net profits, and that's what we based our disgorgement calculation on, not on the allegations in the complaint. So I just wanted to clarify that.

The next issue, though -- and I -- I really have to take exception to -- to the argument that was made that ESSI is some sort of completely separate entity from Mr. Giguiere because the complaint is crystal clear, in Paragraph 29, that Mr. Giguiere was the undisclosed control person of ESSI. And in Paragraph 112 -- 111 and 112, we explain, through our allegations, which are deemed true for purposes of this motion, why.

Okay. In reality, Mr. Giguiere had arranged to pay for the majority shareholder's control block of ESSI shares and, acting as a control person of ESSI, had installed ESSI's CEO and ESSI's CFO as the company's nominal officers. That's an exact quote, Your Honor.

So what happens here is that Mr. Giguiere ends up receiving -- receiving proceeds of the fraud, and then he takes the money from his individual brokerage account, which you can think of as one pocket of a pair of pants, and he sends some of it back to ESSI, although some of it is spent at Yahoo Finance, and we just have no idea why.

But the point is -- is a defendant, a wrongdoer, can't

just take money from his individual account, move it into a corporate account that he controls, and say, "Oops. I don't have disgorgement." He's in control of that company. He can -- he can move it back at any point in time.

And whether he owned 10 percent of the shares or 20 percent of the shares or 50 percent of the shares is not the relevant issue here. The complaint specifically alleges that he was the individual in control of the company.

Okay. I also want to go over the issue of restitution from the criminal case because the -- the fact of the matter is disgorgement and restitution are just two different things. As we understand it, the restitution analysis is only based off of the investors who came forward. The disgorgement analysis is on the basis of all of the investors that we can find and locate.

One does not have to come forward in order to receive disgorgement. Indeed, in many of our cases, you know, involving, say, large-scale mutual funds, you would literally have millions of investors having to come forward, which would just overwhelm the entire system.

People can receive disgorgement -- or people can be -- people can be -- receive funds through an SEC Fair Fund without coming forward. With the approval of the Court, the checks go out in the mail. I myself, 15 years ago, received a check for $7 from a market timing case because I had invested in a mutual

fund.

So it's just a completely different analysis, and I think it's important not to conflate restitution and disgorgement. Finally, like, we -- we do not give investors windfalls in our Fair Funds. So, like, that concern I don't think is really present here.

I think, with respect to the KVMD disgorgement, it's a matter of the -- we don't know whether we're going to find more investors. We think we will, but I -- you know, like, there's no way of -- like, we do not do these analyses until we have money. And this is, I think, ultimately where the defendant's position puts the cart before the horse.

It is possible that every KVMD investor has already received some level of restitution. Now, we may think they haven't received enough restitution. We -- there may be more investors. We just don't know, but it doesn't matter. The fact of the matter is we need to recover funds, and then we do a Fair Funds analysis, and that is the point in which the Court will make the decision on who gets what, but it's not today.

Today is the first step on the road, and it is -- and we have to get a judgment to be able to collect the disgorgement to then be able to do the analysis and ultimately propose a Fair Fund. That's the road we believe we're headed down, and we would ask the Court to grant the disgorgement requested.

And if there's no further questions, I'm going to sit

down.

**THE COURT:** No further questions. Thank you.

Thank you, Counsel. Thank you for your appearances. Your arguments have been very helpful. The briefing was well-done and very helpful, and it was a pleasure to have you here. And I'll issue a written decision, and have a safe trip back to your homes.

Thank you.

**MR. DUNNIGAN:** Thank you, Your Honor.

(Proceedings adjourned at 12:11 p.m.)

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Wednesday, May 1, 2024

/S/ James C. Pence-Aviles

James C. Pence-Aviles, RMR, CRR, CSR No. 13059
U.S. Court Reporter