1
2
3
4
5
6

UNITED STATES DISTRICT COURT

7

SOUTHERN DISTRICT OF CALIFORNIA

8

9   SECURITIES AND EXCHANGE
    COMMISSION,
10                                           Case No.:  18-cv-1530-WQH-JLB
                              Plaintiff,
11                                           **ORDER**
    v.
12
    GANNON GIGUIERE,
13  OLIVER-BARRET LINDSAY,
    ANDREW HACKETT, KEVIN
14  GILLESPIE, and ANNETTA
    BUDHU,
15
                              Defendants.
16

17

HAYES, Judge:

18

       The matter before the Court is the Motion for Civil Penalties, Disgorgement and

19

Prejudgment Interest as to Defendant Gannon Giguiere (ECF No. 157) filed by Plaintiff

20

Securities and Exchange Commission ("SEC").

21

22

**I.    PROCEDURAL BACKGROUND**

23

       On July 6, 2018, the SEC initiated this action by filing a Complaint, alleging that

24

Defendants Gannon Giguiere, Oliver-Barret Lindsay, Andrew Hackett, Kevin Gillespie,

25

and Annetta Budhu participated in schemes to "pump and dump" the common stock of

26

three issuers in violation of federal securities laws. (ECF No. 1.)

27

       On July 29, 2018, the United States filed an Indictment charging Giguiere and

28

Lindsay with conspiracy and securities fraud relating to two of the pump-and-dump

1

schemes, which involved the trading of Kelvin Medical Inc. ("KVMD") stock and Eco Science Solutions, Inc. ("ESSI") stock. *See United States of America v. Giguiere et al.*, No. 18-cr-3071-WQH (S.D. Cal.). On the same day, the United States moved to unseal a second two-count Indictment charging Andrew Hackett, Annetta Budhu, Vikram Khanna, Kuldeep Sidhu, and Kevin Gillespie with conspiracy and securities fraud relating to one of the pump-and-dump schemes, which involved the trading of Arias Intel Corp. stock. *See United States of America v. Hackett et al.*, No. 18-cr-3072-TWR (S.D. Cal.).

On October 24, 2018, the Court issued an Order in this action granting the United States' Motion to Intervene and Stay Proceedings pending resolution of the criminal actions. (ECF No. 44.)

On January 25, 2019, the United States filed a Superseding Indictment in Case No. 18-cr-3071-WQH. On August 9, 2019, the Court accepted Giguiere's guilty plea with respect to Count 1 of the Superseding Indictment, which related to the trading of KVMD. Giguiere was sentenced to a year and a day imprisonment, three years of supervised release, forfeiture of $266,703.37, and restitution of $187,893.43.

On February 27, 2020, the United States filed a Complaint for Civil Forfeiture to collect proceeds from the sale of Giguiere's assets traceable to the ESSI fund. *See United States v. $1,641,290.10 in Net Proceeds from the Sale of Real Property Located at 4633 Perham Rd., Corona Del Mar, CA 92625 et al.*, No. 20-cv-363-BEN-WVG (S.D. Cal.). This action resulted in the collection of $1,769,437.23.

On June 16, 2022, the Court issued an Order lifting the stay of proceedings in this action on the basis that "the defendants in the parallel criminal proceedings have been sentenced and judgment has been entered." (ECF No. 76 at 3.)

On August 5, 2022, the SEC filed a First Amended Complaint, which supplemented the allegations contained in the original Complaint. (ECF No. 92.)

On April 7, 2023, the SEC filed the Second Amendment Complaint ("SAC"), the operative complaint in this case. (ECF No. 136.) As relevant here, the SAC alleges that

2

Giguiere participated in fraudulent stock sale schemes regarding KVMD and ESSI. In connection with KVMD, the SAC alleges that Giguiere violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5(a) and (c) promulgated thereunder. In connection with ESSI, the SAC alleges that Giguiere violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c), as well as Sections 5(a) and (c) of the Securities Act of 1933 ("Securities Act").

On April 17, 2023, the Court issued a Judgment ("Consent Judgment") regarding Giguiere as to liability. (ECF No. 139.) The Consent Judgment permanently enjoins Giguiere from violating Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, violating Section 5 of the Securities Act, acting as an officer or director of any publicly traded company, and from participating in the penny stock market. The Consent Judgment left for further determination by the Court whether disgorgement and/or civil penalties are appropriate, and if so, in what amount.

On November 11, 2023, the SEC filed the Motion for Civil Penalties, Disgorgement, and Prejudgment Interest as to Defendant Gannon Giguiere. (ECF No. 157.) The SEC seeks a civil penalty against Giguiere in the amount of $875,000, disgorgement of $7,760,415.97, and prejudgment interest of $2,091,439.85. On January 2, 2024, Giguiere filed a Response in opposition to the Motion for Civil Penalties, Disgorgement, and Prejudgment Interest. (ECF No. 170.) On January 9, 2024, the SEC filed a Reply. (ECF No. 173.) On February 2, 2024, Giguiere filed a Sur-reply. (ECF No 181.)

On April 29, 2024, the Court heard oral argument on the Motion for Civil Penalties, Disgorgement and Prejudgment Interest.

On May 3, 2024, the SEC filed a Memorandum of Clarification. (ECF No. 201.) On May 8, 2024, Giguiere filed a Response to the Memorandum of Clarification. (ECF No. 203.) On May 10, 2024, the SEC filed a Response to Defendant Giguiere's May 8, 2024 Submission. (ECF No. 205.)

/ / /

3

## II.    ALLEGATIONS OF THE SAC

The Consent Judgment provides that, for purposes of the present motion, Giguiere cannot dispute the facts alleged in the SAC. (ECF No. 139 at 4.)

### A. KVMD Scheme

KVMD was a purported medical-device business. Giguiere controlled KVMD's entire public float and had the ability to direct KVMD to take certain corporate actions.

On August 1, 2016, KVMD filed a Form S-1 that sought to register thirty million shares of its common stock. The Form S-1 disclosed that KVMD entered into a Consulting Agreement with S-1 Services LLC ("S-1 Services"), and that KVMD "paid S-1 Services three million shares of its restricted common stock as payment for S-1 Services' assistance in preparing and filing the S-1." *Id.* ¶ 39. The S-1 did not disclose that S-1 Services was an entity formed by an associate of Giguiere, or that Giguiere had arranged KVMD to enter into the Consulting Agreement with S-1 Services "as a means by which Giguiere could obtain control of the three million shares for his and Lindsay's benefit." *Id.* ¶ 40.

On October 23, 2017, Giguiere caused S-1 Services to enter into a stock purchase agreement with Phenix Ventures LLC ("Phenix"), a nominee entity Giguiere owned and controlled. Pursuant to the agreement, S-1 Services sold 1.5 million shares of KVMD to Phenix. Giguiere similarly caused S-1 Services to sell a second tranche of 1.5 million shares of KVMD to Cataleya Capital ("Cataleya"), a nominee entity Lindsay owned and controlled. When depositing Phenix's 1.5 million shares, Giguiere executed a "Rule 144 Seller's Representation Letter – Non-Affiliate," in which "he knowingly, or at least recklessly, falsely stated that he was not an affiliate of KVMD." *Id.* ¶ 43.

"From November 29, 2017 to January 16, 2018, Giguiere and Lindsay engaged in a matched trading scheme to create a misleading appearance of active trading in KVMD's stock, to increase the price of KVMD stock, and to induce investors to buy KVMD stock." *Id.* ¶ 47. Giguiere and Lindsay's matched trading constituted "more than approximately 79% of KVMD's total trading volume on days that the stock traded." *Id.* ¶ 55. In one phone

4

call between the two, Lindsay admitted, "I'm a little hesitant about typing all of the details into this app…. You can just imagine if it finds its way somewhere *its's fairly incriminating*." *Id.* ¶ 52 (emphasis in original).

On January 18, 2018, Giguiere caused KVMD to issue a Form 8-K with the SEC stating that the company planned to focus its business plan on "telehealth wearable technologies" and "artificial technology." *Id.* ¶ 57. "In fact, KVMD's principals had taken no steps—and lacked the resources—to become a 'wearable technology company' or to 'leverage artificial intelligence.'" *Id.* ¶ 58.

On or about January 29, 2018, Giguiere began promoting KVMD's stock on a stock promotion website he controlled, TheMoneyStreet.com ("TheMoneyStreet"). TheMoneyStreet published an article titled "Can Machine Learning Actually Predict Therapeutic Results?" which claimed that KVMD was "perfectly positioned" to take advantage of the "fast-growing category" of "artificial intelligence and therapeutic treatment." *Id.* ¶¶ 59–60. The article did not disclose "that Giguiere was a control person of KVMD, that Giguiere caused KVMD to issue a dubious Form 8-K, that Giguiere and Lindsay's matched trading had increased KVMD's share price from near zero to $1.20, or that he and Lindsay were intending to sell additional shares of KVMD[.]" *Id.* ¶ 62.

By January 16, 2018, Giguiere had sold Phenix's 1.5 million shares of KVMD for $1.57 million in proceeds. On March 19, 2018, the SEC issued an order suspending trading in KVMD's securities for ten business days, citing "concerns about the accuracy and adequacy of information about KVMD's securities in the marketplace and potentially manipulative transactions in KVMD's common stock." *Id.* ¶ 67.

Through this conduct, Giguiere violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c).

**B. ESSI Scheme**

ESSI was a purported technology company focused on the cannabis industry. On December 17, 2015, ESSI filed a Form 8-K with the SEC, which claimed that "the

5

company's then-majority shareholder had sold his shares of ESSI stock to two brothers in a private transaction, and that the brothers had been appointed as ESSI's new chief executive officer ('ESSI CEO') and chief financial officer ('ESSI CFO')." *Id.* ¶ 111. "In reality, Giguiere had arranged to pay for the majority shareholder's control block of ESSI shares and, acting as a control person of ESSI, had installed the ESSI CEO and ESSI CFO as the company's nominal officers." *Id.* ¶ 112.

On January 1, 2016, Giguiere caused ESSI to enter into a "technology licensing and marketing support" agreement with Giguiere's nominee entity, Separation Degrees Online, Inc. ("SDOI"). *Id.* ¶ 13. "In reality, the 'marketing support' services to be provided by SDOI under the letter agreement were Giguiere's promotion of ESSI's stock on TheMoneyStreet." *Id.* ¶ 114. "Throughout 2016, Giguiere recommended ESSI's stock—a company with zero revenues and an accumulated deficit of more than $43 million by January 31, 2017—on TheMoneyStreet." *Id.* ¶ 134. ESSI compensated Giguiere for this promotion by paying SDOI millions of shares of ESSI stock.

In 2016, "Giguiere caused ESSI to file two Form S-8 registration statements with the [SEC]—the first on April 4, 2016 (the 'April S-8') and the second on November 23, 2016 (the 'November S-8')—that each purported to register five million shares of ESSI's common stock pursuant to ESSI's '2016 Equity Incentive Plan.'" *Id.* ¶ 121. Form S-8 registration statements allow issuers to register securities offered under employee benefit plans for bona fide services rendered, which do not include services in connection with the offer or sale of securities or the promotion of the issuer's securities. On April 6, 2016, ESSI purported to issue 1,250,000 shares to SDOI pursuant to the April S-8, and another 3,607,000 shares sometime thereafter. These issuances were not properly made pursuant to the April S-8 because they were "made in exchange for the marketing of the issuer's stock." *Id.* ¶¶ 123, 126.

When depositing the ESSI shares on April 18, May 23, October 3, and October 19, 2016, Giguiere falsely represented in the deposit documentation that he was not an

"affiliate/control person" of ESSI, and that he had not "made arrangement for the solicitation of buy orders in connection with this sale." *Id.* ¶¶ 124–26. "Giguiere knew, or was at least reckless in not knowing, that these statements were materially false and misleading[.]" *Id.* ¶ 125. For the October 3, 2016 deposit, Giguiere also submitted a "Non-Affiliate Shareholder's Representation Letter," in which he stated "he was not an affiliate of ESSI and that he was not aware of any non-public material adverse information about ESSI." *Id.* ¶ 128. "Giguiere was at least reckless in not knowing that these statements were materially false and misleading[.]" *Id.* ¶ 127. "The October 3, 2016 deposit also included a letter signed by Giguiere and the ESSI CEO in which Giguiere represented that he was not an affiliate of ESSI, and that Giguiere 'did not directly or indirectly promote or maintain a market for the Company's securities.'" *Id.* ¶ 128. "Giguiere knew, or was at least reckless in not knowing, that these statements were materially false and misleading." *Id.*

On November 8 and November 29, 2016, Giguiere deposited an additional 1.9 million shares of ESSI, which consisted of 1.4 million shares that he purchased from ESSI's prior CEO for $100,000, and 500,000 shares as payment for SDOI's sale of a purported communications platform. Again, in the deposit documentation, Giguiere falsely represented that he was not an "affiliate/control person" of ESSI, and that he had not "made arrangement for the solicitation of buy orders in connection with this sale." *Id.* ¶ 130. "Giguiere knew, or was at least reckless in not knowing, that these statements were materially false and misleading." *Id.*

On December 23, 2016, Giguiere deposited another 600,000 shares of ESSI stock into a second brokerage account. Giguiere obtained 500,000 of the 600,000 shares as payment for SDOI's sale of the purported communications platform—duplicating the tranche of 500,000 shares he had been paid and deposited into the first brokerage account. In connection with the deposit, Giguiere signed a "Stock Promotion Affidavit" dated December 29, 2016, in which the broker-dealer stated that it had "detected promotional activity that is concurrent with the deposit and/or sale of your stock," and attached two

online articles discussing promotion of ESSI. *Id.* ¶ 132. The affidavit asked Giguiere, "Were you aware of the promotional activity in the issue you wish to deposit or are offering for sale?" *Id.* ¶ 133.  Giguiere checked "no," and then falsely stated, "I am not involved in any promotional activity whatsoever." *Id.* "Giguiere knew, or was at least reckless in not knowing, that these statements were materially false and misleading." *Id.*

At no time did Giguiere disclose on TheMoneyStreet that he controlled ESSI and TheMoneyStreet, or that he was actively selling shares of ESSI. As of March 2016, TheMoneyStreet's "Disclaimer" page "affirmatively misrepresented" that "[a]rticles on our website represent independent financial commentary. The content is provided by independent authors via a common carrier platform and do not necessarily represent the opinions of our website." *Id.* ¶ 139. "Giguiere knew, or was at least reckless in not knowing, that those statements and omissions were false and misleading." *Id.* Sometime thereafter, Giguiere modified the "Disclaimer" to disclose that TheMoneyStreet may be compensated by SDOI for "advertising services" and that SDOI may sell shares it owns in a recommended stock. *Id.* ¶ 140. However, at no time did the Disclaimer page disclose that Giguiere controlled SDOI.

"Between April 21, 2016 and January 18, 2017, Giguiere sold more than 6.6 million shares of ESSI in his brokerage accounts for illicit proceeds of more than $8.5 million." *Id.* ¶ 141. "Over four million of these shares, generating more than $3.9 million in proceeds, were improperly issued to Giguiere pursuant to the April S-8." *Id.* "Beginning in May 2016, Giguiere began wiring a portion of the proceeds of his stock sales to a third party, who in turn wired the money to ESSI's bank account." *Id.* ¶ 142. "The ESSI CEO and ESSI CFO then paid themselves $5,000 per month out of the ESSI account." *Id.* "Because ESSI earned no revenues, the third party's deposits of the proceeds of Giguiere's sales of ESSI stock were the ESSI account's primary funding source, and thus the source of the ESSI CEO's and ESSI CFO's salaries." *Id.* ¶ 143. In other words, "Giguiere used the proceeds of his

8

sales of ESSI stock to pay the ESSI CEO and ESSI CFO to act as officers of the company." *Id.* ¶ 144.

Through this conduct, Giguiere violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c). Giguiere also violated Sections 5(a) and (c) of the Securities Act by causing ESSI to purport to issue securities pursuant to the April S-8 that were not registered in accordance with the provisions of the Securities Act, and then reselling those securities.

## III. DISGORGEMENT

The SEC seeks disgorgement of Giguiere's ill-gotten gains of $1,119,361.20 with respect to the KVMD fraud, and $6,641,054.77 with respect to the ESSI fraud.[1]

"The district court has broad equity powers to order the disgorgement of 'ill-gotten gains' obtained through the violation of the securities laws." *SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998) (citations omitted). "Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable." *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010) (citation omitted). A district court may only order disgorgement in an amount that "does not exceed a wrongdoer's net profits and is awarded for victims." *Liu v. SEC*, 591 U.S. 71, 74 (2020).

The SEC "bears the ultimate burden of persuasion that its disgorgement figure reasonably approximates the amount of unjust enrichment." *Platforms Wireless*, 617 F.3d at 1096 (quoting *SEC v. First City Financial Corp., Ltd.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989)). Once the SEC has made such a showing, the burden then shifts to the defendant to "demonstrate that the disgorgement figure was not a reasonable approximation." *Id.* (quoting *First City*, 890 F.2d at 1232). "[D]efendants are more likely than the SEC to have access to evidence establishing what they paid for the securities, if anything, to whom the

---

[1] The SEC clarified these figures at oral argument.

9

proceeds from the sales were distributed, and for what purposes the proceeds were used." *Id.* Although "[p]lacing the burden on the defendants of rebutting the SEC's showing of actual profits" may result in "actual profits becoming the typical disgorgement measure," "the risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty." *Id.* (quoting *First City*, 890 F.2d at 1232).

In support of its request for disgorgement, the SEC filed a declaration from one of its staff accountants, which states that between November 29, 2017, and January 16, 2018, Giguiere sold 1.5 million shares of KVMD through 26 transactions. (Brucculeri Decl., ECF No. 157-2 ¶ 4.) The declaration states that, using a zero-cost basis, Giguiere's net profit from those transactions was $1,573,958. After deducting Giguiere's criminal restitution of $187,893.43 and forfeiture of $266,703.37, the SEC seeks disgorgement of $1,119,361.20 in relation to the KVMD fraud. The declaration also states that between April 21, 2016, and January 18, 2017, Giguiere sold 6,044,510 shares of ESSI in one account for proceeds of $6,666,423, and 600,000 shares of ESSI in another account for proceeds of $1,744,069. The declaration states that, using a zero-cost basis, Giguiere's profit from these transactions was $8,410,492. After deducting Giguiere's civil forfeiture of $1,769,437.23, the SEC seeks disgorgement of $6,641,054.77 in relation to the ESSI fraud.

Between the $6,641,054.77 from the ESSI transactions and the $1,119,361.20 from the KVMD transactions, the SEC seeks a total disgorgement of $7,760,415.97. Based on the evidence presented, the SEC has set forth a reasonable approximation of Giguiere's ill-gotten gains. The burden shifts to Giguiere to show that the SEC's approximation is unreasonable.

Giguiere contends that the disgorgement figure with respect to the ESSI fraud is unreasonable under *Liu v. SEC*, 591 U.S. 71 (2020). In *Liu*, the Supreme Court held that "courts must deduct legitimate expenses before ordering disgorgement under §

78u(d)(5)."[2] *Liu*, 591 U.S. at 91–92. A contrary rule that "make[s] no allowance for the cost and expense of conducting [a] business" would be "inconsistent with the ordinary principles and practice of courts of chancery." *Id.* at 92 (quoting *Tilghman v. Proctor*, 125 U.S. 136, 144 (1988)). However, the Supreme Court has "carved out an exception" to this rule. *Id.* "[W]hen the entire profit of a business or undertaking results from the wrongful activity," then "the defendant will not be allowed to diminish the show of profits by putting in unconscionable claims for personal services or other inequitable deductions." *Id.* (quoting *Root v. Railway Co.*, 105 U.S. 189, 203 (1882)). Thus, district courts must ascertain "whether expenses are legitimate or whether they are merely wrongful gains under another name." (ECF No. 170 at 14.)

Giguiere contends that the Court should deduct the cash infusions that Giguiere made to ESSI from the sale of ESSI stock. In support of this argument, Giguiere provides a list of the transfers he made to ESSI, which totaled $7,124,925.40. (*See* Ex. A to Bahcall Decl., ECF No. 170-2.) Giguiere contends that because the sale of his stock was ESSI's primary funding source, these transfers were "necessary to pay ESSI's officers and keep the company functioning for the benefit of all investors." (ECF No. 170 at 14.) Giguiere also states that he returned 1.5 million shares of ESSI stock to the company in connection with the settlement of a derivative action brought on behalf of the ESSI shareholders. (*See* Bahcall Decl., ECF No. 170-2 ¶ 18.) Giguiere contends that because he "has returned much

---

[2] The Supreme Court's holding in *Liu* specifically applies to disgorgement awards made pursuant to 15 U.S.C. § 78u(d)(5). In this case, the SEC seeks a disgorgement award under § 78u(d)(7) in addition to § 78u(d)(5). (*See* ECF 157-1 at 14–15.) Currently, there is a split of out-of-circuit authority regarding whether *Liu*'s holding applies to disgorgement awards under 15 U.S.C. § 78u(d)(7). *Compare SEC v. Hallam*, 42 F.4th 316, 338 (5th Cir. 2022) ("Sections 78u(d)(3) and (d)(7) authorize legal 'disgorgement' apart from the equitable 'disgorgement' permitted by *Liu*."), *with SEC v. Govil*, 86 F.4th 89, 100–04 (2d Cir. 2023) (expressly disagreeing with the Fifth Circuit's holding in *Hallam* and holding that "disgorgement under § 78u(d)(7) must comport with traditional equitable limitations as recognized in *Liu*"). However, the SEC does not contest the applicability of *Liu* to this case.

more to ESSI and its shareholders than he ever profited, disgorgement is not available for this reason alone." *Id.*

As to the $7,124,925.40 that Giguiere transferred to ESSI, Giguere provides no evidence that these funds were used for legitimate business expenses. According to the allegations in the SAC, Giguiere was the "control person" of ESSI, and in that capacity, "installed the ESSI CEO and ESSI CFO as the company's nominal officers." (ECF No. 136 ¶ 112.) Through these officers, Giguiere caused ESSI to enter into multiple agreements with Giguiere's nominal entity, SDOI, whereby ESSI transferred stock to SDOI in compensation for Giguiere's promotional activities on TheMoneyStreet. *See id.* ¶¶ 113–14, 119–20. The SAC alleges that "Giguiere used the proceeds of his sales of ESSI stock to pay the ESSI CEO and ESSI CFO to act as officers of the company." *Id.* at ¶ 144. Based on these allegations, it appears that any salary-related expenses "were incurred for the purpose[] of furthering an entirely fraudulent scheme." *Liu*, 591 U.S. at 91. Additionally, other than payment of the nominal CEO and CFO's salaries, Giguiere does not specify how the funds were "being used for benefit of all shareholders." (ECF No. 170 at 14.) In the absence of proof that the expenses were incurred for a legitimate purpose, the Court cannot deduct any of the funds transferred to ESSI. *See Liu*, 591 U.S. at 91; *SEC v. Brenda Chirstine Barry/Bak West, Inc.*, No. 2:15-cv-02563 DDP (MAAx), 2023 WL 4491724, at *3 (C.D. Cal. July 12, 2023) ("Without clear information about business expenses from any of Defendants, the Court is unable to conclude that those expenses 'have value independent of fueling a fraudulent scheme.'"); *SEC v. Premier Holding Corp.*, No. 21-55249, 2022 WL 541194, at *1 (9th Cir. Feb. 23, 2022) (affirming the district court's disgorgement figure where "Defendants failed to meet their burden of proving that any of the purported business expenses were actually incurred or were legitimate").

On Sur-reply, Giguiere contends that regardless of whether ESSI spent the transferred funds "legitimately," the transferred funds should be credited to Giguiere. (ECF No. 181 at 4.) In support of this contention, Giguiere relies on *SEC v. Govil*, 86 F.4th 89

(2nd Cir. 2023). In *Govil*, the Second Circuit held that the SEC was required to deduct the value of shares the defendant returned to the company in connection with a settlement agreement, reasoning that "each payment in satisfaction of disgorgement offsets the overall disgorgement amount." *Id.* at 106. However, unlike the defendant in *Govil*, Giguiere was still in control of ESSI when he transferred funds to the company. (*See* ECF No. 136 ¶¶ 18, 29, 111–12.) For this reason, Giguiere was not deprived of "the fruits of [his] illegal conduct," and the transfers were not made "in satisfaction of disgorgement." *Govil*, 86 F.4th at 106–07.

As to the 1.5 million shares of ESSI stock that Giguiere transferred back to the company in connection with the derivative action settlement, these shares were not factored into the SEC's approximation of Giguiere's ill-gotten gains. (Brucculeri Decl., ECF No. 157-2 ¶ 5 (calculating net profits from Giguiere's brokerage records).) Further, the attorney declaration filed in support of this argument states only that Giguiere "agreed to return" the shares to ESSI, not that he actually did. (Bahcall Decl., ECF No. 170-1 ¶ 18.) Even so, Giguiere does not provide the fair market value of the shares, which is his evidentiary burden.

Giguiere also contends that the ESSI disgorgement figure is inaccurate because the SEC "improperly assumes a zero-cost basis for any of the shares even though it is expressly alleged that Mr. Giguiere provided promotional services for ESSI and was to be paid via these shares." (ECF No. 170 at 13.) But the "promotional services" Giguiere provided were made under fraudulent circumstances. Based on the allegations in the SAC, the ESSI's Form 10-K for the year ending January 31, 2017 "disclosed that $1,720,914 of the $2,061,506 (approximately 83%) worth of stock paid to SDOI," Giguiere's nominee entity, was for "advertising and promotion services." (ECF No. 136 ¶ 120.) The SAC further alleges that Giguiere made affirmative misrepresentations and material omissions on TheMoneyStreet when promoting ESSI stock. *See id.* ¶¶ 134–40. Giguiere cites no legal authority to support the claim that he should be given a cost-basis in a stock based on his

efforts to fraudulently promote it, nor does Giguiere provide any evidence as to what the correct cost-basis should be.

Accordingly, Giguiere has failed to show that the SEC's approximation of his ill-gotten gains is unreasonable.

In addition to demonstrating that the disgorgement amount is a reasonable approximation of Giguiere's net profits, the SEC must also show that this amount will be "awarded for victims." *Liu*, 591 U.S. at 79. In analyzing the bounds of equitable relief for securities law violations, the Supreme Court stated that disgorgement as a remedy "must do more than simply benefit the public at large by virtue of ill-gotten gains." *Id.* at 90. Instead, the "equitable nature" of the disgorgement remedy "generally requires the SEC to return a defendant's gains to wronged investors for their benefit." *Id.*

Giguiere contends that the SEC fails to show that ESSI and KVMD investors were harmed and that the disgorged funds will go to those investors. As an initial matter, it is unclear whether *Liu* requires the SEC to prove that investors were harmed. While the Second Circuit has held that a finding of pecuniary harm is necessary before ordering disgorgement, *see SEC v. Govil*, 86 F.4th 89, 98 (2d Cir. 2023), the Ninth Circuit has not ruled on the issue. In any case, the SEC has demonstrated that investors have been harmed by the ESSI and KVMD schemes. In the SAC, the SEC alleges that Giguiere's matched-trading scheme created "a misleading appearance of active trading in KVMD's stock," which in turn caused the price of KVMD to rise. (ECF No. 136 ¶ 47.) With respect to the ESSI scheme, the SEC alleges that Giguiere fraudulently promoted ESSI stock on TheMoneyStreet by failing to disclose his interest in the stock, and "[a]s a result of the scheme," Giguiere sold ESSI stock for a sizable profit. *Id.* ¶ 21. The allegations that ESSI's and KVMD's stock prices were artificially inflated during the relevant trading period, when accepted as true, show that investors were harmed when purchasing ESSI and KVMD stock. *See SEC v. Sripetch*, No. 20-cv-01864-H-BGS, 2024 WL 1546917, at *5 (S.D. Cal. Apr. 8, 2024) (concluding that investors were harmed for purposes of disgorgement by

purchasing artificially-inflated stock); *SEC v. iFresh, Inc.*, No. 22CV3200ARRSJB, 2024 WL 416709, at *3 (E.D.N.Y. Feb. 5, 2024) ("The SEC's allegation that iFresh's stock prices were artificially inflated during the relevant time period, taken as true, also establishes the requisite pecuniary harm to those who purchased iFresh stock during that time period."). The pecuniary harm suffered by KVMD shareholders is also evidenced by the restitution that Giguiere was required to pay in the related criminal case, as well as the victim impact statements supporting the request for restitution. *See United States v. Giguiere*, 18-cr-03071-WQH, ECF Nos. 248, 278 (S.D. Cal.).

Additionally, the SEC has adequately represented to the Court that it will distribute the disgorged profits to harmed investors.[3] The SEC states that its staff "has made a preliminary determination that a distribution to defrauded investors will be feasible, if sufficient funds are collected via disgorgement, prejudgment interest, and civil penalty payments." (ECF No. 173 at 7.) The SEC states that if sufficient funds are collected, it is prepared to petition the Court to establish a Fair Fund, through which disgorged funds will be disbursed to victims. Courts in this Circuit have found similar statements by the SEC sufficient to satisfy the victim-benefit requirement under *Liu*. *See Sripetch*, 2024 WL 1546917, at *4 (finding *Liu* satisfied where the SEC represented that "it will make good faith efforts to ensure that any disgorgement award will go to [the] harmed investors" and that it "has already conducted a preliminary assessment for a distribution to defrauded

---

[3] In *Liu*, the Supreme Court left open the question of whether the SEC's practice of depositing disgorged funds with the Treasury, where it is infeasible to distribute collected funds to investors, satisfies the SEC's obligation to award relief "for the benefit of investors." *Liu*, 591 U.S. at 89. The Court stated that "the lower courts may evaluate in the first instance whether [an order directing any proceeds to the Treasury] would indeed be for the benefit of investors." *Id.* at 90. Here, the SEC does not contend that it is infeasible to distribute funds to ESSI and KVMD investors, nor has it requested the Court to order that the disgorged proceeds be sent to the Treasury. Thus, the Court need not address whether depositing the disgorged funds with the Treasury would be "for the benefit of investors." *Id.*; *SEC v. Beck*, No. 2:22-cv-00812-FWS-JC, 2024 WL 1626280, at *14 (C.D. Cal. Mar. 26, 2024) (concluding that the court "does not need to address whether sending the disgorged funds to the U.S. Treasury would be 'for the benefit of investors'" because the SEC "does not argue that it would be infeasible to distribute funds to the victims here").

investors"); *SEC v. Mizrahi*, No. CV 19-2284 PA (JEMx), 2020 WL 6114913, at *2 (C.D. Cal. Oct. 5, 2020) (concluding that disgorgement was consistent with *Liu* where the SEC stated that it "seeks to recover this sum in disgorgement so that it may return those funds to clients who lost significant sums of money that Mizrahi misused for his fraudulent scheme"); *Beck*, 2024 WL 1626280, at *14 (SEC stating that it will distribute disgorged funds through a Fair Fund, if feasible, establishes that disgorgement will be "for the benefit of investors").

Giguiere makes several arguments in opposition. First, Giguiere contends that there are no victims of the ESSI fraud because after he forfeited $1,769,437.23 in the civil forfeiture action, no one made a claim to the money. But the fact that no one came forward to claim forfeited funds does not mean there are no victims of the fraud. In any case, the civil forfeiture amount has been deducted from the disgorgement sought by the SEC. Giguiere similarly contends that ESSI shareholders are no longer harmed because they resolved their claims via a settlement to a shareholder derivative suit. Without evidence of the fair valuation of these shares, the Court is unable to determine that ESSI investors have been made whole.

Giguiere also contends that there were no victims from Giguiere's ESSI-related violations because the reason ESSI trading was suspended had nothing to do with Giguiere's promotion efforts. According to the May 19, 2017 SEC Order of Suspension of Trading, the SEC suspended trading in ESSI "because of concerns regarding the adequacy and accuracy of information in a company press release dated May 5, 2017 relating to the company's proposed acquisition of Ga-Du Bank, Inc." (Ex. A, ECF No. 181-1.) Regardless of what prompted the SEC to suspend trading, the SAC adequately alleges that investors were harmed when they purchased ESSI stock that was artificially inflated based on Giguiere's promotional activity. The extent to which the misrepresentations and omissions alleged in the SAC—as opposed to some other factor—contributed to investor losses is immaterial for purposes of the present motion. The SEC is not required to prove loss

causation or damages when it brings an enforcement action, nor is loss causation an element of calculating disgorgement. *See Gebhart v. SEC*, 595 F.3d 1034, 1040 n.8 (9th Cir. 2010) (stating that "loss causation" and "economic loss" are "inapplicable" to an SEC enforcement action).

As to the KVMD fraud, Giguiere contends that there are no longer any harmed investors because Giguiere paid $187,893.43 in criminal restitution to KVMD victims. This figure, however, is based on the number of victims who came forward in the criminal case to request restitution, and does not necessarily represent all victims who purchased KVMD stock during the relevant trading period. *See United States v. Giguiere*, 18-cr-03071-WQH, ECF No. 248 at 3 (S.D. Cal.). Giguiere contends that there are few, if any, KVMD victims because Giguiere and Lindsay's matched trading constituted 79% of all trading in KVMD stock. However, as Giguiere conceded during oral argument, Giguiere and Lindsay's matched trading did not constitute all KVMD trading, meaning there were still investors who purchased inflated KVMD stock outside of Lindsay and Giguiere. (*See* Transcript of Motion Hearing, ECF No. 202 at 16 ("[A]t most, you have $329,000 worth of possible trading by victims.").) To the extent that Giguiere contends that any disgorgement must be limited to the amount of investor loss, this assertion contradicts Supreme Court and Ninth Circuit authority, which state that disgorgement is measured by a defendant's net gains as opposed to investor losses. *See Liu*, 591 U.S. at 85 (holding that disgorgement awards are calculated based on the "the net profits from wrongdoing"); *SEC v. Sabrdaran*, 252 F. Supp. 3d 866, 893 (9th Cir. 2017) ("Disgorgement need only be a 'reasonable approximation of profits causally connected to the violation.'") (citation omitted); *Platforms Wireless*, 617 F.3d at 1097 ("Unlike [] damages … the purpose of a disgorgement remedy is to prevent unjust enrichment and to make securities law violations unprofitable, not to compensate victims."); *see also Govil*, 86 F.4th at 105 ("[D]isgorgement is measured by the wrongful gain obtained by the defendant rather than by the loss to the investor.").

Accordingly, the SEC has adequately shown that disgorgement will be for the benefit of victims. The Court orders Giguiere to disgorge $7,760,415.97.

## IV.  PREJUDGMENT INTEREST

The Consent Judgment provides that if disgorgement is ordered, prejudgment interest shall be calculated from January 1, 2017,[4] based on "the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2)." (ECF No. 139 at 4.) The purpose of imposing an award of prejudgment interest is "to deny a wrongdoer any economic benefit from his violations." *Platforms Wireless*, 617 F.3d at 1099 (quoting SEC Rules and Regulations, 60 Fed. Reg. 32,788 (June 23, 1995)).

The SEC seeks prejudgment interest in the amount of $2,091,439.85. As to the KVMD fraud, the SEC calculated prejudgment interest from February 1, 2018 to June 30, 2019, totaling $85,270.70. (Ex. A to Brucculeri Decl., ECF No. 157-3.) As to the ESSI fraud, the SEC calculated prejudgment interest from February 1, 2017 to February 28, 2023, which totaled $2,006,169.15. (Ex. B to Brucculeri Decl., ECF No. 157-4.)

Giguiere does not dispute that the SEC calculated prejudgment interest in accordance with the Consent Judgment. Rather, Giguiere asks the Court to calculate prejudgment interest only until the date he returned his profits to ESSI, because once the profits were transferred, he "no longer had use of the money in question." (ECF No. 170 at 27 (citation omitted).) However, based on the allegations in the SAC, Giguiere was the "control person of ESSI," ECF No. 136 ¶ 112, and in that capacity, caused ESSI to exchange funds with other entities also in Giguiere's control, *see id.* ¶¶ 113–14. Thus, once Giguiere transferred his unlawful gains to ESSI, he was not deprived of their use. *See Platforms Wireless*, 617 F.3d at 1099 (calculating prejudgment interest was appropriate for

---

[4] The SEC's supporting brief incorrectly states that prejudgment interest shall be calculated from September 30, 2021. The SEC clarified at oral argument that, per the terms of the Consent Judgment, prejudgment interest shall be calculated from January 1, 2017.

the period in which "defendants plainly had the use of their unlawful profits"). The Court therefore orders Giguiere to pay prejudgment interest in the amount of $2,091,439.85.

## V.   CIVIL PENALTIES

The SEC seeks a third-tier civil penalty of $875,000 against Giguiere arising out of the ESSI fraud. The SEC only seeks a civil penalty with respect to the ESSI fraud because Giguiere was already incarcerated due to his involvement with the KVMD fraud.

Under the Exchange Act and Securities Act, a district court may impose civil penalties for violation of securities laws. 15 U.S.C. §§ 77t(d)(2)(A), 78u(d)(3)(B)(i). Courts assess penalties according to a three-tiered system, which is based on a defendant's level of culpability. First-tier penalties may be imposed for any violation of the Exchange Act or Securities Act. *See id.* §§ 77t(d)(2)(A), 78u(d)(3)(B)(i). Second-tier penalties are permitted if the violation "involve[ed] fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." *Id.* §§ 77t(d)(2)(B), 78u(d)(3)(B)(ii). Third-tier penalties may be imposed for violations that (1) "involve[ed] fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and (2) "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Id.* §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii). A third-tier penalty shall not exceed the greater of (1) $223,229 for each violation, or (2) the gross amount of pecuniary gain to the defendant. *See id.* §§ 77t(d)(2), 78u(d)(3)(B); 17 C.F.R. § 201.1001(b) (statutory amount adjusted for inflation). The amount of civil penalty imposed within each tier is discretionary, and is to be determined "in light of the facts and circumstances" of the case. *Id.* §§ 77t(d)(2)(A), 78u(d)(3)(B)(i).

Because "civil penalties are designed to deter the wrongdoer from similar violations in the future," courts apply the factors set forth in *SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980) to determine the proper penalty. *SEC v. Murphy*, 50 F.4th 832, 847 (9th Cir. 2022) (internal quotation marks and citations omitted). These factors include: (1) the degree of scienter involved; (2) the isolated or recurrent nature of the infraction; (3) the defendant's

recognition of the wrongful nature of his conduct; (4) the likelihood, because of the defendant's professional occupation, that future violations might occur; and (5) the sincerity of his assurances against future violations. *SEC v. Husain*, 70 F.4th 1173, 1184 (9th Cir. 2023).

The SEC contends that a third-tier penalty is appropriate because "Giguiere's violations were egregious, recurrent, and involved a high degree of scienter." (ECF No. 157-1 at 12.) The SEC contends that given the number of Giguiere's misrepresentations and trades, assessing a $223,229 civil penalty for each violation "could lead to a sum far more than Giguiere's profits." *Id.* at 13. Instead, the SEC seeks a penalty of $875,000, which reflects a third-tier penalty for each of the four instances Giguiere deposited ESSI shares under false pretenses, slightly rounded down.[5] (ECF No. 173 at 11.)

Giguiere contends that civil penalties are not appropriate. Giguiere contends that he did not act with a high degree of scienter because he did not knowingly fail to disclose that he was selling ESSI stock while promoting it, and most of the profits from his trading were invested back into the company. Giguiere also contends that his infractions were isolated to less than a year and involved a single S-8 form, he recognized the wrongful nature of his conduct by consenting to liability, he is unlikely to commit future violations because he is enjoined from trading penny stock and from serving as an officer or director of a publicly traded company, and he is unable to pay a civil penalty.

As an initial matter, the Court finds that a third-tier penalty is warranted. Per the terms of the Consent Judgment, Giguiere admitted that he engaged in fraudulent activity and acted with at least a reckless disregard for regulatory requirements. *See* 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii); ECF No. 136 ¶ 152. Additionally, by artificially inflating the price of ESSI stock, Giguiere's scheme "created a significant risk of substantial loss" to investors who purchased ESSI stock. 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii); *see*

---

[5] The SEC appears to count the May 23, October 3, and October 19, 2023, deposits as one instance.

*SEC v. Wellness Matrix Group, Inc.*, No. 8:21-cv-01031-SSS-DFMx, 2023 WL 5235177, at *8 (C.D. Cal. Aug. 10, 2023) (fraudulently promoting stock created a "significant risk of substantial losses to other persons"); *SEC v. BIC Real Estate Dev. Corp.*, No. 1:16-cv-00344-LJO-JLT, 2017 WL 1740136, at *5 (E.D. Cal. May 4, 2017) (rejecting the contention that the court must calculate "the precise amount of investor losses prior to awarding [third-tier civil penalties]").

Considering the *Murphy* factors, the first two factors weigh in favor of a sizable civil penalty. As outlined by the SAC, Giguiere acted with a high degree of scienter, evidenced by Giguiere's efforts to conceal his unlawful stock promotion through inaccurate filings with broker-dealers. *See SEC v. Rothenberg*, 428 F. Supp. 3d 246, 253 (N.D. Cal. 2019) (scienter evidenced by efforts to conceal fraudulent activity). When depositing ESSI shares, Giguiere represented to the broker-dealer that "he was not an 'affiliate/control person' of ESSI," that "he had not 'made arrangement for the solicitation of buy orders in connection with [the] sale," and that he was "not involved in any promotional activity whatsoever." (ECF No. 136 ¶¶ 125, 127, 128, 130.) In reality, Giguere was promoting ESSI, the company he controlled, while actively liquidating ESSI stock. *See id.* ¶¶ 111–12, 134–41. Giguiere agreed that he "knew, or was at least reckless in not knowing, that [the] statements [to the broker-dealer] were materially false and misleading." *Id.* ¶¶ 125, 128, 130. Further, despite being notified by a broker-dealer that it had detected suspicious promotional activity, Giguiere continued to falsely represent that he was not involved in such activity. *See id.* ¶¶ 132–33; *see BIC Real Estate Dev. Corp.*, 2017 WL 1740136, at *5 (finding a high degree of scienter where the defendant "repeatedly and brazenly misrepresented the truth of his fraudulent scheme"). While Giguiere contends that his investments back to ESSI show that he did not act with a high degree of intent, these investments furthered his fraudulent scheme by, among other things, paying ESSI's CEO and CFO to purport to act as officers of the company. (*See* ECF No. 136 ¶¶ 143–44.) Giguiere's violations were also recurrent. Giguiere made multiple misrepresentations and

omissions to broker-dealers, to the SEC, and to investors, and these violations occurred over several months. *See id.* ¶¶ 121–22 (inaccurate Form S-8 registration statements with the SEC); *id.* ¶¶ 125, 128, 130, 133 (misrepresentations to broker-dealers); *id.* ¶¶ 137–40 (misrepresentations and omissions to investors); *SEC v. CMKM Diamonds, Inc.*, 635 F. Supp. 2d 1185, 1193 (D. Nev. 2009) (concluding that violations were "not isolated but recurrent" where defendant "repeatedly violated several securities laws, and continually defrauded investors" over multiple months).

On the other hand, the third, fourth, and fifth factors weigh in favor of imposing a reduced penalty. Giguiere has recognized the wrongful nature of his conduct by consenting to liability in this case and in the related civil forfeiture case, and has agreed to an injunction against future securities law violations. It does not appear that Giguiere is in a position to commit further securities violations, given that Giguiere is now a convicted felon and permanently banned from trading penny stock and from serving as an officer or director of a publicly traded company. The Court also acknowledges Giguiere's fraught financial situation, and that he is unlikely to be able to pay any penalty imposed. *See* Ex. G to Bahcall Decl., ECF No. 170-8 (Giguiere's bank statements); *SEC v. Kara*, No. 09-cv-01880-EMC, 2016 WL 794886, at *7 (N.D. Cal. Mar. 1, 2016) ("Weighing against factors which support a civil penalty is Defendant's current financial situation[.]").

The penalty requested by the SEC, $875,000, is about 10% of the amount of disgorgement. Courts frequently impose third-tier civil penalties that are a much higher percentage of a defendant's ill-gotten gains. *See, e.g.*, *SEC v. Blockvest, LLC*, No. 18CV2287-GPB(MSB), 2020 WL 7488067, at *5 (S.D. Cal. Dec. 15, 2020) (assessing a civil penalty equal to the amount of defendants' pecuniary gain); *SEC v. Driver*, No. 2:09-CV-03410-ODW, 2014 WL 6882854, at *3 (C.D. Cal. Dec. 4, 2014) (assessing a civil penalty over $3 million equal to defendant's ill-gotten gains). But given the competing *Murphy* factors in this case, the Court finds that the reduced civil penalty requested by the SEC is appropriate. This penalty adequately balances the egregiousness

of the offense with Giguiere's recognition of wrongdoing and the low likelihood of future violations. *See SEC v. Presto Telecomms, Inc.*, 237 Fed. App'x 198, 200 (9th Cir. 2007) (affirming third-tier civil penalties in an amount equal to 10% of the amount defendant was ordered to disgorge). Accordingly, Giguiere is ordered to pay a civil penalty of $875,000.

## VI.   CONCLUSION

IT IS HEREBY ORDERED that the Motion for Civil Penalties, Disgorgement and Prejudgment Interest as to Defendant Gannon Giguiere (ECF No. 157) is granted. Within fourteen (14) days of the date of this Order, the SEC shall submit a proposed final judgment consistent with this Order.

Dated:  June 11, 2024

Hon. William Q. Hayes
United States District Court

23