**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>GANNON GIGUIERE, OLIVER-BARRET LINDSAY, ANDREW HACKETT, KEVIN GILLESPIE, AND ANNETTA BUDHU,<br><br>Defendants. | Case No.: 18-cv.-1530-WQH-JLB |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR SUMMARY JUDGMENT <u>AS TO DEFENDANT ANDREW HACKETT</u>**

# TABLE OF CONTENTS


**TABLE OF AUTHORITIES** ........ iii

**PRELIMINARY STATEMENT** ........ 1

**RELEVANT PROCEDURAL BACKGROUND** ........ 3

I. **The SEC's Complaint** ........ 3

A. The Relevant Civil Defendants Gain Control of ASNT ........ 4

B. The Relevant Civil Defendants Plan to Promote ASNT ........ 4

C. Hackett Engages in Matched Trading ........ 5

D. The Charged Securities Law Violations ........ 6

II. **The Stay in this Case** ........ 6

III. **Hackett's Recent Filings in this Case** ........ 6

**STATEMENT OF FACTS** ........ 7

I. **The Criminal Indictment Against Hackett** ........ 7

II. **The Criminal Conviction and Hackett's Appeal** ........ 8

A. Testimony at the Criminal Trial ........ 8

B. Documentary Evidence at the Criminal Trial ........ 11

C. The Government's Summation and Rebuttal at Trial ........ 12

D. Hackett's Conviction, Appeal, and Motion for a New Trial ........ 13

III. **Additional Undisputed Facts** ........ 13

**LEGAL ARGUMENT** .......... 13

I. **Standard of Review** .......... 13

II. **Legal Standard for Underlying Securities Fraud Claims** .......... 14

III. **Summary Judgment Is Warranted Based on Collateral Estoppel** .......... 15

A. The Offense for Which Hackett Was Convicted was Serious .......... 16

B. The Criminal Case Involved a Full and Fair Trial .......... 17

C. The Claims in the Criminal Case are Co-Extensive with the Claims in this Civil Matter .......... 17

D. Identity of Parties .......... 19

IV. **Hackett's Pending Appeal Does Not Preclude Summary Judgment** .......... 19

V. **The Court Should Grant the SEC's Requested Remedies** .......... 19

A. Disgorgement .......... 20

B. Prejudgment Interest .......... 20

C. Injunction .......... 20

D. Penny Stock Bar .......... 22

**CONCLUSION** .......... 22

# TABLE OF AUTHORITIES

**Cases**

*Aaron v. SEC*, 446 U.S. 680 (1980) ....................................................................14

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..........................................14

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......................................................14

*Collins v. D.R. Horton, Inc*., 505 F.3d 874 (9th Cir. 2007).....................................19

*Emich Motors Corp. v. General Motors Corp*., 340 U.S 558 (1951) ................15, 19

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976)..................................................14

*Gebhart v. SEC*, 595 F.3d 1034 (9th Cir. 2010).......................................................14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574 (1986) .............14

*Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979)...............................................15

*SEC v. Abellan*, 674 F. Supp. 2d 1213 (W.D. Wash.)..............................................22

*SEC v. Alexander*, 115 F. Supp. 3d 1071, 1080-84 (N.D. Cal. 2015).....................16

*SEC v. Baccam*,
No. 17-cv.-0172, 2017 WL 5952168 (C.D. Cal. June 14, 2017).........................21

*SEC v. Bilzerian*, 29 F.3d 689 (D.C. Cir. 1994) .......................................................16

*SEC v. Braslau*,
No. 14-cv.-01290-ODW, 2016 WL 5922666 (C.D. Cal. May 13, 2016) ......16, 18

*SEC v. Cross Financial Services*, 908 F. Supp. 718 (C.D. Cal. 1995)......................20

*SEC v. Everest Management Corp*., 466 F. Supp. 167 (S.D.N.Y. 1979) .................16

*SEC v. First Pacific Bancorp*, 142 F.3d 1186 (9th Cir. 1998) .................................20

*SEC v. GLT Dain Rauscher*, *Inc*., 254 F.3d 852 (9th Cir. 2001)..............................14

*SEC v. Gruenberg*, 989 F.2d 977 (8th Cir. 1993)....................16

*SEC v. Haligiannis*, 470 F. Supp. 2d 373 (S.D.N.Y. 2007)....................18

*SEC v. Hilsenrath*,
No. C-03-03252, 2008 WL 225709 (N.D. Cal. May 30, 2008)....................16, 19

*SEC v. Koracorp Industries, Inc.*, 575 F.2d 692 (9th Cir. 1978) ....................21

*SEC v. Management Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975) ....................21

*SEC v. Moran*, 944 F. Supp. 286 (S.D.N.Y. 1996)....................20

*SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980)....................20, 21

*SEC v. Pierre*,
No. 19-cv.-10299, 2024 WL 1994051 (S.D.N.Y. May 6, 2024) (JPC) ....................15

*SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072 (9th Cir. 2010)....................14, 20

*SEC v. Reyes*,
No. C-06-04435, 2008 WL 3916247 (N.D. Cal. Aug. 25, 2008) ....................15, 16, 19

*SEC v. Schooler*, 106 F. Supp. 3d 1157 (S.D. Cal. 2015) ....................14

*Simpson v. AOL Time Warner, Inc.*,
452 F.3d 1040, 1048 (9th Cir. 2006), *vacated on other grounds sub nom.*, *Avis Budget Group Inc. v. Cal. State Teachers' Ret. System*, 552 U.S. 1162 (2008)...15

*In re Towers Financial Corp. Noteholders Litig.*,
75 F. Supp. 2d 178 (S.D.N.Y. 1999) ....................16

*United States v. Castillo-Basa*, 483 F.3d 890 (9th Cir. 2007)....................17

*United States v. Real Property Located at Section 18*,
976 F.2d 515 (9th Cir. 1982)....................16

*United States v. Podell*, 572 F.2d 31 (2d Cir. 1978)....................15

**Regulations**

15 U.S.C. § 78c(a)(51) ....................................................................................2

15 U.S.C. § 78j(b) ..........................................................................................14

26 U.S.C. § 6621(a)(2).....................................................................................20

17 C.F.R. § 240.10b-5(a)..................................................................................14

17 C.F.R. § 240.10b-5(c)..................................................................................14

17 C.F.R. § 240.3a51-1 .....................................................................................2

**Rules**

Fed. R. Civ. P. 56(a) 13

Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this Memorandum of Points and Authorities in Support of the Motion for Summary Judgment Against Defendant Andrew Hackett ("Hackett") pursuant to the Court's Orders of May 14, 2024 (Dkt. No. 211) and June 17, 2024 (Dkt. No. 218). The SEC moves for summary judgment based on collateral estoppel resulting from Hackett's conviction on criminal securities fraud charges in the parallel action *United States v. Hackett*, 18-cr.-3072 (S.D. Cal.) (TWR) (the "Criminal Case"). Together with this Memorandum of Points and Authorities, the Commission submits the Undisputed Statement of Facts Pursuant to Judge William Q. Hayes' Civil Pre-Trial & Trial Procedures and the Declaration of Christopher J. Dunnigan, executed July 25, 2024 ("Dunnigan Decl."), which attaches certain relevant documents.

**PRELIMINARY STATEMENT**

In a parallel criminal proceeding, a jury convicted Hackett of the same securities fraud at issue in this SEC civil enforcement action. Based on *res judicata* principles, Hackett is collaterally estopped from contesting his liability for securities fraud in this action, where the burden of proof is lower than in his criminal case. In addition, the facts established in the Criminal Case, along with other undisputed facts, entitle the SEC to all of the relief it seeks in this litigation: (1) a permanent injunction against future violations of the securities fraud provisions Hackett violated; (2) a permanent bar prohibiting Hackett from participating in any offering of a penny stock; and (3) disgorgement of $30,812.30 and prejudgment interest of $11,797.54, which the SEC seeks to be deemed satisfied by the restitution order in the Criminal Case. Courts routinely grant the SEC summary judgment as to liability and non-monetary relief once a defendant has been convicted of securities fraud in a parallel criminal case. This Court should do the same.

Both this action and the Criminal Case arose out of a securities fraud scheme Hackett, along with his co-defendants Kevin Gillespie ("Gillespie") and Annetta

Budhu ("Budhu") (collectively, the "Relevant Civil Defendants"), conducted to "pump and dump"[1] the stock of Arias Intel Corp. (f/k/a First Harvest Corp. (formerly trading as "HVST")) ("ASNT" or the "Company"), a publicly-held microcap company that issued penny stock (essentially, stock that traded below $5.00 per share)[2] and purportedly operated a digital media business. The Complaint alleges in relevant part that, from approximately 2016 to 2018, the Relevant Civil Defendants worked to gain control over ASNT stock, which they planned to then "pump" (inflate the share price through fraudulent promotion) and "dump" (sell in the open market), ultimately splitting among themselves the ill-gotten gains generated by this scheme.

In the Criminal Case involving the same conduct, a jury convicted Hackett of one count of securities fraud and one count of conspiracy to commit securities fraud. (Dunnigan Decl. Ex. 1.) The Criminal Case went to trial on July 21, 2021 and, on August 2, 2021, the jury returned a verdict of guilty on both counts. (Dunnigan Decl. Ex. 3.) On June 9, 2022, Hackett was sentenced to 46 months of incarceration and 3 years of supervised release and was ordered to pay restitution of $67,184.91. (Dunnigan Decl. Exs. 4, 5.)

The SEC now seeks summary judgment against Hackett as to liability and relief. His criminal conviction and additional undisputed facts establish that Hackett

---

[1] In a "pump and dump" scheme, a group of individuals who control the "free trading" shares of an issuer with a thinly-traded stock, also referred to as the issuer's "float," inflate the issuer's share price and trading volume through, among other things, engaging in wash and matched trading, issuing false or misleading press releases, and paying for stock promotions. When the issuer's share price reaches a desirable level or target price, the individuals "dump" their shares into the buying volume generated during the "pump" phase for substantial financial gain. (Dkt. No. 136 ¶ 11 n. 1.)

[2] During the relevant time period, ASNT's common stock was a "penny stock" as defined in Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)] and Exchange Act Rule 3a51-1 [17 C.F.R. § 240.3a51-1].

poses a serious threat to the investing public. A permanent injunction and penny stock bar are necessary to prevent him from defrauding investors again. The Court should therefore grant the SEC's summary judgment motion in its entirety.

## RELEVANT PROCEDURAL BACKGROUND

### I. The SEC's Complaint.

The SEC filed its Complaint in this case on July 6, 2018. (Dkt. No. 1.) With the Court's authorization, the SEC filed a Second Amended Complaint on April 7, 2023. (Dkt. No. 136.) Hackett filed an Answer to the SEC's Second Amended Complaint and Cross-Claims against two other defendants on July 31, 2023.[3] (Dkt. No. 144.)

The Commission's Second Amended Complaint alleges, in relevant part, that the Relevant Civil Defendants conducted a fraudulent pump and dump scheme in the common stock of ASNT. (Statement of Undisputed Facts ("SUF"), ¶¶ 4, 6.) According to the Second Amended Complaint, the Relevant Civil Defendants planned to carry out their scheme through a series of steps: *first*, by gaining control of a majority of ASNT shares available to be traded in the open market, in part through material misrepresentations to ASNT's transfer agent (*Id.* ¶¶ 8-12); *second*, by promoting ASNT through a stock promotion website and a series of Company press releases in order to generate investor interest and trading volume (*Id.* ¶¶ 13; 15); and *third*, by Hackett and other associates selling ASNT shares once the stock reached a targeted price per share (*Id.* ¶ 16.) The Second Amended Complaint further alleges that, when the planned promotion efforts fell through, Hackett tried to increase the trading volume and price per share of ASNT stock by engaging in an alternative scheme involving matched trading with an individual who, unbeknownst to Hackett, was an undercover agent for the Federal Bureau of Investigation ("FBI") posing as the leader of a network of corrupt stockbrokers (the "Undercover Agent"). (*Id.* ¶¶ 17-

---

[3] The two defendants never answered or moved against Hackett's cross-claims.

19.) Throughout the scheme, the Relevant Civil Defendants used encrypted messaging platforms to hide their actions from law enforcement. (*Id.* ¶¶ 19; 22.)

A. The Relevant Civil Defendants Gain Control of ASNT.

The Second Amended Complaint alleges that, in 2016, Gillespie became ASNT's majority shareholder when Budhu brokered a sale of ASNT stock from the Company's previous sole-officer and director to Gillespie. (*Id.* ¶ 69.) Gillespie also assumed the roles of CEO, president, and chairman of the Company's board of directors. (*Id.* ¶ 70.) In February 2017, Gillespie caused ASNT to enter into a purported "Advisory Agreement" with Budhu and her nominee, Baywall Inc. ("Baywall"), under which the Company paid her 200,000 shares of ASNT stock for her "consulting services;" those shares were transferred to Baywall the following month. (*Id.* ¶¶ 7; 72-73.) In August 2017, Baywall sold the 200,000 ASNT shares to Hackett's nominee entity, FreeLife Investments, Inc. ("FreeLife") at a significant premium to its then trading price. (*Id.* ¶¶ 9; 74-75.) As part of the sale, Hackett made multiple materially false misrepresentations to the ASNT transfer agent in a "Seller's Representation Letter" that the transfer agent required to effect the sale of shares from Baywall to FreeLife and any future sales by FreeLife in the open market. (*Id.* ¶¶ 10; 77.) In particular, Hackett falsely represented that he was "not aware of any material, non-public information about the Company[,]" despite knowing that the Relevant Civil Defendants planned to pump and dump ASNT stock. (*Id.* ¶ 79.) Also in August 2017, in an effort to transfer even more control of ASNT to Hackett, Gillespie caused ASNT to issue to FreeLife a $300,000 convertible promissory note that would allow Hackett to convert the debt into 750,000 shares of ASNT stock. (*Id.* ¶¶ 11; 80-82.)

B. The Relevant Civil Defendants Plan to Promote ASNT.

According to the Second Amended Complaint, in October 2017, Budhu was introduced to an individual who could purportedly promote ASNT on a stock promotion website called TheMoneyStreet.com. (*Id.* ¶¶ 13; 84.) Unbeknownst to Budhu and the other Relevant Civil Defendants, however, this individual was a

confidential witness with the FBI (the "Confidential Witness"), who was recording their phone calls and preserving encrypted email and text message conversations that they sought to hide from, among others, law enforcement. (*Id.* ¶ 14.) The Second Amended Complaint alleges that, in initial recorded calls on October 31 and November 1, 2017, Budhu discussed with the Confidential Witness the ASNT shares the Relevant Civil Defendants controlled and that would be available to sell, along with the Confidential Witness's planned promotional efforts. (*Id.* ¶¶ 84-86; 88.) Later, on a November 6, 2017 recorded call involving the all of the Relevant Civil Defendants, the Confidential Witness, and an associate, the group discussed a series of press releases on ASNT that Gillespie planned to issue and which would go "hand-in-hand" with the ASNT promotion the Confidential Witness was purportedly planning for TheMoneyStreet.com. (*Id.* ¶¶ 90-91.) On a later December 9, 2017 recorded call among Budhu, Hackett, and the Confidential Witness, they agreed that Hackett would sell shares of ASNT on behalf of the group until the stock reached a target price of $5.00 per share. (*Id.* ¶ 93.)

C. Hackett Engages in Matched Trading.

Ultimately, the Confidential Witness declined to promote ASNT, and Hackett's scheme shifted. (*Id.* ¶ 15.) Instead, he engaged in a matched trading scheme in an effort to liquidate his holdings and create a misleading appearance of active trading in ASNT. (*Id.* ¶ 98.) As part of this scheme, in December 2017 the Confidential Witness introduced Hackett to the Undercover Agent, who claimed to be the ringleader of a network of corrupt stockbrokers who would buy ASNT stock that Hackett was selling in the open market in their customers' accounts—and without their customers' knowledge—in exchange for a 30% kickback. (*Id.* ¶¶ 15; 97.) Accordingly, over a series of days from December 22, 2017 and January 12, 2018, Hackett placed orders to sell ASNT in an effort to match trades with the Undercover Agent, and, on January 16, 2018, Hackett paid a kickback to the Undercover Agent for some of the trades (*Id.* ¶¶ 100; 107; 109.) Hackett ultimately sold 14,000 shares of ASNT in matched trades

with the Undercover Agent. (*Id.* ¶16.) Throughout the period of time during which the matched trading occurred, Hackett coordinated the scheme with the Confidential Witness over multiple recorded phone calls and encrypted messages. (*Id.* ¶¶ 97; 99-102; 104-106.)

D. The Charged Securities Law Violations.

The Second Amended Complaint alleges that, through the conduct described above, the Relevant Civil Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c).

## II. The Stay in this Case.

On July 6, 2018, the same day that the SEC filed its Complaint, the United States Attorney's Office for the Southern District of California (the "Government") unsealed an indictment against the Relevant Civil Defendants and two other individuals in the Criminal Case (the "Indictment"). (*Id.* ¶ 22.)[4] On August 21, 2018, the Government moved to intervene in and stay this SEC enforcement action, pending resolution of the Criminal Case. (Dkt. No. 20.) In its motion, the Government explained, in part, "the SEC Case and Criminal Case[] overlap almost entirely in terms of charged conduct, defendants . . ., witnesses, and evidence; the cases therefore cannot realistically proceed independent of one another." (*Id.*) On October 24, 2018, the Court granted the Government's motion. (Dkt. No. 44.) On June 16, 2022, the Court lifted the stay after the defendants in the Criminal Case were sentenced and judgment was entered. (Dkt. No. 76.)

## III. Hackett's Moton to Reopen Discovery.

Discovery in this SEC enforcement action initially concluded on October 27, 2023. (Dkt. No. 151.) On June 1, 2024, the Court entered an Order allowing Hackett

---

4 The Indictment is addressed in more detail below in the Statement of Facts.

to reopen discovery for the limited purpose of seeking information regarding an individual named Alexander Smirnov who he learned, after the initial close of discovery, was a confidential informant for the FBI, but who did not testify in the Criminal Case.[5] (Dkt. No. 222.) The June 1, 2024 Order did not alter the summary judgment motion schedule originally entered by the Court on May 14, 2024 and modified on June 17, 2024.

## STATEMENT OF FACTS

### I. The Criminal Indictment Against Hackett.

The Indictment charged the Relevant Civil Defendants (and two other defendants) with one count of securities fraud and one count of conspiracy to commit securities fraud. (SUF ¶ 23.) The securities fraud charge was based on violation of the very same statute and rule at issue in this SEC enforcement action, specifically, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5.].

In describing the overt acts supporting the charges, the Indictment alleged that Budhu sold to Hackett, through an entity he controlled (a reference to FreeLife), 200,000 shares of ASNT (*Id*. ¶ 32.) According to the indictment, Hackett then submitted a Seller's Representation Letter to ASNT's transfer agent that contained misrepresentations. (*Id*. ¶ 34.) On a phone call in December 2017, Hackett, Budhu, another Criminal Case defendant, and a confidential witness (a reference to the same Confidential Witness here) agreed upon a price at which they would sell shares of ASNT stock. (*Id*. ¶ 35.) In December 2017, Budhu sent an encrypted message to

---

[5] In the July 1, 2024 Order, the Court held "Hackett has made only the thinnest demonstration of potential relevance [regarding Smirnov]. Specifically, because Mr. Smirnov's contact with Hackett was in the context of sales related to a different securities fraud scheme, it is highly unlikely that discovery related to Smirnov will yield anything relevant." (Dkt. No. 222, pg. 12.)

Hackett, the Confidential Witness, and another Criminal Case defendant discussing the issuance of a press release concerning ASNT stock, and Gillespie issued a series of press releases concerning the Company. (*Id*. ¶¶ 36-37.) The Indictment further alleged that beginning on December 22, 2017, and ending on January 12, 2018, Hackett engaged in manipulative trading in ASNT on five days. (*Id*. ¶ 38.) These trades were pre-arranged with the Undercover Agent and were executed at prices that were designed to artificially avoid the deflation of, maintain the price of, and inflate the price of, ASNT stock. (*Id*. ¶ 39.)

## II. <u>The Criminal Conviction and Hackett's Appeal.</u>

On July 26, 2021, the jury trial against Hackett began in the Criminal Case. (*Id.* ¶ 40.) Hackett was represented by counsel. (*Id.* ¶ 42.) The Government called at least six witnesses in its case-in-chief, offered numerous documentary exhibits, and the trial lasted approximately five days. (*Id.* ¶¶ 43.)

### A. <u>Testimony at the Criminal Trial.</u>

The evidence presented in the Government's case-in-chief included the following witness testimony:

- Gillespie testified that he was the founder and CEO of ASNT, and that he caused ASNT to issue to Budhu 200,000 ASNT shares pursuant to an "advisory agreement" in exchange for her consulting services. (*Id*. ¶ 59.) Budhu introduced Gillespie to Hackett and Gillespie and Hackett discussed Hackett obtaining Budhu's 200,000 ASNT shares, obtaining additional ASNT shares through a convertible promissory note, and promoting the Company. (*Id*. ¶¶ 61-68.) Gillespie testified that the convertible promissory note was later transferred to a supposed individual named "Robert Farrill," who Gillespie understood to be Hackett's partner, though Gillespie never spoke to or met Farrill. (*Id*. ¶¶ 69-71.) Gillespie concluded that Hackett "planned on doing a marketing strategy to liquidate his shares and make as much money as possible within a short period of time." (*Id*. ¶ 74.) Gillespie also testified that Budhu

introduced him to the Confidential Witness and Gillespie and the Confidential Witness discussed issuing news releases concerning the Company to "[m]ake the stock price go higher and create more volume." (*Id*. ¶¶ 75-76.)

- Kara Kennedy ("Kennedy"), the Executive Director of ClearTrust, LLC ("ClearTrust"), testified that ClearTrust served as the transfer agent for ASNT. (*Id*. ¶ 78.) Kennedy further testified that a person who seeks to sell restricted shares in the public market must have the "restricted legend" removed from the shares. (*Id.* ¶¶ 82-83.) ClearTrust requires a "Seller's Representation Letter" in order to remove a restricted legend from shares. (*Id.* ¶ 87.) Kennedy further testified that Budhu sought to transfer 200,000 shares of restricted ASNT stock to FreeLife. (*Id.* ¶ 86.) Hackett executed a Seller's Representation Letter in order for ClearTrust to remove the restricted legend from these shares. (*Id*. ¶¶ 86-87.) Kennedy testified that without the Seller's Representation Letter, ClearTrust would not have permitted FreeLife to sell ASNT shares in the open market. (*Id*. ¶ 94.)
- Michael Forster ("Forster"), the Confidential Witness, testified that he had been involved in pump and dump schemes involving microcap stocks for 20 to 25 years. (*Id*. ¶ 109.) In August of 2017, the FBI approached Forster and he agreed to record and capture correspondence with other individuals involved in pump and dump schemes. (*Id*. ¶ 110.) Forster later turned over to the FBI recorded phone calls, emails, and encrypted text messages involving Hackett and other individuals. (*Id*. ¶ 114.) Forster further testified that TheMoneyStreet.com was a website whose primary function was to pump microcap stocks, and Forster facilitated finding deals for the website. (*Id*. ¶¶ 112-113.) Forster testified that he discussed promoting the Company with both Gillespie and Hackett. (*Id.* ¶¶ 116-119.)
- Thomas Carocci ("Carroci"), an employee of the Financial Industry Regulatory Authority ("FINRA") in its Criminal Prosecution Assistance Group, testified as

an expert witness on the securities industry. (*Id.* ¶ 48.) Carocci testified that ASNT was a public company that "apparently was into apps and gaming, more technology[.]" (*Id.* ¶ 53.) Carocci also testified about several demonstrative exhibits, including a summary of the ASNT sales by an individual supposedly named "Robert Farrill" and his sales proceeds. (*Id.* ¶¶ 58; Dunnigan Decl. Exs. 86-89.) Carocci further testified that if an individual or firm is engaged in promoting a stock, they are required to disclose the nature and substance of any consideration and payment that they are receiving. (SUF ¶ 51.)

- David Wolfson ("Wolfson") testified that he owned and managed "call rooms," which he staffed with sales agents who used predictive dialing software to call potential investors in an effort to get them to buy certain stocks the call room "represented," one of which was ASNT. (*Id.* ¶¶ 98-101.) Wolfson further testified that when a sales agent reached an interested investor, the agent instructed the investor to place an order to purchase shares of the represented stock at a specific price, frequently above the market price. (*Id.* ¶ 104.) Wolfson testified that an associate, Liana Millhouse, paid him commissions in the range of 25 to 40% for stock purchases initiated through his call rooms. (*Id.* ¶ 106.) Wolfson further testified that neither he nor his sales agents disclosed to investors the commissions Millhouse paid to him in connection with their stock purchases. (*Id.* ¶ 108.)
- Marc Pennebaker ("Pennebaker"), a Special Agent with the FBI, testified that he investigated financial crimes during the 2017 to 2018 time period. (*Id.* ¶ 116.) Pennebaker testified that Stellar Media Group, LLC and PTE.la issued a series of twelve promotional newsletters concerning the Company between September 12, 2017, and March 9, 2018, all of which contained disclaimer language indicating that ACN, LLC ("ACN") had compensated them for advertising and marketing for the Company. (*Id.* ¶ 122.) Pennebaker further

testified that FreeLife made a series of payments to ACN and an entity held in Millhouse's name over roughly the same period of time. (*Id.* ¶¶ 123-124.)

B. <u>Documentary Evidence at the Criminal Trial</u>.

The Government offered numerous exhibits at trial, including telephone recordings, emails, and text messages. (Dunnigan Decl. ¶¶ 9-113, Exs. 8-89, 92-109.) Of particular relevance are:

- Government Exhibit 127, a text message from Hackett to the Confidential Witness, in which Hackett states he "[s]old all my asnt [sic] have just a small bit left" (SUF ¶ 138; Dunnigan Decl. Ex. 19);
- Government Exhibit 134, a January 24, 2018 text exchange between Hackett and Millhouse setting the selling price for the day for ASNT stock (Dunnigan Decl. Ex. 26);
- Government Exhibit 206, an August 8, 2017 Share Purchase Agreement between Budhu and Hackett for the 200,000 ASNT shares (Dunnigan Decl. Ex. 33);
- Government Exhibit 211, an August 30, 2017 Seller's Representation Letter from Hackett to attorney John Dolkart ("Dolkart"), which falsely stated that Hackett had owned 200,000 shares of ASNT for at least 6 months, that he was not in possession of material, non-public information about ASNT, and that he was not affiliated with the company (Dunnigan Decl. Ex. 37);
- Government Exhibit 212, an August 31, 2017 Seller's Representation Letter from Hackett to ClearTrust concerning the proposed sale of 200,000 shares of ASNT in the open market and falsely stating, "I have not made and do not propose to make any payment in connection with the offer or sale of the shares to any person or entity except customary . . . charges[;]" "I am not acting in concert with any person in selling the Shares and I have not agreed to so act[;]" and falsely representing that FreeLife had owned the shares for at least 12 months (Dunnigan Decl. Ex. 38);

- Government Exhibit 201, a September 19, 2017 letter from Dolkart to ClearTrust, relying upon Hackett's misrepresentations in Government Exhibit 211, and opining that the restrictive legend on the 200,000 ASNT shares FreeLife held could be removed in order to allow Hackett to sell the shares (Dunnigan Decl. Ex. 27); and
- Government Exhibit 255, an email promotion of ASNT stock for which Hackett later admitted, during his civil deposition in this SEC enforcement action, that he paid. (SUF ¶ 163; Dunnigan Decl. Ex. 52.)

C. The Government's Summation at Trial.

In summation, the Government argued that a pump and dump scheme consists of three stages: "controlling the stock, pumping up the stock, and then dumping it." (SUF ¶ 126.) The Government argued that Hackett participated in each of these three stages in connection with the pump and dump of ASNT stock. (*Id.*)

*First*, the Government argued in summation, Hackett obtained control over ASNT stock when FreeLife purchased 200,000 shares of ASNT from Budhu pursuant to a share purchase agreement. But "there was a problem" preventing Hackett from selling the shares in the open securities markets: "you can't do it when there is a restricted legend on the stock." (*Id.* ¶ 129.) According to the Government's summation: "Mr. Hackett sought to remove that restriction" and "lied" in the "fraudulent seller's representation letter itself" in order to do so. (*Id.* ¶¶ 130, 133.) The Government further argued, "[n]ot only did Hackett pick up these 200,000 shares, but he absolutely – the calls, the other evidence shows – was trying to pick up more shares to extend his control, to extend his ability to accomplish this pump and dump." (*Id.* ¶ 138.) *Second*, the Government argued in summation, Hackett participated in the "pump" stage "to get the price up somehow" and he and his Criminal Case co-defendants "didn't get the price up by doing great things with the company, by creating great products and selling terrific solutions. They pumped up the price by working outside the company on investors and on the stock." (*Id.* ¶ 140.)

Specifically, the Government argued, Hackett and his Criminal Case co-defendants attempted to pump the share price of ASNT using press releases and manipulative trading generated through Mr. Wolfson's call rooms. (*Id*. ¶¶ 143-144.) *Third*, the Government argued, Hackett "sold into this inflated market" as shown through brokerage records. (*Id*. ¶ 154.)

Finally, the Government argued that it had proved intent, an element necessary to their (and the SEC's) securities fraud charge. (*Id*. ¶ 157.) The Government argued that Hackett's "efforts to conceal, to hide what he's doing," through offshore brokerage accounts and the use of encrypted messaging apps, demonstrated intent. (*Id*. ¶¶ 158-161.)

D. <u>Hackett's Conviction, Appeal, and Motion for a New Trial</u>.

On August 2, 2021, the jury in the Criminal Case returned a verdict finding Hackett guilty beyond a reasonable doubt on both counts: the conspiracy to commit securities fraud count and the securities fraud count. (*Id*. ¶ 41.) On June 10, 2022, Judge Robinson entered judgment against Hackett in the Criminal Case, sentencing him to 46 months of imprisonment and three years of supervised release. (*Id*. ¶ 44.) On November 28, 2022, Judge Robinson ordered Hackett to pay restitution in the amount of $67,184.91.

On April 3, 2023, Hackett filed a Notice of Appeal of his criminal conviction to the Ninth Circuit United States Court of Appeals. His appeal remains pending. Hackett was released from prison in October 2023. On July 5, 2024, Hackett filed a motion for a new trial in the Criminal Case. That motion is presently pending.

## III. <u>Additional Undisputed Facts.</u>

Additionally, Hackett admitted in his deposition in this SEC enforcement action that he worked with a woman named Liana Milhouse to sell ASNT stock through "phone rooms" she operated to target potential investors in penny stocks. Hackett paid Millhouse a 50% fee for any trades initiated through her phone room. (*Id*. ¶ 164.)

**LEGAL ARGUMENT**

**I. Standard of Review.**

A party is entitled to summary judgment if "there is no genuine dispute as to any material fact and … the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A plaintiff moving for summary judgment meets its burden by establishing for each element of the claim that no reasonable trier of fact could find for the opposing party. *See Celotex*, 477 U.S. at 323; *SEC v. Schooler*, 106 F. Supp. 3d 1157, 1161 & n.1 (S.D. Cal. 2015). Once the moving party has met its burden, the "nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986) (emphasis in original). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

**II. Legal Standard for Underlying Securities Fraud Claims.**

Section 10(b) and Rules 10b-5(a) & (c) thereunder prohibit fraud in connection with the purchase or sale of any security. [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(a) & (c)]; *SEC v. GLT Dain Rauscher, Inc*., 254 F.3d 852, 855 (9th Cir. 2001). Violations of this Section and Rule are the basis for both the Criminal Case and this civil action. Section 10(b) and Rule 10b-5 thereunder require a showing of scienter. *Aaron v. SEC*, 446 U.S. 680 (1980). Scienter is defined as a "mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). In the Ninth Circuit, scienter may be established by a showing of either actual knowledge or recklessness. *Gebhart v. SEC*, 595 F.3d 1034, 1040 (9th Cir. 2010); *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1093 (9th Cir. 2010).

Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder make it unlawful, in connection with the purchase or sale of a security, "to employ any device, scheme, or artifice to defraud" or "to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person" in connection with the purchase or sale of any security. [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(a) & (c).] To be liable for a scheme to defraud, a defendant must have engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme. *See Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006), *vacated on other grounds sub nom., Avis Budget Group Inc. v. Cal. State Teachers' Ret. System*, 552 U.S. 1162 (2008). It is these underlying elements (plus the element of willfulness) which the Government in the Criminal Case established beyond a reasonable doubt in order to obtain Hackett's conviction – and the Court in the Criminal Case so instructed the jury which convicted Hackett. (Dunnigan Decl. Ex. 2, pgs. 23-24)

## III. Summary Judgment Is Warranted Based on Collateral Estoppel.

Summary judgment on the SEC's securities fraud claim against Hackett is appropriate under the doctrine of collateral estoppel in light of his conviction in the Criminal Case, which is based on the same underlying conduct that is alleged in the SEC's civil complaint.[6] *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326, n.5 (1979) (the doctrine of collateral estoppel prohibits relitigation of an issue of fact or law that has been decided in earlier litigation); *Emich Motors Corp. v. General Motors Corp.*, 340 U.S 558, 568-69 (1951) ("[i]t is well established that a prior criminal conviction may work an estoppel in favor of the Government in a subsequent civil proceeding."); *SEC v. Reyes*, Case No. C-06-04435, 2008 WL 3916247, *2 (N.D. Cal. Aug. 25,

---

[6] As the United States Attorney's Office for the Southern District of California noted in its stay motion in this matter, "the SEC Case and Criminal Cases overlap almost entirely in terms of charged conduct." (Dkt. No. 20, pg. 2.)

2008) ("a criminal conviction, whether by jury verdict or guilty plea, constitutes estoppel in favor of the United States in a subsequent civil proceeding as to those matters determined by the government in the criminal case") (quoting *United States v. Podell*, 572 F.2d 31, 35 (2d Cir. 1978)). "This is because the government bears a higher burden of proof in the criminal than in the civil context." *SEC v. Pierre*, Case No. 19-cv.-10299, 2024 WL 1994051, *7 (S.D.N.Y. May 6, 2024) (JPC) (internal quotations omitted). Accordingly, "[w]hen a defendant has already been convicted of criminal securities fraud, courts have not hesitated to apply the doctrine of collateral estoppel to civil securities fraud violations to bar re-litigation of factual issues necessarily decided in the criminal case." *SEC v. Braslau*, Case No. 14-cv.-01290-ODW, 2016 WL 5922666, *1 (C.D. Cal. May 13, 2016); *see also, SEC v. Alexander*, 115 F. Supp. 3d 1071, 1080-84 (N.D. Cal. 2015); *Reyes*, 2008 WL 3916247 at *2; *accord SEC v. Bilzerian*, 29 F.3d 689, 694 (D.C. Cir. 1994); *SEC v. Gruenberg*, 989 F.2d 977, 978 (8th Cir. 1993); *In re Towers Fin. Corp. Noteholders Litig*., 75 F. Supp. 2d 178 (S.D.N.Y. 1999); *SEC v. Everest Mgmt. Corp*., 466 F. Supp. 167, 172 (S.D.N.Y. 1979).

Where, as here, a party seeks to invoke the doctrine of collateral estoppel based on a parallel criminal action, the moving party must establish that: "(1) the prior conviction must have been for a serious offense so that the defendant was motivated to fully litigate the charges; (2) there must have been a full and fair trial to prevent convictions of doubtful validity from being used; (3) the issue on which the prior conviction is offered must of necessity have been decided in the criminal trial; and (4) the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior trial." *SEC v. Hilsenrath*, Case No. C-03-03252, 2008 WL 225709, *3 (N.D. Cal. May 30, 2008) (quoting *United States v. Real Prop. Located at Section 18*, 976 F.2d 515, 518 (9th Cir. 1982)). *See also Reyes*, 2008 WL 3916247 at *2 (setting forth a similar four-factor test). These elements are easily established here with respect to Hackett.

A. The Offense for Which Hackett Was Convicted was Serious.

Hackett was convicted of securities fraud and conspiracy to commit securities fraud, the first of which carries a maximum term of incarceration of 25 years. (SUF, ¶ 41; 18 U.S.C. § 1348.) As such, the seriousness of the offense was such that Hackett was fully motivated to litigate the charges, and he did.

B. The Criminal Case Involved a Full and Fair Trial.

The Criminal Case resulted in a five-day jury trial (Dunnigan Decl. ¶¶ 93-110) during which Hackett was represented by counsel. During the criminal trial, Hackett had and took advantage of the opportunity to cross-examine Government witness, to object to questions during the Government's examination of witnesses, to have his counsel make an opening statement and closing argument to the jury, and to make evidentiary arguments to the Court. Hackett also had the opportunity, but declined to, present his own evidence. There is no question that Hackett fully participated in, and litigated, the Criminal Case. *See, e.g., United States v. Castillo-Basa*, 483 F.3d 890, 898 (9th Cir. 2007) ("[T]here is no rule, nor should there be, that an issue is not 'litigated' for purposes of collateral estoppel simply because a party fails to present all of the evidence that it possesses or that it might have obtained in support of its case. That is, the second step of collateral estoppel does not require that an issue be 'fully and fairly' litigated to the maximum extent possible, only that it be 'litigated.'").

C. The Claims in the Criminal Case are Co-Extensive with the Claims in this Civil Matter.

The third element needed to establish collateral estoppel – that the issues to be determined in this case were necessarily adjudicated in the criminal case – is also satisfied here.

To begin with, the jury in the Criminal Case convicted Hackett of violating the same legal provision: securities fraud under Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. (Dunnigan Decl. Ex. 3.)

Moreover, an examination of the Indictment and the Government's evidence and summations in the Criminal Case demonstrates that the jury found Hackett liable for fraud under these provisions based on the same conduct at issue in the SEC's Second Amended Complaint. *See Braslau*, 2016 WL 5922666 at *4 ("Where, as here, a criminal judgment rests on a general verdict of the jury . . . and no special findings have been made, the Supreme Court instructs trial judges to examine 'the record, including the pleadings, the evidence submitted, the instructions under which the jury arrived at its verdict, and any opinions of the court' to determine the proper scope of collateral estoppel.") (quoting *Emich Motors Corp. v. General Motors Corp*., 340 U.S. at 568). Here, the Criminal Case and the SEC case involved manipulative conduct by the same individuals in the same security as part of the same pump and dump scheme. The Indictment and the Second Amended Complaint both allege Hackett's purchase of 200,000 shares of ASNT stock from defendant Budhu (Dunnigan Decl. Ex. 1, ¶ 24.a; Dkt. No. 136, ¶ 12.); a supposed $300,000 loan that Hackett made to ASNT (Dunnigan Decl. Ex. 1; ¶ 24.b; Dkt. No. 136, ¶ 13); Hackett's misrepresentations to a transfer agent in order to facilitate trading in ASNT stock (Dunnigan Decl. Ex. 1, ¶ 24.c; Dkt. No. 136, ¶¶ 77, 79); and Hackett's manipulative trading of ASNT stock. (Dunnigan Decl. Ex. 1, ¶ 24.n; Dkt. No. 136, ¶¶ 96-110.)

Furthermore, as noted above, to obtain a criminal conviction for violating Exchange Act Section 10(b) and Rule 10b-5 thereunder, the Government had to prove each of the same elements that the SEC is required to prove to establish liability under the same statute and rule in a civil case. *See SEC v. Haligiannis*, 470 F. Supp. 2d 373, 382 (S.D.N.Y. 2007) ("Courts have applied collateral estoppel in the securities fraud context because the elements necessary to establish civil liability under Section . . . 10(b) are identical to those necessary to establish criminal liability under Section 10(b)."). Indeed, the Government offered proof at trial, including the witness testimony and documentary evidence summarized above, as to each of these elements with respect to the same conduct alleged in the SEC's Second Amended

Complaint. (SUF ¶¶ 48-124.) And, in its summation, the Government argued that it had proven these elements. (SUF ¶¶ 125-161.)

The Court then instructed the jury on the requirements to find a violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, the same claim alleged in the SEC's Second Amended Complaint. (Dunnigan Decl. Ex. 2, pgs. 23-24; Dkt. No. 136, ¶ 149.) As a result, Hackett's criminal conviction and the judgment against him conclusively established all of the facts necessary to prove Hackett's liability for violations of Exchange Section 10(b) and Rule 10b-5 thereunder. Hackett should therefore be estopped from re-litigating his liability for the same violations here.

D. Identity of Parties.

The fourth requirement is satisfied because Hackett himself was the defendant in the Criminal Case.

Accordingly, here, the SEC satisfies each of the applicable factors to invoke the doctrine of collateral estoppel based on a parallel criminal action. *See, e.g.*, *Hilsenrath*, 2008 WL 225709, *3.

**IV. Hackett's Pending Appeal Does Not Preclude Summary Judgment.**

Finally, Hackett's pending appeal of his criminal conviction does not prevent the application of the collateral estoppel doctrine. *Reyes*, 2008 WL 3916247 at *5 (N.D. Cal. Aug. 25, 2008) ("Reyes had an opportunity to fully and fairly litigate his guilt, and the jury's verdict will not be stripped of its preclusive effect merely because of the possibility of reversal."); *Collins v. D.R. Horton, Inc.*, 505 F.3d 874, 883 (9th Cir. 2007) ("the benefits of giving a judgment preclusive effect pending appeal outweigh any risks of a later reversal of that judgment"). If Hackett's conviction is reversed on appeal, he would be entitled to vacate a judgment in this action based on collateral estoppel. *Reyes*, 2008 WL 3916247 at *5.

**V. The Court Should Grant the SEC's Requested Remedies.**

The SEC seeks disgorgement $30,812 and $11,797.54 in prejudgment interest, to be deemed satisfied[7] by the order of restitution of $67,184.91 in the Criminal Case. (Dunnigan Decl. ¶¶ 113-118.) The SEC further seeks an injunction against violating Section 10(b) of the Exchange Act and Rules 10b-5 thereunder, and a penny stock bar. The SEC does not seek a civil penalty.

A. Disgorgement.

With respect to disgorgement, "a district court has broad equity powers to order the disgorgement of ill-gotten gains obtained through violation of the securities laws. Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable." *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010) (quoting *SEC v. First Pacific Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998)). "The amount of disgorgement should include all gains flowing from the illegal activities." *Platforms Wireless*, 617 F.3d at 1096. For Hackett, the SEC calculates disgorgement based on $30,812 in gross ASNT stock sales proceeds by Hackett. (Dunnigan Decl. ¶¶ 113-118.)

B. Prejudgment Interest.

Disgorgement normally includes prejudgment interest to ensure that the wrongdoer does not profit from the illegal activity. *See SEC v. Cross Fin. Servs.*, 908 F. Supp. 718, 734 (C.D. Cal. 1995). The SEC calculates prejudgment interest based on the rate of interest used by the Internal Revenue Service for the  case, the amount of prejudgment interest is $11,797.54. (Dunnigan Decl. ¶ 118.) The method used by

---

[7] Because the amount of criminal restitution is higher than the amount of disgorgement, pursuant to the terms of the proposed judgment the SEC will submit to the Court if this motion is granted, the SEC will not seek to collect the awarded disgorgement.

the SEC for calculating prejudgment interest on disgorgement has been affirmed by the Ninth Circuit. *See Platforms Wireless*, 617 F.3d at 1099. An award of prejudgment interest is designed to deprive the wrongdoer of the benefit of "what amounts to an interest free loan procured as a result of illegal activity." *SEC v. Moran*, 944 F. Supp. 286, 295 (S.D.N.Y. 1996). (Dunnigan Decl. Ex. 114.)

C. Injunction.

A permanent injunction may be granted on summary judgment given the proper record. *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980). To obtain an injunction, the SEC must establish that there is a reasonable likelihood of future violations. *Id*. In predicting the likelihood of future violations, a court evaluates the totality of the circumstances. *Id*. (the existence of past violations may give rise to an inference that there will be future violations); *SEC v. Koracorp Indus., Inc*., 575 F.2d 692, 699 (9th Cir.1978). Foremost among these circumstances is the past illegal conduct of the defendant, from which the Court may infer the likelihood of future violations. *SEC v. Mgmt. Dynamics, Inc*., 515 F.2d 801, 807 (2d Cir. 1975). The factors to be considered by the Court also include the degree of scienter involved; the isolated or recurrent nature of the infraction; the defendant's recognition of the wrongful nature of his conduct; the likelihood, because of defendant's professional occupation, that future violations might occur; and the sincerity of his assurances against future violations. *Murphy*, 626 F.2d at 655. These factors and considerations are well established here.

Hackett participated in a complex fraud, including four outright misrepresentations to a transfer agent necessary to facilitate the fraud. He has not recognized the wrongful nature of his conduct. He has not given any assurance against future violations. *See, e.g., SEC v. Baccam*, Case No. 17-cv.-0172, 2017 WL 5952168, *9 (C.D. Cal. June 14, 2017) (awarding injunctive relief by default, noting that the defendant "has not given any assurances against future violations, but to the contrary, declined to appear in this case").

D. Penny Stock Bar.

The Court is authorized to issue a penny stock bar pursuant to Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)(A)-(B)] against any person participating in, or, at the time of the alleged misconduct, who was participating in, an offering of penny stock; *i.e.*, "engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of [] any penny stock." Factors to consider when deciding whether a penny stock bar should be imposed include (1) the egregiousness of the underlying securities law violation; (2) the defendant's repeat offender status; (3) the defendant's role or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur. *SEC v. Abellan*, 674 F. Supp. 2d 1213, 1223 (W.D. Wash.).

These factors weigh in favor of a penny stock bar. Hackett's conduct was egregious—he lied to a transfer agent in an attempt to further the fraudulent scheme. (SUF, ¶¶ 90-92; 133-134.) He hired what was effectively a boiler room to search for victim investors and paid a 50% commission for it to do so. (*Id*., ¶¶ 101-108, 153, 161, 164.) His scienter level was high enough to warrant a criminal conviction. (Dunnigan Decl. Exs. 3, 4.) Finally, he has not acknowledged any wrongdoing. Therefore, he is likely to return to penny stock trading unless he is barred from doing so.

## CONCLUSION

For the foregoing reasons, the SEC respectfully requests that the Court: (i) grant it summary judgment against Hackett as to the Second Claim for Relief of the Second Amended Complaint; (ii) order disgorgement of $30,812 and prejudgment interest of $11,797.54, to be deemed satisfied in light of the order of restitution imposed in the Criminal Case; (iii) enjoin Hackett from future violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; and (iv) impose a penny stock bar against Hackett.

Dated: July 25, 2024

/s/ Christopher J. Dunnigan

Christopher J. Dunnigan
Christine Ely
Securities and Exchange Commission
Division of Enforcement
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
E-mail: dunnigancj@sec.gov
*Attorney for Plaintiff*
*Securities and Exchange Commission*