# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

SECURITIES AND EXCHANGE
COMMISSION,

                   Plaintiff,

v.

GANNON GIGUIERE,
OLIVER-BARRET LINDSAY,
ANDREW HACKETT,
KEVIN GILLESPIE, AND
ANNETTA BUDHU,

                   Defendants.

Case No.:  18-cv.-1530-WQH-JLB

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT ANDREW HACKETT**

Plaintiff Securities and Exchange Commission (the "SEC") respectfully submits this statement of undisputed material facts as to which it contends there is no genuine issue to be tried in support of its Motion for Summary Judgment (the "Motion") Against Defendant Andrew Hackett ("Hackett").[1] The Commission sets forth these facts only for purposes of the Motion and does not necessarily concede each of these facts for all purposes in this action.

---

[1]     This statement of undisputed material facts cites to the Declaration of Christopher J. Dunnigan, executed July 25, 2024.

1

I. **The Commission's Allegations in This Civil Enforcement Action Against Hackett**

1. On July 6, 2018, the Commission filed its Complaint in the instant case against Hackett and four other defendants. (Dkt. No. 1.)

2. On August 5, 2022, the Commission filed an Amended Complaint, adding claims against defendant Gannon Giguiere ("Giguiere"). The Commission's claims against Hackett did not change. (Dkt. No. 92.)

3. On August 5, 2022, the Commission filed a Second Amended Complaint. The Commission's claims against Hackett again remained the same. (Dkt. No. 136.)

4. The Commission's Second Amended Complaint alleges that Hackett and two other defendants, Kevin Gillespie ("Gillespie") and Annetta Budhu ("Budhu") (collectively with Hackett, the "Relevant Civil Defendants"), conducted a fraudulent scheme in the common stock of Arias Intel Corp. (f/k/a First Harvest Corp. (formerly trading as "HVST")) ("ASNT"). (Dkt. No. 136 ¶¶ 10-11.)

5. ASNT was a penny stock issuer and purported digital media company with a focus on the cannabis industry. (Dkt. No. 136 ¶ 35.)

6. The Second Amended Complaint further alleges that, in early 2017, Gillespie, ASNT's chief executive officer, Budhu, a purported adviser to the company, and Hackett, a purported lender to ASNT, began laying the groundwork for a "pump and dump" of ASNT's stock, by which they would engage in conduct to artificially inflate ASNT's share price and then sell shares of ASNT into the buying volume generated by the inflation for financial gain. (Dkt. No. 136 ¶¶ 1, 13.)

7. The Second Amended Complaint further alleges that, on February 10, 2017, Gillespie caused ASNT to enter into a purported "Advisory Agreement" with Budhu and her nominee, Baywall Inc. ("Baywall"), under which she was paid 200,000 shares of ASNT stock for her "consulting services." (Dkt. No. 136 ¶¶ 12; 72.)

2

8.     The Second Amended Complaint further alleges that, on or about March 15, 2017, Gillespie caused ASNT's transfer agent to issue 200,000 ASNT shares to Baywall pursuant to the Advisory Agreement. (Dkt. No. 136 ¶¶ 12; 73.)

9.     The Second Amended Complaint further alleges that, on or about August 8, 2017, Baywall sold the 200,000 ASNT shares to Hackett's nominee entity, FreeLife Investments, Inc. ("FreeLife") at a significant premium to its then trading price. (Dkt. No. 136 ¶¶ 74-75.)

10.     The Second Amended Complaint further alleges that Hackett made material misrepresentations to the ASNT transfer agent in a "Seller's Representation Letter" that the transfer agent required to effect the sale of shares from Baywall to FreeLife. (Dkt. No. 136 ¶¶ 76-77.)

11.     The Second Amended Complaint further alleges that, on August 10, 2017, Gillespie caused ASNT to issue to FreeLife a $300,000 convertible promissory note that would allow Hackett to convert the debt into 750,000 shares of ASNT stock. (Dkt. No. 136 ¶¶ 13; 81.)

12.     The Second Amended Complaint further alleges that the Relevant Civil Defendants planned for FreeLife to ultimately sell these 950,000 shares in connection with the pump and dump after which they would split the proceeds among themselves. (Dkt. No. 136 ¶ 13.)

13.     The Second Amended Complaint further alleges that, in October 2017, the Relevant Civil Defendants approached an associate about promoting ASNT's stock on TheMoneyStreet.com, a stock promotion website, in connection with the Relevant Civil Defendants' planned pump and dump. (Dkt. No. 136 ¶¶ 8, 14, 83-84.)

14.    The Second Amended Complaint further alleges that, unbeknownst to the Relevant Civil Defendants, the associate was a confidential witness[2] with the Federal Bureau of Investigation ("FBI") and was recording their phone calls and preserving encrypted email and text message conversations that they sought to hide from, among others, law enforcement. (Dkt. No. 136 ¶¶ 6, 14.)

15.    The Second Amended Complaint further alleges that Gillespie planned to issue a series of press releases designed to promote ASNT stock and discussed the press releases with Budhu and Hackett. (Dkt. No. 136 ¶¶ 89-95.)

16.    The Second Amended Complaint further alleges that the Relevant Civil Defendants planned for Hackett to sell shares of ASNT stock once the price reached a certain target. (Dkt. No. 136 ¶ 93.)

17.    The Second Amended Complaint further alleges that, in December 2017, after declining to promote ASNT, the cooperating witness introduced Hackett to an individual claiming to be the ringleader of a network of corrupt stockbrokers who would buy stock that Hackett was selling in the open market in their customers' accounts—and without their customers' knowledge—in exchange for a 30% kickback. (Dkt. No. 136 ¶ 15.)

18.    The Second Amended Complaint further alleges that, unbeknownst to Hackett, the purported ringleader of the corrupt broker network was an undercover FBI agent (the "Undercover Agent"). (Dkt. No. 136 ¶ 15.)

19.    The Second Amended Complaint further alleges that Hackett agreed to engage in the scheme in an effort to liquidate his ASNT holdings and create a misleading appearance of active trading, and between December 22, 2017 and January 12, 2018, Hackett sold more than 14,000 shares of ASNT in matched trades with the Undercover

---

[2]    The cooperating witness referred to in the Second Amended Complaint is Michael Forster. (Dunnigan Decl. ¶ 121.)

4

Agent that he coordinated with the cooperating witness in recorded phone calls and preserved encrypted text messages. (Dkt. No. 136 ¶¶ 15-16; 96-109.)

20.  The Second Amended Complaint further alleges that Hackett paid the Undercover Agent a 30% kickback on trades they executed. (Dkt. No. 136 ¶¶ 103, 109.)

21.  The Second Amended Complaint further alleges that because the cooperating witness ultimately did not promote ASNT on TheMoneyStreet, the group was unable to accomplish its goal of conducting a pump and dump of ASNT's stock. (Dkt. No. 136 ¶ 110.)

22.  The Second Amended Complaint further alleges that the Relevant Civil Defendants used encrypted text messaging applications to communicate about the ASNT scheme. (Dkt. No. 136 ¶¶ 16, 89, 94, 95, 99, 100, 108.)

23.  The Second Amended Complaint further alleges that Hackett directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, knowingly or recklessly (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons. (Dkt. No. 136 ¶ 149.)

24.  The Second Amended Complaint further alleges that Hackett violated Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)]. (Dkt. No. 136 ¶ 150.)

## II.   __The Criminal Case Against Hackett__

25.  On July 6, 2018, the United States Attorney's Office for the Southern District of California (the "Government") unsealed an indictment against Hackett, Budhu, Gillespie, and two other defendants (collectively, the "Criminal Defendants"), *United*

*States v. Hackett, et al.*, 18-cr-03072 (S.D.Cal.) (TWR) (the "Criminal Case"). (Dunnigan Decl. Ex. 1.)

26.    The indictment charged Hackett and the other Criminal Defendants with one count of securities fraud and one count of conspiracy to commit securities fraud. (*Id.* ¶¶ 10, 26.)

27.    The criminal indictment alleged that ASNT was formerly known as First Harvest Corp. ("First Harvest") until on or about December 1, 2017, when it changed its name to Arias Intel Corp., which purported to be "a digital media platform for tech, media and gaming, which includes mobile gaming, augmented reality, on-demand delivery, digital and social media, and e-commerce." (*Id.*  ¶ 6.)

28.    The criminal indictment alleged that as part of the conspiracy, Gillespie and Budhu would seek out others to promote ASNT in order to artificially avoid the deflation of, maintain the price of, and inflate the share price of, ASNT stock. (*Id.* ¶ 11.)

29.    The criminal indictment further alleged that, as part of the conspiracy, Hackett would promote, and find others to promote, ASNT and its stock in order to artificially avoid the deflation of, maintain the price of, and inflate the share price of, ASNT stock. (*Id.* ¶ 12.)

30.    The criminal indictment further alleged that, as part of the conspiracy, Hackett would engage in manipulative trading in ASNT stock in order to artificially avoid the deflation of, maintain the price of, and inflate the share price of, ASNT stock. (*Id.* ¶ 19.)

31.    The criminal indictment further alleged that Hackett controlled FreeLife and participated in the management or control of one or more brokerage accounts in the name of FreeLife. (*Id.* ¶ 1.)

32.    The criminal indictment further alleged that on or about August 8, 2017, Budhu sold to Hackett, through an entity he controlled, 200,000 shares of ASNT. (*Id.* ¶ 24.)

6

33.     The criminal indictment further alleged that on or about August 10, 2017, Hackett, through an entity he controlled, loaned $300,000 to ASNT in exchange for one or more convertible promissory notes. (*Id*. ¶ 24.)

34.     The criminal indictment further alleged that on or about August 31, 2017, Hackett submitted a seller's representation letter to ASNT's transfer agent that contained misrepresentations. (*Id*. ¶ 24.)

35.     The criminal indictment further alleged that on a phone call in December 2017, Hackett, Budhu, another Criminal Defendant, and a confidential witness agreed upon a price at which they would sell shares of ASNT stock. (*Id*. ¶ 24.)

36.     The criminal indictment further alleged that in December 2017, Budhu sent an encrypted message to Hackett, the confidential witness, and another Criminal Defendant discussing the issuance of a press release concerning ASNT stock. (*Id*. ¶ 24.)

37.     The criminal indictment further alleged that Gillespie caused ASNT to publish a series of press releases over the period December 1, 2017 to January 24, 2018. (*Id*. ¶ 24.)

38.     The criminal indictment further alleged that beginning on December 22, 2017, and ending on January 12, 2018, Hackett engaged in manipulative trading in ASNT on five days. (*Id*. ¶ 24.)

39.     The criminal indictment further alleged that these trades were pre-arranged with an associate of the confidential witness who in fact was an undercover FBI agent, and were executed at prices that were designed to artificially avoid the deflation of, maintain the price of, and inflate the price of, ASNT stock. (*Id*. ¶ 24.)

40.     The Criminal Case against Hackett went to trial on July 26, 2021. (Dunnigan Decl. Ex. 92.)

41.     On August 2, 2021, the jury returned a verdict of guilty on both counts. (Dunnigan Decl. Ex. 3.)

42.     Hackett was represented by counsel at the trial in the Criminal Case. (Dunnigan Decl. Exs. 92-109.)

43.     At trial in the Criminal Case, the Government called at least six witnesses in its case-in-chief, offered numerous documentary exhibits, and the trial lasted approximately five days. (Dunnigan Decl. Exs. 92 - 109.)

44.     On June 10, 2022, judgment was entered against Hackett in the Criminal Case, sentencing him to 46 months of imprisonment and three years of supervised release. (Dunnigan Decl. Ex. 4.)

45.     On November 28, 2022, Hackett was ordered to pay $67,184.91 in criminal restitution. (Dunnigan Decl. Ex. 5.)

46.     On April 3, 2023, Hackett filed a Notice of Appeal in the Criminal Case. (Dunnigan Decl. Ex. 6.)

47.     On July 5, 2024, Hackett filed a Motion for a New Trial in the Criminal Case. (Dunnigan Decl. Ex. 7.)

A. Evidence Presented at Trial in the Criminal Case

   i.   *Testimony of Thomas Carocci*

48.     At trial in the Criminal Case, the Government presented the testimony of Thomas Carocci, an employee of the Financial Industry Regulatory Authority ("FINRA") in its Criminal Prosecution Assistance Group, who testified as an expert witness on the securities industry. (Dunnigan Decl. Ex. 92 pgs. 41-42.)

49.     Carocci testified that unrestricted stock is freely tradable on the open market, but restricted stock has some restrictions to its resale. (*Id*. pg. 43.)

50.     Carocci further testified that, absent extenuating circumstances, a stockbroker commission rate over 5% is generally presumed to be excessive. (Dunnigan Decl. Ex. 93 pgs. 63-64.)

51.   Carocci further testified that if an individual or firm is engaged in promoting a stock, they are required to disclose the nature and substance of any consideration and payment that they are receiving. (*Id*. pg. 65.)

52.   Carocci further testified that First Harvest's ticker symbol was HVST. (*Id*. pg. 69.)

53.   Carocci further testified that the company name for First Harvest, a public company in the cannabis industry, changed to Arias Intel Corporation, a public company that "apparently was into apps and gaming, more technology[,]" with a new ticker, ASNT. (*Id*. pg. 69.)

54.   Carocci further testified that, on August 1, 2017, the intraday high trading price for HVST/ASNT was $3.40 per share and there was a total daily trade volume of 2,659 shares. (*Id*. pgs. 72-73; Ex. 86.)

55.   Carocci further testified that, on September 14, 2017, the intraday trading price for HVST/ASNT was $9.90 per share and there was a total daily trade volume of 13,706 shares. (Dunnigan Decl. Ex. 93 pgs. 74-75; Ex. 86.)

56.   Carocci further testified that, on April 27, 2018, the closing trading price for HVST/ASNT was $0.04 per share and there was a total trading volume of 214,310 shares. (Dunnigan Decl. Ex. 93, pg. 75; Ex. 86.)

57.   Carocci further testified that First Harvest issued a press release on September 20, 2017, announcing that the company had been flagged by OTC Markets for promotional activity on September 13, 2017, and claiming that the promotional activity was unauthorized, third-party promotional activity. (Dunnigan Decl. Ex. 93, pg. 79; Ex. 86.)

58.   Carocci further testified that during the period March 7, 2018 to April 2, 2018, Robert Farrill sold a total of 234,766 shares of ASNT for sales proceeds of $97,585.32. (Dunnigan Decl. Ex. 93 pg. 84; Ex. 89.)

###### ii.    Testimony of Kevin Gillespie

59.    At trial in the Criminal Case, the Government presented the testimony of Gillespie, who testified that he was the founder and CEO of First Harvest. (Dunnigan Decl. Ex. 95 pgs. 128-29.)

60.    Gillespie testified that First Harvest entered into an advisory agreement with Budhu's company, Baywall, whereby Baywall would receive 200,000 shares of First Harvest common stock in exchange for consulting services. (Dunnigan Decl. Ex. 95 pg. 134.)

61.    Gillespie testified that Budhu told Gillespie that Hackett was interested in investing in First Harvest and, afterwards, Gillespie had two calls with Hackett. (Dunnigan Decl. Ex. 95 pgs. 137-139.)

62.    Gillespie testified that during their first call, he and Hackett discussed "the overall potential for the company, primarily the share structure, what other investors were involved with the company, what the float was, which is the outstanding shares, what was available to the public to purchase in regards to shares." (Dunnigan Decl. Ex. 95 pgs. 137-138.)

63.    Gillespie testified that during their second call, he discussed with Hackett how First Harvest might use any money Hackett invested, "potentially, putting some marketing behind the stock," and paying off debt. (Dunnigan Decl. Ex. 95 pg. 139.)

64.    Gillespie testified that, during their second call, Hackett discussed obtained shares from Budhu, Gillespie, and any other shareholders who might have free-trading stock. (Dunnigan Decl. Ex. 95 pg. 142.)

65.    Gillespie testified that Hackett was trying to obtain from Budhu the 200,000 shares of First Harvest stock she had received under the advisory agreement for her consulting services.  (Dunnigan Decl. Ex. 95 pgs. 142-143.)

66.     Gillespie testified that on August 10, 2017, First Harvest entered into a convertible promissory note agreement with FreeLife.  (Dunnigan Decl. Ex. 95 pgs. 143-144; Ex. 44.)

67.     Gillespie testified that Hackett was behind FreeLife.  (Dunnigan Decl. Ex. 95 pg. 144.)

68.     Gillespie testified that under the convertible promissory note, FreeLife agreed to loan $300,000 to First Harvest at a 5% interest rate.  If First Harvest did not repay the loan and interest, FreeLife could receive up to 750,000 shares of First Harvest stock. (Dunnigan Decl. Ex. 95 pg. 145; Ex. 4.)

69.     Gillespie testified that the agreement was later converted to another name because, according to Budhu, "[Hackett's] money wasn't available and Robert Farrill had capital available." (Dunnigan Decl. Ex. 95 pgs. 145-146.)

70.     Gillespie testified that Budhu told him that Robert Farrill ("Farrill") was Hackett's "partner, maybe it was an associate or an accountant, and the funds were available to him." (Dunnigan Decl. Ex. 95 pg. 145.)

71.     Gillespie testified that he did not know who Farrill was and he never spoke to Farrill. (Dunnigan Decl. Ex. 95 pg. 146.)

72.     Gillespie testified that the terms of the agreement with Farrill were the same as the terms of the previous agreement with FreeLife. (Dunnigan Decl. Ex. 95 pg. 162; Ex. 45.)

73.     Gillespie testified that after First Harvest executed the agreement with Farrill, Gillespie continued to discuss with Hackett how First Harvest would use the $300,000 investment, including Hackett's "plans for having the stock become more liquid, trade more volume, move the price higher."  (Dunnigan Decl. Ex. 95 pg. 149.)

74.     Gillespie testified that at the time, he concluded that Hackett "planned on doing a marketing strategy to liquidate his shares and make as much money as possible within a short period of time." (Dunnigan Decl. Ex. 95 pg. 151.)

75.    Gillespie testified that Budhu introduced him to an individual named Michael Forster ("Forster"), who wanted to do some marketing for First Harvest. (Dunnigan Decl. Ex. 95 pgs. 151-152.)

76.    Gillespie testified that he spoke with Forster about issuing news releases concerning First Harvest to "[m]ake the stock price go higher and create more volume." (Dunnigan Decl. Ex. 96 pg. 169.)

77.    Gillespie testified that First Harvest's name was changed to Arias Intel Corp. "to reflect that it was more of a technology company" in advance of issuing the news releases. (Dunnigan Decl. Ex. 96 pg. 170.)

       *iii.    Testimony of Kara Kennedy*

78.    At trial in the Criminal Case, the government presented the testimony of Kara Kennedy ("Kennedy"), who testified that she was the Executive Director of ClearTrust, LLC ("ClearTrust"), a stock transfer agent, which served as the transfer agent for First Harvest from 2016 to 2018. (Dunnigan Decl. Ex. 97 pgs. 212-213.)

79.    Kennedy further testified that as a stock transfer agent, ClearTrust is "responsible for keeping record of who shareholders are for companies. And then we record changes to that master record of shareholders as stock is issued, transferred, or otherwise retired." (Dunnigan Decl. Ex. 96 pg. 213.)

80.    Kennedy further testified that in order for shares to be freely traded, they must be registered with the SEC or qualify for an exemption to registration. (Dunnigan Decl. Ex. 96 pg. 215.)

81.    Kennedy further testified that a broker performs an extensive due diligence process when determining whether or not to accept shares for deposit, including whether the shares are registered with the SEC or qualify for an exemption from registration. (Dunnigan Decl. Ex. 97 pg. 222.)

82.     Kennedy further testified that a "restrictive legend" is affixed to restricted shares to indicate that they can only be sold by becoming registered or by qualifying for an exemption from registration. (Dunnigan Decl. Ex. 97 pg. 223.)

83.     Kennedy further testified that a person who wanted to sell restricted shares in the public market would need to have the restricted legend removed by demonstrating that the shares qualify for an exemption from registration. (Dunnigan Decl. Ex. 97 pg. 223.)

84.     Kennedy further testified that Rule 144 is one exemption from registration. (Dunnigan Decl. Ex. 97 pg. 222.)

85.     Kennedy further testified that, as of July 31, 2017, 160,404 shares of First Harvest were unrestricted and eligible to be traded in the public markets. (Dunnigan Decl. Ex. 97 pg. 228; Ex. 14.)

86.     Kennedy further testified that on August 17, 2017, ClearTrust received a request from Baywall to transfer 200,000 shares of First Harvest stock to FreeLife and remove the restriction on those shares. (Dunnigan Decl. Ex. 97 pg. 231; Exs. 34, 35.)

87.     Kennedy further testified that ClearTrust needed a Seller's Representation Letter from FreeLife in order to remove the restriction on the shares. (Dunnigan Decl. Ex. 97 pg. 232.)

88.     Kennedy further testified that ClearTrust received a Seller's Representation Letter from FreeLife, executed by Hackett. (Dunnigan Decl. Ex. 97 pg. 233.)

89.     Kennedy further testified that, in the Seller's Representation Letter, Hackett on behalf of FreeLife represented that he had carefully reviewed Rule 144. (Dunnigan Decl. Ex. 97 pg. 234; Ex. 38.)

90.     Kennedy further testified that, in the Seller's Representation Letter, Hackett on behalf of FreeLife represented that "he intends to sell the shares and he has not paid anyone in connection with this proposed sale, with the exception of customer broker's

commissions. And he's also representing that he hasn't prearranged any orders to sell the shares with anyone else." (Dunnigan Decl. Ex. 97 pg. 234; Ex. 38.)

91.    Kennedy further testified that in the Seller's Representation Letter, Hackett on behalf of FreeLife represented, "I'm not engaged in a plan with anyone else to dispose of the shares," which to her meant that he was not acting in collusion with anyone. (Dunnigan Decl. Ex. 97 pg. 235; Ex. 38.)

92.    Kennedy further testified that ClearTrust ultimately removed the restriction on the 200,000 shares of First Harvest stock that Baywall requested to transfer to Hackett. (Dunnigan Decl. Ex. 97 pg. 235.)

93.    Kennedy further testified that 200,000 shares of First Harvest stock were deposited into a brokerage account held by FreeLife at Citibank on September 22, 2017. (Dunnigan Decl. Ex. 97 pgs. 237-238.)

94.    Kennedy further testified that without the Seller's Representation Letter, ClearTrust would not have permitted the sale of First Harvest shares by FreeLife. (Dunnigan Decl. Ex. 97 pg. 238.)

95.    Kennedy further testified that 768,750 shares of ASNT were issued to Farrill without a restrictive legend because they qualified for an exemption under Rule 144. (Dunnigan Decl. Ex. 97 pg. 240; Ex. 46.)

96.    Kennedy further testified that 350,000 of the unrestricted ASNT shares issued to Farrill were deposited into a brokerage account at Interactive Brokers. (Dunnigan Decl. Ex. 97 pg. 240; Ex. 46.)

97.    Kennedy further testified that 418,750 of the unrestricted ASNT shares issued to Farrill were deposited into a brokerage account at Wilson Davis. (Dunnigan Decl. Ex. 97 pg. 240; Ex. 47.)

14

*iv.*    *Testimony of David Wolfson*

98.    At trial, the government presented the testimony of David Wolfson ("Wolfson"), who testified that he owned and managed "call rooms." (Dunnigan Decl. Ex. 97 pg. 260.)

99.    Wolfson further testified that a call room is "an office with agents, salespeople, openers and closers who market and sell various things." (Dunnigan Decl. Ex. 97 pg. 260.)

100.    Wolfson further testified his call rooms used predictive dialing software to call large numbers of people in an effort get them to buy shares of specific stocks on the market, those stocks that they "represented." (Dunnigan Decl. Ex. 97 pgs. 260-261, 264-265; Dunnigan Decl. Ex. 98 pg. 270.)

101.    Wolfson further testified that his call rooms were used in connection with sales of the stocks HVST and ASNT. (Dunnigan Decl. Ex. 97 pg. 263.)

102.    Wolfson further testified that when his sales agents reached a potential investor in ASNT/HVST, they were not always honest, including about "[t]he growth potential, appreciation of the stock and how much money they could make in what period of time." (Dunnigan Decl. Ex. 98 pg. 269.)

103.    Wolfson further testified, "[a]t any given day, there was a particular stock that was represented to us through . . . Liana, a woman I worked with, that we had the power or had the capability and we were to be paid if we marketed it to those particular stocks." (Dunnigan Decl. Ex. 98 pg. 270.)

104.    Wolfson further testified that, when a sales agent reached an investor interested in buying the HVST/ASNT, he would text or call Liana the dollar amount of shares the investor sought to purchase and Liana would respond with the price per share, which was frequently above the market price. (Dunnigan Decl. Ex. 98 pgs. 278-280.)

105.   Wolfson further testified that the investor would then place an order for the stock at the price Liana specified in the investor's personal trading account. (Dunnigan Decl. Ex. 98 pg. 283.)

106.   Wolfson further testified that Liana paid him a commission ranging from 25 to 40%, depending on the stock. (Dunnigan Decl. Ex. 98 pg. 284.)

107.   Wolfson further testified that on January 11, 2018, an individual named Grace Dahlbeck purchased 2,702 shares of ASNT through his call room, at a purchase price of $1.85 per share, and out of the $4,998.70 that Dahlbeck paid, Wolfson charged gross commissions of $2,249.42. (Dunnigan Decl. Ex. 98 pgs. 290-291; Ex. 312.)

108.   Wolfson further testified that Dahlbeck was not told the commission rate she paid on the ASNT shares she purchased, and investors generally were not told of the commissions he received on sales of represented stock shares. (Dunnigan Decl. Ex. 98 pg. 288, 290-291; Ex. 74.)

   *v.*   *Testimony of Michael Forster*

109.   At trial, the government presented the testimony of Michael Forster, who testified that he had been involved in pump and dump schemes involving microcap stocks for 20 to 25 years. (Dunnigan Decl. Ex. 100 pg. 409.)

110.   Forster further testified that, in August of 2017, he was approached by the FBI and offered a cooperation agreement, to which he agreed, whereby he would record and capture correspondence with other individuals involved in "pump and dumps, with stock fraud." (Dunnigan Decl. Ex. 100 pgs. 411-412.)

111.   Forster further testified that he was primarily involved in the marketing side of pump and dump schemes. (Dunnigan Decl. Ex. 100 pg. 412.)

112.   Forster further testified that TheMoneyStreet.com was a website whose primary function was to pump microcap stocks. (Dunnigan Decl. Exs. 100 & 101 pgs. 412-413.)

113.   Forster further testified that he facilitated finding deals to promote on TheMoneyStreet. (Dunnigan Decl. Ex. 101 pgs. 424-425.)

114.   Forster further testified that he turned over to the FBI recorded phone calls, emails, and encrypted text messages involving the Defendants. (Dunnigan Decl. Ex. 101 pgs. 424-425.)

115.   Forster further testified that offshore brokerage firms offered the advantage of anonymity in pump and dump schemes by hiding ownership of the account and "freedom to sell an excessive amount of shares in a thinly veiled traded microcap without repercussions." (Dunnigan Decl. Ex. 101 pg. 435.)

116.   Forster further testified that he learned, from a November 1, 2017 email forwarded to him, that Gillespie had press releases about First Harvest that he planned to put out in the future. (Dunnigan Decl. Ex. 102 pgs. 465-466.); Ex. 16.)

117.   Forster further testified that he believed the planned press releases were a good thing in the context of a planned pump and dump scheme because "[i]t's like hyping the stock more." (Dunnigan Decl. Ex. 102 pg. 466.)

118.   Forster further testified that on a recorded call with Hackett, they discussed the planned promotion of First Harvest, and Hackett told Forster that he had promoted First Harvest stock before. (Dunnigan Decl. Ex. 102 pg. 469.)

119.   Forster further testified that on a recorded call, Hackett told him regarding ASNT, "I just did a campaign to just kind of test things out to see how this thing trades, and the stock you'll see shot up to around 9, 9.50, around there," which Forster understood to mean he had "run a campaign, brought in buying, volume . . . . as a test to see if the stock of ASNT would behave in a positive way with increased volume and increased price when he ran a campaign, when he created demand." (Dunnigan Decl. Ex. 102 pg. 473.)

120.   Forster further testified that, on a later recorded call with Hackett and Budhu during which they discussed at which price to begin dumping ASNT, Hackett said, "Let's

17

just try to take it up as high as possible," which Forster understood to mean to allow the share price of ASNT to go up as much as possible." (Dunnigan Decl. Ex. 102 pg. 491; Ex. 110.)

  *vi. Testimony of Marc Pennebaker*

  121. At trial, the government presented the testimony of Marc Pennebaker, who testified that he was a Special Agent from the FBI who investigated financial crimes during the 2017 to 2018 time period. (Dunnigan Decl. Ex. 105 pg. 594.)

  122. Pennebaker testified that Stellar Media Group, LLC ("Stellar Media") and PTE.la issued a series of twelve promotional newsletters concerning the Company between September 12, 2017, and March 9, 2018, all of which contained disclaimer language indicating that ACN, LLC ("ACN") had compensated them for advertising and marketing for the Company. (Dunnigan Decl. Ex. 105 pgs. 594, 625-627; Ex. 87.)

  123. Pennebaker further testified that FreeLife made payments to ACN on August 17, 2017, January 17, 2018, and January 26, 2018. (Dunnigan Decl. Ex. 105 pg. 594; Ex. 81.)

  124. Pennebaker further testified that from November 30, 2017 to January 26, 2018, FreeLife made a series of payments to an entity held in the name of Liana Millhouse. (Dunnigan Decl. Ex. 105 pg. 594; Ex. 82.)

 B. <u>Summation at Trial</u>

  125. In summation at trial in the Criminal Case, the Government argued: "It's the cheating. It's the lying. It's the misrepresentations. It's the massively manipulated market for Arias Intel [s]tock that makes this a classic pump-and-dump scheme. It's the tidal wave of evidence that the United States has presented that makes Andrew Hackett guilty of participating in, even leading that scheme. A pump and dump, as the evidence has shown, is exactly what it sounds like. You pump up the price -- you've heard it time and again in here -- through call rooms, through e-mail promotional newsletters, through a

manipulated market for the stock, both in terms of its price and its volume, and then you dump the shares into that inflated market." (Dunnigan Decl. Ex. 108 pg. 717.)

126.    In summation at trial in the Criminal Case, the Government further argued: "[I]n opening statement, [the Government] predicted what the evidence would show. It would show that a pump-and-dump scheme consisted of controlling the stock, pumping up the stock and then dumping it. And [the Government] went through various ways in which that would be done, and [the Government's] prediction was exactly right because that's exactly what the evidence has shown." (Dunnigan Decl. Ex. 108 pg. 718.)

127.    In summation at trial in the Criminal Case, the Government further argued: "The evidence shows that Ms. Budhu received 200,000 shares of First Harvest stock by being a consultant for the company. And that was pursuant to the advisory agreement[.]" (Dunnigan Decl. Ex. 108 pg. 720.)

128.    In summation at trial in the Criminal Case, the Government further argued: "She then sold those shares to Mr. Hackett for $5,000. 200,000 shares for $5,000. By the way, that's two and a half cents a share. You'll see from the stock charts and all the data about the stock price through – over time, the real price – the market price of that stock when he got them for 2.5 cents a share was 100 times greater. It was about $2.50 or more. That's cheap stock, stock that you can buy enough of to control." (Dunnigan Decl. Ex. 108 pg. 720.)

129.    In summation at trial in the Criminal Case, the Government further argued: "Mr. Hackett bought these shares through a share purchase agreement, but there was a problem. Mr. Hackett wanted to buy those shares so he could sell them to people in the open securities markets. The problem was, of course, as Kara Kennedy testified about, and so did Tom Carocci, the FINRA expert, that you can't do it when there is a restricted legend on the stock." (Dunnigan Decl. Ex. 108 pgs. 720-721.)

130.    In summation at trial in the Criminal Case, the Government further argued: "Mr. Hackett sought to remove that restriction." (Dunnigan Decl. Ex. 108 pg. 721.)

131.   In summation at trial in the Criminal Case, the Government further argued: "So in order to issue a new certificate without the restrictive legend, you have to go through a process. Kara Kennedy had to assess as the transfer agent for First Harvest whether or not to lift that restriction and allow those $5,000 worth, the 200,000 shares to be traded into the public market." (Dunnigan Decl. Ex. 108 pg. 721.)

132.   In summation at trial in the Criminal Case, the Government further argued: "She analyzed a number of factors in order to make that determination. Whether Mr. Hackett was affiliated with the company. Whether he had solicited people to buy stock. Whether he had paid others to sell shares. And, of course, whether he had a plan to dispose of the stock. All of these were very important considerations. They were the considerations that Kara Kennedy used to decide whether to lift the legend." (Dunnigan Decl. Ex. 108 pgs. 721-722.)

133.   In summation at trial in the Criminal Case, the Government further argued: "Mr. Hackett lied about just about every one of those things when he submitted his packet to Kara Kennedy. This is the . . . fraudulent seller's representation letter itself." (Dunnigan Decl. Ex. 108 pg. 722.)

134.   In summation at trial in the Criminal Case, the Government further argued: "[A]s far as the pump-and-dump model, when you're trying to gain control over the stock . . . the lies here worked. Kara Kennedy accepted these misrepresentations." (Dunnigan Decl. Ex. 108 pg. 725.)

135.   In summation at trial in the Criminal Case, the Government further argued: "[T]hese 200,000 shares, we have evidence about where those ended up. They ended up in Mr. Hackett's Seton account." (Dunnigan Decl. Ex. 108 pg. 725.)

136.   In summation at trial in the Criminal Case, the Government further argued: "The DTC sheets show a grand total of deposited shares at brokerage firms . . . . It's 332,000 some-odd shares." (Dunnigan Decl. Ex. 108 pg. 727.)

20

137.   In summation at trial in the Criminal Case, the Government further argued: "[A]t Citibank, which is where Mr. Hackett said his shares were, there are 177,000 shares. Just by this piece of evidence along, you can determine that Mr. Hackett had sufficient control over the stock to do what he intended to do." (Dunnigan Decl. Ex. 108 pg. 727.)

138.   In summation at trial in the Criminal Case, the Government further argued: "Not only did Hackett pick up these 200,000 shares, but he absolutely – the calls, the other evidence shows – was trying to pick up more shares to extend his control, to extend his ability to accomplish this pump and dump." (Dunnigan Decl. Ex. 108 pg. 729.)

139.   In summation at trial in the Criminal Case, the Government further argued: "He sent this text to Michael Forster. Happy Friday. Sold all my ASNT. Have just a small bit left but 850K more free up for me. Free up for who? Free up for Robert Farrill? No, free up for me, Andrew Hackett. 850,000 shares. The control was just going to grow and grow." (Dunnigan Decl. Ex. 108 pg. 730.)

140.   In summation at trial in the Criminal Case, the Government further argued: "The second aspect of a pump-and-dump scheme, of course, is the pump. You've got to get the price up somehow. Here, they didn't get the price up by doing great things with the company, by creating great products and selling terrific solutions. They pumped up the price by working outside the company on investors and on the stock. This isn't like legitimate capitalism and entrepreneurialism. This is just manipulation of the stock price." (Dunnigan Decl. Ex. 108 pg. 730.)

141.   In summation at trial in the Criminal Case, the Government further argued: "They did so in a number of ways, through press releases. The crowd even gave Michael Forster and the other members of this pump-and-dump scheme previews to press releases." (Dunnigan Decl. Ex. 108 pgs. 730-731.)

142.   In summation at trial in the Criminal Case, the Government further argued: "The point is to know that news will be released by the company hopefully that creates a

21

buzz, you can use it in your promotions to force the price of the stock up. There is also this notion that even though the company was ready to announce its news, they were holding it back so that they could actually extend their gains on pumping up the stock." (Dunnigan Decl. Ex. 108 pg. 731.)

143.   In summation at trial in the Criminal Case, the Government further argued: "Another part of forcing up the price of the stock is not just pumping it through press releases and coordinating it with the pump, but also manipulative trading." (Dunnigan Decl. Ex. 108 pgs. 733-34.)

144.   In summation at trial in the Criminal Case, the Government further argued: "[T]he manipulative trading that happened not only included Mr. Hackett supporting the market, but it included this method that Mr. Hackett used with Mr. Wolfson and his call rooms." (Dunnigan Decl. Ex. 108 pg. 734.)

145.   In summation at trial in the Criminal Case, the Government further argued: "[I]f Wolfson's call agents got a victim on the line, they said, don't go away and trade yourself for the best price. We'll give you a price in just a second." (Dunnigan Decl. Ex. 108 pg. 734.)

146.   In summation at trial in the Criminal Case, the Government further argued: "And then there is a text message over to Liana Millhouse and then to Hackett, back to Millhouse, back to the call room agents so that the victim could match the trade in a prearranged quantity and price and time so that the person who would be selling to these victims would be Andrew Hackett specifically." (Dunnigan Decl. Ex. 108 pgs. 734-735.)

147.   In summation at trial in the Criminal Case, the Government further argued: "As Tom Carocci, the FINRA expert said, you may not prearrange in a supposedly anonymous securities market the time, volume and price of trades like that. That's manipulative trading. That's a scheme to defraud." (Dunnigan Decl. Ex. 108 pg. 735.)

148.   In summation at trial in the Criminal Case, the Government further argued: "You can track from this chart, now that you have the evidence, the fact that Free Life

[sic], Mr. Hackett's company, paid ACN some money on August 17th, 2017. A week later from ACN's bank statements, you can tell that ACN paid $22,500 of that to Stellar Media. Stellar Media is the party that put out that promotion." (Dunnigan Decl. Ex. 108 pg. 737.)

149.   In summation at trial in the Criminal Case, the Government further argued: "This all worked, of course. . . . And look what happened to the stock price. . . . [I]t went straight up. It closed on the 14th of September at $9.30. That was up from, boy, right before that, $2.70 a few days prior. That's a pretty effective pump." (Dunnigan Decl. Ex. 108 pgs. 737-738.)

150.   In summation at trial in the Criminal Case, the Government further argued: "There is also, of course, The Money Street [sic]. That's where Mr. Forster comes in. This group had – or at least Mr. Hackett had his own way to pump up ASNT stock, but he was interested, too, in The Money Street [sic] because, as Mr. Forster testified, it had been very successful in the past. People knew about The Money Street [sic] and knew what kind of illegal profits they could make by using it if they had the opportunity." (Dunnigan Decl. Ex. 108 pg. 738.)

151.   In summation at trial in the Criminal Case, the Government further argued: "This is the text message that you saw come in just this morning. [']Andrew: HVST, it's at $2. I can get you the whole deal. There are lots of good news. You think your New York guys will do it?['] Ladies and gentlemen, that was on August 3rd, 2017. You can go to the stock purchase agreement and see that he didn't actually purchase these shares from Annetta Budhu and sign that until I think 5 days later. It was a prerequisite of acquiring the shares that he would be able to pump and dump the stock." (Dunnigan Decl. Ex. 108 pg. 739.)

152.   In summation at trial in the Criminal Case, the Government further argued: "Mr. Hackett talked to Mr. Forster on the phone about the call rooms and specifically Liana Millhouse repeatedly." (Dunnigan Decl. Ex. 108 pg. 740.)

153.    In summation at trial in the Criminal Case, the Government further argued: "You put up a bid and she filled it. That's the manipulative trading aspect of Liana Millhouse's and Dave Wolfson's operation. We know Liana Millhouse from that tape got 50 percent. 50 percent of what? 50 percent of the dollars that an investor, an innocent investor victim put in." (Dunnigan Decl. Ex. 108 pg. 740.)

154.    In summation at trial in the Criminal Case, the Government further argued: "When Andrew Hackett said, [']You [sic] know, I sold when it went up to 9,['] he wasn't just being boastful. It wasn't empty talk. He did it. Not only is there the suggestion that Mr. Hackett profited, that he sold into this inflated market, there is cold, hard documentary evidence from his own Seton account statement." (Dunnigan Decl. Ex. 108 pg. 745.)

155.    In summation at trial in the Criminal Case, the Government further argued: "Did [Hackett] do things that created a scheme to defraud? Not necessarily a specific lie or misrepresentation or omission, but was there a scheme in which he did a number of things that operated as a deceit and a fraud on investors? The evidence is that he did." (Dunnigan Decl. Ex. 108 pg. 747.)

156.    In summation at trial in the Criminal Case, the Government further argued: "He lied to Kara Kennedy to unrestrict his shares so that he could trade them in the market. And he knew that others were lying, too. He paid them to lie, like David Wolfson and his call room agents." (Dunnigan Decl. Ex. 108 pgs. 747-748.)

157.    In summation at trial in the Criminal Case, the Government further argued: "One of the elements that you have to find that the government has proven beyond a reasonable doubt is whether Mr. Hackett intended to defraud through his actions. And I suggest to you there is a long list of evidence that supports the conclusion that he did, he had the intent." (Dunnigan Decl. Ex. 108 pg. 748.)

158.    In summation at trial in the Criminal Case, the Government further argued: "One is concealment, there are all these efforts to hide, to conceal what he's doing. Those

include the use of an offshore brokerage firm, even though you have to pay 10 percent and they have lousy execution." (Dunnigan Decl. Ex. 108 pg. 748.)

159.   In summation at trial in the Criminal Case, the Government further argued: "An effort to make sure that wouldn't be able to see where the buying was coming from, because then people wouldn't spot you, spot the trading activity and get suspicious." (Dunnigan Decl. Ex. 108 pg. 748.)

160.   In summation at trial in the Criminal Case, the Government further argued: "And also the use of WhatsApp and Wire and Crypto Heaven and Proton, Signal, all of these encrypted apps, even choosing which encrypted app because you might suspect that some of are comprised. . . . You don't use all of these and switch around among them unless you've got something to hide. If you've got something to hide and you know it, that's evidence of an intent to defraud." (Dunnigan Decl. Ex. 108 pg. 749.)

161.   In summation at trial in the Criminal Case, the Government further argued: "[Y]ou can infer an intent to defraud if he does things, Mr. Hackett, that would make no sense in the nonfraud world. They only make sense if you're trying to commit fraud. One is paying 50 percent to Ms. Millhouse. A standard commission at a brokerage firm, as Mr. Carocci said, over 5% is presumed to be excessive." (Dunnigan Decl. Ex. 108 pg. 749.)

## III.   <u>Additional Evidence</u>

162.   On August 31, 2017, Hackett executed a Seller's Representation Letter to ClearTrust for a proposed sale of 200,000 shares of First Harvest.  He represented, "I have not solicited or arranged for the solicitation of orders to buy in anticipation of or in connection with the proposed sale pursuant to such order, and I will not do so" and "I am not acting in concert with any person in selling the Shares, and I have not agreed to so

act. I am not engaged in a plan with anyone else to dispose of the Shares." (Dunnigan Decl. Ex. 38.)

163.    Between December 22, 2017 and January 12, 2018, Hackett and the Undercover Agent executed a series of trades of ASNT stock whereby Hackett sold the stock on the open market and the Undercover Agent purchased them. (Dunnigan Decl. ¶¶ 114-117; Ex. 113.) These sales by Hackett totaled $30,812.30.

164.    At his deposition, Hackett admitted that he worked with a woman named Liana Milhouse to sell ASNT stock through "phone rooms" she operated to target potential investors in penny stocks. Hackett paid Millhouse a 50% fee for any trades initiated through her phone room. (Dunnigan Decl. Ex. 92, pgs. 121-22; 151-54.)

New York, New York
July 25, 2024

/s/ Christopher J. Dunnigan_____
Christopher J. Dunnigan
Christine Ely
Securities and Exchange Commission
Division of Enforcement
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-0061 (Dunnigan)