FILED
AUG 19 2024
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY ____ DEPUTY

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SECURITIES EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>GANNON GIGUIERE. et al..<br><br>Defendants. | Case No.: 18-cv-01530-WQH-JLB<br><br>**DEFENDANT ANDREW HACKETT'S OPPOSITION TO PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR SUMMARY JUDGMENT** |

Defendant Andrew Hackett respectfully submits this Opposition to Plaintiff Securities and Exchange Commission's Motion for Summary Judgment.

# Table of Contents


**TABLE OF AUTHORITIES ........ - 3 -**

**I. INTRODUCTION ........ - 4 -**

**II. STATEMENT OF FACTS ........ - 5 -**

A. THE ORIGINS OF THE ASNT DEAL ........ - 5 -
B. THE GOVERNMENT'S MOTIONS IN LIMINE IN THE CRIMINAL CASE ........ - 9 -
C. FORENSIC EVIDENCE FROM ASNT SEC BLUESHEET TRADING DATA ........ - 10 -
D. EXCULPATORY EVIDENCE WITHHELD FROM HACKETT BY GOVERNMENT AND SEC ........ - 11 -

**III. LEGAL STANDARDS ........ - 13 -**

A. SUMMARY JUDGMENT ........ - 13 -
B. SECURITIES FRAUD CLAIMS ........ - 14 -
C. COLLATERAL ESTOPPEL ........ - 15 -

**IV. ARGUMENT ........ - 15 -**

A. SEC'S MISLEADING USE OF UNDERCOVER AGENT'S "COMMISSIONS" CHART ........ - 15 -
B. FORENSIC EVIDENCE OF TRADING DATA WAS AVAILABLE ........ - 16 -
C. NON-DISCLOSURE OF EXCULPATORY EVIDENCE IN THE CRIMINAL CASE DENIED HACKETT A FULL AND FAIR TRIAL ........ - 17 -
D. A JURY MUST WEIGH THE EVIDENCE ........ - 18 -

**V. CONCLUSION ........ - 19 -**

## Table of Authorities

Page(s)

Cases

*Barlow v. Ground*,
*943 F.2d 1132* (9th Cir. 1991) .......... 13
*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976) .......... 14, 16, 18
*Kirschner Bros. Oil v. Natomas Co.*,
185 Cal. App. 3d 784 (1986) .......... 14
*Piper v. Chris-Craft Indus.*,
430 U.S. 1 (1977) .......... 14
*Rezner v. Bayerische Hypo-Und Vereinsbank AG*,
630 F.3d 866 (9th Cir. 2010) .......... 13
*Santa Fe Indus. v. Green*,
430 U.S. 462 (1977) .......... 14
*SEC v. Capital Gains Research Bureau*,
375 U.S. 180 (1963) .......... 14
*Tzung v. State Farm Fire and Casualty Co.*,
873 F.2d 1338 (9th Cir. 1989) .......... 13
*United States v. Real Prop. Located at Section 18*,
976 F.2d 515 (9th Cir. 1982) .......... 15

Statutes

15 U.S.C. § 78i .......... 14, 18

Rules

Fed. R. Civ. P. 56(a) .......... 13

## I. INTRODUCTION

The Securities and Exchange Commission ("SEC") seeks judgment on a false premise that the defendant Andrew Hackett ("Hackett"), received a full and fair trial in the parallel criminal case to which the SEC seeks to apply the theory of collateral estoppel; he did not. As the evidence submitted with this opposition shows, the SEC cannot show a single trade which Hackett in his personal capacity, nor Hackett's corporation conducted in any illegal capacity. Moreover, in the criminal trial, the Government argued that while it did not possess "forensic evidence" of Hackett's trades of ASNT/HVST, it sought to admit evidence of  "similar act deals" which would prove Hackett's "modus operundi of the charged scheme." Of these similar act deals included WRIT. However, it has been recently revealed as of late March of this year that the Government, and subsequently the SEC concealed the fact that another Federal Bureau of Investigations ("FBI") informant, Alexander Smirnov was not only substantially involved in promotional efforts surrounding WRIT, but made contact with Hackett and the other informant in Hackett's case. No exculpatory evidence collected by Smirnov during his interactions with Hackett was turned over to Hackett in discovery. Smirnov's WRIT trades would have been the only forensic evidence, that the Government had in it's possession, provided to the jury during trial to show that Hackett lacked the requisite state of mind required for securities fraud. Hackett and Smirnov's interactions and reports concerning WRIT would have reasonably affected the jury's judgment on whether Hackett sold his stock in connection with any proposed sales. Instead, the intentional non-disclosure of such evidence allowed the Government to mislead the jury, deceive the court during its Motions in Limine, and provide a false presentation of the facts at trial. To date, the SEC continues to mislead the Court in presenting solely circumstantial evidence falsely portraying that Hackett engaged in manipulative trading, when in fact, forensic evidence that should have been produced to Hackett would disprove this point. Thus, Hackett was not provided a

full and fair trial in the criminal case to prevent a conviction of doubtful validity. Therefore, the defendant Hackett respectfully submits this Opposition to the SEC's Motion for Summary Judgment.

## II. STATEMENT OF FACTS

A. The Origins of the ASNT Deal

1. Beginning in or around August of 2017, defendants Kevin Gillespie, Annetta Budhu, and Andrew Hackett entered into a legitimate business arrangement. (Hackett Decl., **Ex. A,** 16:11-18) The company that Gillespie controlled, First Harvest Corp, needed to raise money to remove convertible debt holders of the company. *Id.*

2. During an interview with the Federal Bureau of Investigations ("FBI"), Gillespie stated that he "believed the arrangement with Hackett was a simple business transaction." (Hackett Decl., **Ex. C,** p. 2, ¶5)

3. As part of the business arrangement, Hackett received 200,000 ASNT shares discounted as insurance for his partner's risk in the investment. (Hackett Decl., **Ex. A**, 25:2-17) Hackett's partner in this business arrangement with First Harvest, Robert Farrill, took on a significant risk in investing $300,000 into the company to buyout the debt holders. *Id.* In the event the debt holders were not bought out, it was highly likely that the company's stock would go to zero. *Id.*

4. On or about August 8, 2017, Budhu sold the 200,000 shares to Hackett's company Free Life Investments, Inc., as part of the business arrangement with First Harvest. (Hackett Decl., **Ex. A**, 24:10-23) In the depositing of the 200,000 shares with the transfer agent, Hackett did not make material misrepresentation to the ASNT transfer agent in the Seller's Representation Letter. (*United States v. Hackett et al.*, 18-cr-03072 (S.D. Cal.) (TWR) ("the Criminal Case, Dkt. No. 343, Def. Trial Ex. B (HVST SEC Bluesheet Data), C (ASNT SEC Bluesheet Data))

5. The SEC Bluesheet Data contains forensic trading data for the relevant stock. *Id.* Specifically, the HVST/ASNT Bluesheet Data reveal that Hackett's shares in question were not traded illegally, and subsequently, Hackett did not make a material misrepresentation on the ASNT transfer agent Seller's Representation Letter. *Id.*

6. On August 10, 2017, Gillespie issued Robert Farrill a $300,000 convertible promissory note as part of the business arrangement. (Hackett Decl., **Ex. A,** 19:25, 20:1-25, 21:1-25, 22:1-23) Hackett was not issued a convertible promissory note. *Id.* The note allowed Farrill to convert the debt into 750,000 shares of ASNT stock. (Dunnigan Decl., Ex. 97 pg. 240, Ex. 46)

7. During the criminal trial, the representative of the transfer agent in question, Kara Kennedy, testified that 768,750 shares of ASNT were issued to Farril. *Id.* Kennedy further testified that 350,000 of the unrestricted ASNT shares issued to Farrill were deposited into Interactive Brokers, and the remaining 418,750 issued to Farrill were deposited into his Wilson Davis account. *Id.*

8. Farrill's 350,000 shares out of the 750,000 total were first transferred from Clear Trust to his broker on March 1, 2018. (Hackett Decl., **Ex. QQ)** Farrill sold and transferred these shares to Hackett into his brokerage account. (Hackett Decl., **Ex. A,** 44:23-25, 45:1-11.

9. The 750,000 shares of ASNT that were issued to Farrill were not for the benefit of Hackett. (Hackett Decl., **Ex. A,** 44:21-25, 45:1-23) Rather, Hackett purchased approximately half of Farrill's shares for a purchase price of $150,000. *Id.*

10. In or around October of 2017, Michael Forster, through Vikrham Khanna and Kuldeep Sidhu, approached Hackett searching for "deals" to promote. (Hackett Decl., **Ex. H**; **Ex. A,** 39:12-18)

11. During this period, the confidential witness, Michael Forster, with the FBI that purported to be recording and "preserving" conversations, did not in fact preserve all communications. (Hackett Decl., **Ex. F**) For example, during the

supposed first recorded call by the confidential witness, Forster, on October 13, 2017 with Vikrham Khanna, Khanna references a conversation the pair had prior to the recorded call. *Id.*

12. At the criminal trial, Forster testified to speaking to Khanna "daily." (Hackett Decl., **Ex. E,** 430: 12-23)

13. Forster signed a cooperation agreement with the FBI on August 18, 2017. (Hackett Decl., **Ex. G**) Despite Forster becoming an informant in August of 2017, testifying that he spoke with Khanna daily prior to October, and that Khanna referenced an earlier conversation the pair had that was not recorded, all communications were not preserved by Forster. (Hackett Decl., **Ex. F**; **Ex. E,** 430: 12-23; **Ex. G**)

14. At a later date, Hackett discovererd that he and Farrill had been duped by Gillespie regarding their business arrangement. (Hackett Decl., **Ex. A**, 59:1-13) Despite their arrangement, Hackett and Farrill discovered that the debt holders had not been bought out. *Id.*

15. Budhu approached Hackett with First Harvest press releases, to which Hackett stearnly declined to view and scolded Budhu for attempting to share press releases before publishing to the public. (Hackett Decl., **Ex. M**)

16. Hackett did not discuss press releases with Gillespie and Budhu for promotional purposes. (Hackett Decl., **Ex. N**)

17. Hackett did not plan to sell shares of ASNT stock once the price reached a certain target. (Hackett Decl., **Ex. O**)

18. In or around November of 2017, it became clear that Hackett was disinterested in completing the business arrangement that Forster proposed to Hackett through Kuldeep Sidhu. *Id.* Khanna told Forster that Hackett did not want to proceed with his proposed business arrangement because it was "wonky." *Id.*

19. Despite not wanting to proceed with Forster's business arrangement, Forster would manipulate the recordings by strategically recording certain calls and not recording others to portray the false narrative that Hackett was interested in moving forward with Forster's arrangement. (Hackett Decl., **Ex. A,** 47:12-15)

20. On December 9, 2017, Forster, Budhu, Sidhu, and Hackett spoke on a recorded line discussing Forster's business arrangement that would begin, unless otherwise objected by the parties on the upcoming Monday. (Hackett Decl., **Ex. P**)

21. On December 12, 2017, Forster and Hackett spoke referencing a conversation prior to the recorded call in which Hackett would not move forward with Forster's arrangement. (Hackett Decl., **Ex. HH**) However, the referenced call was not recorded and preserved by Forster. (Hackett Decl., **Ex. A,** 47:12-15)

22. By Forster purposely not recording his call with Hackett, Forster was able to speak with Gillespie on December 12, 2017, to falsely portray that Hackett was moving forward with Forster's arrangement. (Hackett Decl., **Ex. Z**)

23. On the same day, Forster has a recorded call with Khanna where he references a call that Forster had with Budhu. (Hackett Decl., **Ex. R**) However, no such recording of a conversation with Budhu was recorded and preserved by Forster. (Hackett Decl., **Ex. A,** 47:12-15)

24. Ultimately, Hackett was the one who declined to move forward with the ASNT deal, not Forster. (Hackett Decl., **Ex. A,** 47:9-15; **Ex. Q**; **Ex. R**) Forster wanted to continue the ASNT deal despite knowing that Hackett did not want to proceed. *Id.*

25. To continue the deal, Forster introduces Hackett to an individual named "Jay," later to be revealed as the undercover agent, who Hackett believes runs a phone room. (Hackett Decl., **Ex. U**)

26. Hackett and Forster had differing motives in their dealings with each other. (Hackett Decl., **Ex. T**) Forster and the undercover agent aggressively attempted to get

Hackett to "capture" the undercover agent's buy orders of ASNT, with the ambitions of creating an illegal trade. *Id.* Hackett's refusal to capture trades hindered Forster and the undercover agent's plans, and went "against everything." *Id.*

27. Utimately, Hackett did not agree to engage in the scheme to liquidate his ASNT holdings and create a misleading appearance of active trading. *Id.* Hackett did not match trades with the undercover agent. *Id.* In Hackett refusing to engage in a manipulative trading scheme, Hackett went against everything Forster and the undercover agent had planned. *Id.*

B. <u>The Government's Motions in Limine In the Criminal Case</u>

28. On September 4, 2019, the Government, in its' Motion in Limine to "Admit the conspirators' references to other penny stock "deals" in describing the ASNT scheme," sought to admit evidence of a Writ Media Group ("WRIT") deal. (Hackett Decl., **Ex. CC**)

29. The Government argued that WRIT is "intrinsic evidence of the charged" ASNT scheme, and that WRIT evidence should be admitted because it shows Hackett's "knowledge, plan, and modus operandi surrounding pump-and-dump schemes." (Hackett Decl., **Ex. CC; Ex. FF**)

30. WRIT evidence constitutes "direct evidence" of the "securities fraud alleged," and discussions of WRIT were had "to illuminate" Hackett's "plans and actions with respect to ASNT, they are intrinsic evidence" of Hackett's alleged securities fraud. *Id.*

31. The Government further highlighted the importance of admitting WRIT evidence at the criminal trial by reasoning that "the jury cannot be expected to make its decision in a void—without knowledge of the time, place, and circumstances of the acts which form the basis of the charge." *Id.* The WRIT evidence provides "a context in which the transactions at issue took place." *Id.*

32. Discussions about WRIT provide evidence of Hackett's state of mind because discussions of WRIT are "therefore inextricably intertwined with the ASNT scheme." *Id.* The WRIT evidence is necessary to "allow for a coherent and comprehensible story regarding the commission" of the ASNT deal. *Id.*

33. The WRIT evidence proves Hackett's "intent, knowledge of, and plan to perpetrate the ASNT scheme" the "scope" of the agreement, and Hackett's "modus operandi surrounding pump-and-dump schemes." *Id.*

34. The discussions about WRIT "were contemporaneous with" the "discussions about ASNT." *Id.* The "recorded calls make clear that Hackett was working on the…WRIT deal during the same period he was engaged in active discussions regarding the ASNT scheme – October 2017 through at least January 2018." *Id.*

35. The Government sought to admit similar act evidence because ultimately, there is no forensic evidence of Hackett conducting matched trades. (Hackett Decl., **Ex. BB**)

C. <u>Forensic Evidence From ASNT SEC Bluesheet Trading Data</u>

36. The Government, and now the SEC relies on a commissions chart curated by Forster and the undercover agent to misleadingly portray that Hackett conducted matched trades in ASNT stock. (Dunnigan Decl., Ex. 113).

37. The SEC Bluesheet trading data are the only forensic evidence of trades conducted in ASNT. (Hackett Decl., ¶35) The relevant Bluesheet data for December 22, 2017, January 8, 2018, and January 9, 2018, show the buy orders conducted by the undercover agent. (Hackett Decl., **Ex. II; Ex. JJ; Ex. KK**) However, the corresponding sell orders, the matched trades, are **<u>not</u>** any portion of Hackett's 200,000 shares in question—the shares subject to the Seller's Representation Letter signed by Hackett, nor the 350,000 shares Hackett purchased from Farrill in or around March of 2018. *Id.*

///

D. Exculpatory Evidence Withheld From Hackett By Government and SEC

38. The Government produced in discovery a recorded call between Hackett, a man labelled by the FBI as "Alex LNU (Last Name Unknown), Forster, and "Denis" (an associate of Alex). (Hackett Decl., **Ex. OO)** The conversation surrounds the "similar act deal" WRIT, and a transcript created by the FBI, along with the audio recording of the call (recorded by Forster) was produced to Hackett in discovery. *Id.*

39. A commissions chart (identical to the commissions chart concerning ASNT) regarding WRIT trades was provided by Forster to Hackett. (Hackett Decl., **Ex. PP**)

40. On March 24th, 2024, Hackett became aware of the identity of a former FBI informant named Alexander Smirnov, through his indictment in the Central District of California. Case No. 2:24-cr-00091-ODW. (Hackett Decl., **Ex. EE**) The indictment alleges one count of providing false statement to a government agent, 18 U.S.C. §1001, and one count of falsifying records in a federal investigation, 18 U.S.C. §1519, in connection with Smirnov's attempts to frame President Joe Biden and his son Hunter Biden. (Hackett Decl., **Ex. EE**)

41. Hackett through his appellant counsel Mr. Carl Gunn, reached out to the Government requesting "evidence that is potentially exculpatory and may have been subject to disclosure under Rule 16 of the Federal Rules of Criminal Procedure" concerning Alexander Smirnov, who was recently publicly revealed as a long-time FBI informant when he was indicted in connection with false statements made in the Hunter Biden investigation and there was subsequent extensive media coverage." (Hackett Decl., **Ex. LL**)

42. In response to Gunn's request, AUSA Janaki Chopra advised that "there is no further discovery we anticipate producing in this case." (Hackett Decl., **Ex. MM**)

43. On May 14, 2024, during a hearing before the Court, the SEC confirmed that Smirnov was the individual identified as Alex whom Hackett spoke with during the

relevant investigation with the Government's primary trial witness Forster. (Hackett Decl., **Ex. NN**)

44. Smirnov's contacts with Hackett would have produced either recordings of their conversations, or reports and notes summarizing the conversations, trading reports pertaining to WRIT, trading reports authorizing Smirnov to purchase or sell WRIT, FBI reports pertaining to Smirnov and brokerage reports and conversations with Smirnov's broker/associate Denis, which were not produced to Hackett in discovery prior to trial.

45. On July 1, 2024, the Court granted in part and denied in part Hackett's Motion to Reopen Discovery. (Dkt. No. 222).

46. On July 8, 2024, Hackett filed Request for Leave to take Smirnov's deposition in prison. (Dkt. No. 223).

47. On July 10, 2024, the Court granted Defendant leave to take the deposition of. Smirnov in prison. (Dkt. No. 224).

48. On July 15, 2024, Smirnov was served a Subpoena to Testify at a Deposition in a Civil Action. (Motion to Vacate Deposition, "MVD" Dkt. No. 223) Smirnov advised Hackett, through his legal counsel David Chesnoff, that Smirnov intends to assert his Fifth Amendment privilege against all questions submitted by Hackett. (MVD) The SEC also advised Hackett of the potential difficulty of being permitted entry into the correctional facility that Mr. Smirnov is currently housed in to take his deposition. (MVD)

49. Taking into account these factors, Hackett submitted written questions to Smirnov on August 4th, 2024. (MVD, Ex. A)

50. On August 7, 2024, Smirnov provided his sworn affidavit to the Hackett in response to Hackett's written questions. (MVD, Ex.B)

51. Hackett submitted 43 written questions concerning his work as an FBI informant, his contact with Hackett, and his involvement with WRIT and ASNT, among other things. (MVD, Ex. A)

52. Smirnov asserted his Fifth Amendment privilege to prevent self-incrimination against all 43 written questions submitted by Hackett. (MVD, Ex. B)

53. On July 14, 2024, Hackett submitted 25 interrogatories and 12 requests for production to SEC concerning Smirnov (Hackett Decl., ¶45)

54. On August 13, 2024, the SEC refused to answer all 25 interrogatories submitted by Hackett. (Hackett Decl., ¶46)

## III. LEGAL STANDARDS

A. Summary Judgment

As the moving party seeking summary judgment, it is the SEC's burden to show that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ruling on a motion for summary judgment. Where material factual disputes exist, the court must allow a jury to resolve them." *Rezner v. Bayerische Hypo-Und Vereinsbank AG*, 630 F.3d 866, 871 (9th Cir. 2010) (citation omitted).

The Court must "view the evidence in the light most favorable to the non-moving party" when determining if there are genuine issues of material fact. *Barlow v. Ground, 943 F.2d 1132, 1134* (9th Cir. 1991) (citing *Tzung v. State Farm Fire and Casualty Co.*, 873 F.2d 1338, 1339-40 (9th Cir. 1989). "The affidavits of the moving party are strictly construed, whereas those of the party opposing the motion are liberally construed. Doubts as to the propriety of granting summary judgment must be

resolved in favor of the opponent of the motion." *Kirschner Bros. Oil v. Natomas Co.*, 185 Cal. App. 3d 784, 789 (1986).

B. Securities Fraud Claims

Section 10(b) of the 1934 Act makes it "unlawful for any person… to use or employ… any manipulative or deceptive device or contrivance in contravention of [Securities and Exchange Commission rules]"; Rule 10b-5, promulgated by the SEC under § 10(b), prohibits, in addition to nondisclosure and misrepresentation, any "artifice to defraud" or any act "which operates or would operate as a fraud or deceit." *Santa Fe Indus. v. Green*, 430 U.S. 462, 471 (1977). Actions under Section 10(b) and 10(b)-5 require a showing of scienter, defined as "embracing the intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). "Manipulation" is "virtually a term of art when used in connection with securities markets." *Ernst & Ernst*, 425 U.S., at 199. The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity. See, e.g., § 9 of the 1934 Act, 15 U.S.C. § 78i (prohibiting specific manipulative practices); *Ernst & Ernst*, supra, at 195, 199 n. 21, 205.

The Supreme Court in *Piper v. Chris-Craft Industries, Inc.* has stated that § 10(b), is "an antimanipulative provision designed to protect the orderliness of the securities market during distributions of stock" and "to prevent stimulative trading by an issuer in its own securities in order to create an unnatural and unwarranted appearance of market activity." *Piper v. Chris-Craft Indus.*, 430 U.S. 1, 43 (1977); See also *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 186 (1963)("Section 10(b)'s general prohibition of practices deemed by the SEC to be 'manipulative' - in this technical sense of artificially affecting market activity in order to mislead investors - is fully consistent with the fundamental purpose of the 1934 Act.")

///

C. Collateral Estoppel

Summary judgment against Hackett based on collateral estoppel is innapropriate due to the SEC's failure to meet the four-factor test. Specifically, the SEC cannot establish that "there must have been a full and fair trial to prevent convictions of doubtful validity from being used." *United States v. Real Prop. Located at Section 18*, 976 F.2d 515, 518 (9th Cir. 1982).

## IV. ARGUMENT

A. SEC's Misleading Use of Undercover Agent's "Commissions" Chart

Hackett was not afforded a full and fair trial in the criminal case. The basis of the securities fraud charged in the criminal indictment surrounds Hackett's alleged participation in a manipulative trading scheme—matched trading. However, the Government in the criminal case did not possess direct evidence of Hackett's match trading, because Hackett did not match trade. Instead, the Government relied solely on circumstantial evidence, such as the undercover agent's commissions summary charts produced by the FBI as false proof that Hackett conducted matched trades by selling his ASNT stock directly into the purchases of the undercover agent. (Dunnigan Decl., Ex. 113). However, the SEC Bluesheet trading data provides the irrefutable evidence that the Government's commissions charts are inaccurate. (Hackett Decl., **Ex. II; Ex. JJ; Ex. KK**) The Bluesheet data reveals that Hackett did not match a single trade with the undercover agent, despite what is documented in the commissions chart fasely. In the present matter before the Court, the SEC seeks to rely on the exact same faulty chart as support for their Motion for Summary Judgement. (Dunnigan Decl., ¶ 115)

The Bluesheet data does not show a single trade that the Defendant sold "in connection" to the undercover agent's buy orders. The words "in connection" are

important because the shares in question, subject to the SEC's Complaint allegations pertain to shares Hackett controlled, shares which are specifically related to 200,000 ASNT shares subject to the transfer agent Rule 144 Seller's Representation form. Any other shares Hackett acquired in a non-restricted format, i.e., purchasing shares in the open market, are not subject to the Rule 144 document.

B. Forensic Evidence of Trading Data Was Available

What has become public only as of earlier this year, is the fact that another FBI informant was involved in the relevant investigation of Hackett. (Hackett Decl., **Ex. EE**) Alexander Smirnov, an informant who used Hackett as a middle-man to ultimately get to FBI informant Forster, hired Forster and the undercover agent to promote his WRIT deal. Smirnov's involvement with the investigation of Hackett, and Smirnov's dealings of WRIT would have produced further forensic evidence surrounding manipulative trading. Specifically, because Smirnov had the undercover agent and Forster bring in buy orders of WRIT, Smirnov would have forensic trading data through his brokerage records. For the WRIT deal, Forster and the undercover agent were to bring in buying of WRIT in the same manner they were to bring in buying for ASNT.

As the Government repeatedly told the court in the criminal case, WRIT was intrinsic evidence of the charged scheme in ASNT. Yet, such evidence was not disclosed to Hackett. Smirnov's interactions, records, reports and findings concerning WRIT would have affected the jury's judgment on whether Hackett sold his stock in connection with any proposed sales. Evidence disproving Hackett's alleged matched trading goes directly to the "scienter" requirement of a 10-b, 10-b(5) action. *Ernst & Ernst*, supra, at 195, 199 n. 21, 205. The same commissions chart that the undercover agent and Forster produced to Hackett in the ASNT deal was created for the WRIT deal. (Dunnigan Decl., Ex. 113; Hackett Decl., **Ex. PP**)

However, Smirnov was controlling the WRIT deal, meaning he had control over the sales and trades of the deal. (Hackett Decl., **Ex. RR; Ex. SS**) Smirnov himself would have forensic evidence in his possession, which Smirnov would have been obligated to produce to his FBI handler. Despite the Government's false claims that they did not seek forensic evidence, what has come to light after the criminal trial is that the Government had access to forensic evidence of trading data for WRIT, a deal argued as intrinsic evidence of the charged ASNT deal. With the availability of forensic trading data in mind, the purported commissions charts produced by the Government, and relied upon by the SEC are false and misleading. (Hackett Decl., **Ex. PP**) The Government knew that Smirnov was involved with Hackett and Forster in this deal, when Forster verified the identity of Smirnov through text exchanges with Hackett. (Hackett Decl., **Ex. SS**) The Government would have also know that Smirnov was an FBI informant at the time in question, and subsequently would have had access to the evidence Smirnov obtained in connection with the investigation of Hackett.

C. <u>Non-disclosure of Exculpatory Evidence in the Criminal Case Denied Hackett a Full and Fair Trial</u>

The intentional non-disclosure of the aforementioned evidence allowed the Government to mislead the jury, deceive the court during its Motions in Limine, and provide a false presentation of the facts at trial. Hackett was denied evidence that would directly disprove the primary theory of the case, that Hackett engaged in manipulative trading of ASNT.

The SEC continues to use false and misleading evidence, through the commissions chart, to have the Court believe that because Hackett was provided the chart and subsequently paid the undercover agent's fees owed. The SEC's flawed position is that the two equate to Hackett selling his shares in connection with the undercover agent's buy orders. However, similar to the WRIT deal, Hackett was provided the

same commissions chart, the same undercover agent purchased WRIT stock, Hackett paid the undercover agent's fees for WRIT, but what would have been revealed through Smirnov's material evidence is that Hackett did not instruct Smirnov to match trades with the undercover agent's buy orders. Smirnov's brokerage records would prove this fact. If the intent was to match trades with the undercover agent's buy orders, Smirnov's bank records would show that Smirnov paid Hackett for the matched trades. However, bank records cannot show such a transaction because Smirnov did not compensate Hackett for any matched trades. Yet, Hackett still paid the undercover agent's commissions solely for marketing and awareness efforts, which does not constitute a manipulation. See, e.g., § 9 of the 1934 Act, 15 U.S.C. § 78i (prohibiting specific manipulative practices); *Ernst & Ernst*, supra, at 195, 199 n. 21, 205;

D. A Jury Must Weigh the Evidence

Ultimately, the two facts cannot be true. Either the Government stated the law correctly during its Motions in Limine hearing arguing that WRIT constituted intrinsic evidence of the charged scheme, and subsequently, the non-disclosure of the Smirnov WRIT evidence prevented Hackett a full and fair criminal trial. Or, the Government misstated the law in seeking to admit 404b similar act evidence. In both scenarios, Hackett was not afforded a full and fair trial in the criminal case—the conviction in which the SEC seeks a summary judgment.

As this Court recognized in it's July 1, 2024 Order, it held:

> "The SEC has acknowledged that the prior criminal investigation targeting Hackett resulted in recorded calls between Hackett and Smirnov, acting as a CHS; and (2) Smirnov has been charged with providing false information to the FBI in another matter, the Court is inclined to give wider latitude. In addition, with respect to the discovery related to Mr. Smirnov, Hackett has offered a plausible proffer of diligence: that Smirnov was not previously fully identified, and Hackett only recently learned that the FBI has accused him of dishonesty. (See ECF No. 193 at 2.) (ECF No. 222. at 12:7-13)

The jury, as the fact finder, must resolve the material factual disputes at issue in this case. The new facts that have come to light alter the circumstances surrounding, and the narrative concerning the previous criminal trial. The new facts bring into serious question the validity of Hackett's prior criminal conviction.

## V. CONCLUSION

For the foregoing reasons, Defendant respectfully requests the Court deny Plaintiff's motion and allow the case to proceed to trial on the merits.

Dated: August 19, 2024

/s/ Andrew Hackett
*pro se*
andrewyge@gmail.com